Mark E. Ferrario, Bar No. 1625
William L. Bryson, Bar No. 7292
Michael J. Schwartzer Bar No. 10747
**KUMMER KAEMPFER BONNER RENSHAW & FERRARIO**
3800 Howard Hughes Parkway Seventh Floor
Las Vegas, Nevada 89169
Telephone:  (702) 792-7000
Facsimile:  (702) 796-7181

Christopher F. Wong Cal. Bar No. 142507 (admitted *pro hac vice*)
Adam J. Thurston, Cal. Bar No. 162636 (admitted *pro hac vice*)
Ryan S. Fife, Cal. Bar No. 235000 (admitted *pro hac vice*)
**EISENBERG RAIZMAN THURSTON & WONG LLP**
10880 Wilshire Boulevard, Eleventh Floor
Los Angeles, California 90024
Telephone:  (310) 445-4400
Facsimile:   (310) 445-4410

Attorneys for Plaintiffs
FSP Stallion 1, LLC through FSP Stallion 26, LLC, inclusive

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| FSP STALLION 1, LLC, et al.,<br><br>                    Plaintiffs,<br>vs.<br><br>MICHAEL F. LUCE, et al.,<br><br>                    Defendants. | Case No.:  2:08-cv-01155-PMP-PAL<br><br>**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS THE COMPLAINT**<br><br>**Oral Argument Requested** |

        Plaintiffs FSP Stallion 1, LLC through FSP Stallion 26, LLC, inclusive (collectively,

"Plaintiffs"), hereby oppose the motion to dismiss the Complaint brought by defendants William

T. Walters ("Walters") Golf Club Of Nevada, Inc. ("Golf Club"), Walters Golf ("Walters Golf")

and Las Vegas Preferred Tee Times, LLC ("Tee Times") (collectively, the "Moving Defendants"

or "Walters Parties"), joined by defendants Michael F. Luce ("Luce"), Joe R. Munsch

("Munsch"), , Fairway Signature Properties, LLC ("Fairway"), Evergreen Alliance Golf Limited,

1   L.P. ("EAGL"), and Stallion Mountain LeaseCo, LLC ("LeaseCo") (collectively, the "Joining

2   Defendants" or "Luce/Munsch Parties").

3

4                      **MEMORANDUM OF POINTS AND AUTHORITIES**

5   **I.     INTRODUCTION**

6          Defendants' Motion is based upon the contention that the Complaint fails to allege the

7   misrepresentations and omissions constituting the fraud with sufficient specificity.  The Motion

8   argues that the Complaint contains only general allegations of "fraud by hindsight," without ever

9   identifying specific false statements of historical fact, or specific material facts that were

10  withheld which would make the statements and projections in the Private Placement

11  Memorandum ("PPM") misleading.  However, defendants' Motion makes these arguments by

12  simply ignoring the majority of the allegations in the Complaint.

13         The allegations not addressed by defendants' Motion demonstrate that the Complaint

14  relies upon the best and most direct way of demonstrating fraud:  The existence of undisclosed

15  contemporaneous inconsistent written information in defendants' possession which render the

16  Historical Performance Representations and Cash Flow Projections false and misleading.  For

17  example:

18       ●   The Complaint alleges that the PPM projected total revenues in the first year

19           as of January 2007 of $6,245,393, while the undisclosed contemporaneous

20           internal operating budget for the Property (attached to this opposition)

21           projected total gross revenue of only $4,871,489 for the same period.

22           Complaint ¶¶ 42, 42(a); Exhibit 3 p.2.

23       ●   The Complaint alleges that the PPM projected *positive* net cash flow of

24           $54,173 in the first year as of January 2007, while the undisclosed

KUMMER KAEMPFER BONNER
RENSHAW & FERRARIO
Seventh Floor
3800 Howard Hughes Parkway
Las Vegas, Nevada  89169

contemporaneous internal operating budget for the Property projected *negative* net cash flow in the amount of $684,899.  Complaint ¶¶ 42, 42(b); Exhibit 3 p.7.

● The Complaint alleges that the PPM projected a substantially higher number of golf rounds (the main revenue source and revenue driver for Stallion Mountain) in the first three years of operations than were projected by the undisclosed PwC Appraisal, *i.e.*: PwC projected 47,320 rounds in Year One compared to 51,901 in the Cash Flow Projections; PwC projected 45,931 rounds in Year Two compared to 53,198 in the Cash Flow Projections; and PwC projected 45,119 rounds in Year Three compared to 54,262 in the Cash Flow Projections.  Complaint ¶¶ 43(b); Exhibit 4.

● The Complaint alleges that defendants overstated the Historical Performance Representations (Complaint ¶¶ 37-39), which list Net Operating Income of $1,358,950 for the 12 month trailing period from September 2004 through August 2005, whereas the undisclosed PwC Appraisal lists Net Operating Income of only $492,535 for the 12 month trailing period from April 2004 through March 2005.  Exhibit 2.

● The Complaint alleges that defendants failed to disclose that net operating income, which was projected to substantially increase each year in the Cash Flow Projections, was down 73% in 2004 compared to prior years, and down 43% for the twelve month trailing period from April 2004 through March 2005.  Complaint ¶ 43(c); Exhibit 2.  The failure to disclose this negative trend is particularly egregious since the Cash Flow Projections assume

positive growth that would constitute a stunning, rapid and unlikely reversal

of this negative trend.

Defendants' Motion ignores these specific allegations, concentrating instead on more general allegations to argue that Plaintiffs have failed to plead with the requisite specificity. Similarly, defendants' Motion relies upon generalized cautionary language about the speculative nature of the investment and the Cash Flow Projections – which utterly fails to reveal any of the specific negative information alleged in the Complaint – to argue that defendants are insulated from liability by the bespeaks caution doctrine.  However, as the courts have recognized, the "doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away."  *In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996).  Such is the case here.  Defendants were not free to withhold the specific material negative information in their possession from the Plaintiffs as alleged in the Complaint.

The Complaint must be viewed as a whole, and all reasonable inferences must be drawn in plaintiffs' favor.  Plaintiffs need not prove their case at the pleading stage.  The Complaint satisfies the pleading requirements of Rule 9(b) and the PSLRA, and accordingly, the Motion should be denied.

## II.     STATEMENT OF FACTS

### A.     Background Allegations – the Scheme to Defraud

This case alleges a fraudulent scheme by the defendants to sell a struggling Las Vegas golf course at an inflated price to unsuspecting investors with little or no knowledge of the golf business generally or the Las Vegas golf market in particular.  Complaint ¶ 17.  Defendants structured the transaction as a private placement of undivided tenant in common ("TIC")

interests in the real property commonly known as the Stallion Mountain Country Club ("Stallion Mountain" or "Property"), bundled with a leaseback of the Property to defendant LeaseCo, an entity controlled by two of the individual defendants, Luce and Munsch, who would continue to operate it. *Id.* ¶ 18.

The Complaint alleges that this leaseback structure enabled defendants to target unsophisticated investors with little knowledge of or experience in the golf business, because defendants could tell potential investors that the golf course would continue to be operated by the defendants who held themselves out as experts in the field supposedly committed to the success of the venture. *Id.* The deal was structured to spread the $24.4 million offering price over many investors by offering undivided TIC interests as small as 1%. *Id.* ¶ 18. The cost of the investment was further reduced by virtue of a loan arranged by the defendants to cover $15.2 million of the $24.4 million offering price. *Id.* ¶ 19. However, this saddled the project with a heavy debt obligation making cash flow representations highly material, since significant cash flow would be required to service the debt. *Id.*

Defendant Golf Club owned and operated Stallion Mountain from 1997 to February 2006. Golf Club was under the direct control and influence of defendant Walters, its President and director. *Id.* ¶ 25. Golf Club and its principals were intimately familiar with Stallion Mountain and its business operations, including its financial performance, historic growth rate, revenue potential, and risk factors. Moreover, Golf Club, its principals and affiliates operated multiple golf courses in Las Vegas, and were intimately familiar with market conditions and factors that influence the financial performance of golf courses in the Las Vegas market generally, and Stallion Mountain in particular. *Id.*

Defendant Luce was a close business associate of Walters. *Id.* ¶ 26. Luce was the President and an owner of The Walters Group, an entity affiliated with Golf Club and Walters

Golf, both commonly owned with Walters.  *Id.*  Luce was also an officer of other Walters entities.  As such, Luce was intimately familiar with and had complete access to the business operations at Stallion Mountain, including its financial performance, historic growth rate, revenue potential, and risk factors.  *Id.*  Defendant Munsch was a close business associate of Luce and Walters.  Munsch was the President of defendant EAGL, a golf course management company headquartered in Texas that did business with Walters, Luce, and various Walters Group companies and affiliates.  *Id.* ¶ 27.  Munsch was also experienced in the operation of golf courses nationally, and in Las Vegas in particular.  *Id.*

Walters, Luce and Munsch formed defendant Fairway, which was in turn owned by two limited liability companies, one of which was owned and controlled by Luce, and the other by Munsch.  Fairway was formed to purchase Stallion Mountain from Golf Club and then act as the sponsor for the private placement of the TIC Interests.  *Id.* ¶ 32.  Walters, Luce and Munsch also formed LeaseCo to serve as the Master Tenant, which was owned and controlled by the same principals as Fairway, i.e., Luce and Munsch.  *Id.* ¶ 34.

**B.      Particularized Allegations – Defendants' False and Misleading Representations and Omissions**

Plaintiffs received and relied upon the Confidential Private Placement Memorandum ("PPM") prepared by defendants in deciding to invest in the TIC Interests, and would not have invested in the TIC Interests had the true facts and risk factors relevant to the investment been fully and accurately disclosed to them.  *Id.* ¶¶ 20, 36.  Walters, Luce, Munsch and their respective entities, Fairway, LeaseCo, EAGL and Golf Club, each played a significant role and substantially participated in the drafting and preparation of the PPM.  *Id.* ¶ 30.  In the PPM, these defendants made misleading representations and material omissions designed to create the appearance that Stallion Mountain was capable of generating sufficient revenue to service a $15,250,000 loan secured by the Property, and provide a return on a $9,230,000 equity

investment in the range of 8.25% to 8.75% over the course of seven years. *Id.* ¶ 28. However, based on their experience operating Stallion Mountain over the previous nine years with complete access to operational and financial performance information, Walters, Luce and Munsch knew that Stallion Mountain was not capable of generating sufficient revenue to service a $15.25 million debt on the Property, let alone provide an 8.25% return on a $9.23 million investment over and above the debt service. *Id.* ¶ 29.

More specifically, Exhibit G of the PPM contained representations relating to the historical economic performance of Stallion Mountain for the time period September 2004 through August 2005, including the number of golf rounds, total golf revenue, merchandise, food and beverage and other miscellaneous revenue, membership revenue, costs, operating expenses, net operating income and net cash flow (the "Historical Performance Representations"). *Id.* ¶ 37; Exhibit 1.[1] These Historical Performance Representations are alleged to be false and misleading as described below.

### 1.    The False and Misleading Historical Performance Representations are Specifically Alleged

The Complaint alleges that defendants manipulated and overstated the Historical Performance Representations to make them appear more favorable. Complaint ¶¶ 37-39. In the PPM, defendants' Historical Performance Representations list Net Operating Income ("NOI") of $1,358,950 for the 12 month trailing period from September 2004 through August 2005. *Id.* ¶ 38; Exhibit 1. This figure is in marked contrast with the actual performance of Stallion Mountain during the next two years, each of which produced over $1 million less in cash flow than the historical figure reported in the PPM. *Id.* ¶ 38. But, contrary to defendants' contention

---

[1]    For convenience, an excerpt of Exhibit G to the PPM containing the Historical Performance Representations and Cash Flow Projections, which has been annotated to highlight the referenced statements, is attached hereto as Exhibit 1. The entire PPM, of which this document is a part, is attached to defendants' Motion as Exhibit A.

1   in the Motion, this is ***not*** the only basis for alleging that the Historical Performance

2   Representations were false and misleading.

3          The Complaint further alleges that defendants failed to disclose material negative

4   information in their possession that was contained in an appraisal of the Property performed by

5   PriceWaterhouseCoopers in June 2005 (the "PwC Appraisal").   Complaint ¶ 43.   The

6   undisclosed PwC Appraisal lists NOI of only $492,535 for the 12 month trailing period from

7   April 2004 through March 2005 (Exhibit 2).[2]  This is over $866,000 (63.7%) less than the NOI

8   of $1,358,950 for the twelve month trailing period reported in the PPM.[3]   This massive

9   difference between the net operating income figure reported in the PPM and the figure reported

10  in the undisclosed PwC Appraisal is sufficient in and of itself to support the Complaint's

11  allegations that the Historical Performance Representations were false and misleading.  When

12  combined with the fact that the cash flow during the following two years was more than $1

13  million less the historical $1,358,950 figure reported in the PPM, the allegations are compelling

14  that the Historical Performance Representations were false and misleading.

15

16

17

18  [2]      For convenience, excerpts of the PwC Appraisal which, have been annotated to highlight
    the relevant portions, are attached hereto as Exhibits 2, 4, 5 and 6.  Defendants attached the PwC
19  Appraisal as Exhibit D to the Motion to Dismiss.  However, the document supplied with the
    Motion ends at page 52, while the actual PwC Appraisal contains 127 pages, not including
20  addenda.  Because Defendants did not attach a complete copy of the PwC Appraisal as Exhibit D
    to the Motion, a complete copy of the 127 page Appraisal (not including addenda) is attached
21  hereto, and is also designated as Exhibit D for consistency.  Exhibits 2, 4, 5, and 6 are merely
    excerpts of the complete version of Exhibit D.

22  [3]      Although the twelve month trailing period reported in the PwC Appraisal is five months
    earlier than the twelve month trailing period reported in the PPM, seven of the twelve months
23  overlap between the two trailing periods, and there is no basis upon which to assume that
    Stallion Mountain's financial performance improved dramatically during this five month period.
24  To the contrary, Stallion Mountain's actual performance only deteriorated with the passage of
    time. *See e.g.*, Complaint ¶¶ 38, 51.

2.      **The False and Misleading Gross Revenue Representations in the Cash Flow Projections are Specifically Alleged**

The Complaint alleges that defendants compounded the fraud by using the false and misleading Historical Performance Representations as the starting point for projected upward trending net operating income and cash flow over the next eight years ending January 2007 through January 2014 (the "Cash Flow Projections").  *Id.* ¶ 40; Exhibit 1.   The Cash Flow Projections reflected positive net cash flow to LeaseCo after the payment of Base Rent, Additional Rent, and all expenses.   *Id.*   The PPM specifically stated that the Cash Flow Projections are based upon "capitalization rates that are ***reasonable*** based upon historical sales comparisons, budgeted expenses and capital costs for the Property growing at ***historically reasonable*** rates for the Property and the industry, revenues for the Property growing at ***historically reasonable rates*** for the Property and the industry."  *Id.* ¶ 41.   The PPM further stated that the "Sponsor believes there will be a substantial increase in net operating income" at Stallion Mountain following the sale of the Property to the investors.  *Id.*

The Complaint alleges that these representations were false and misleading.   Specifically, the Complaint alleges that defendants failed to disclose an internal operating budget for the Property created in November 2005, contemporaneous with the Cash Flow Projections contained in the PPM, which contained revenue figures that contradicted the Cash Flow Projections.  *Id.* ¶ 42, 42(a).   In this regard, the PPM projected total revenues in the first year as of January 2007 of $6,245,393.  *Id.* ¶ 42(a); Exhibit 1.   However, defendants failed to disclose that LeaseCo had internally budgeted much lower total gross revenue of $4,871,489 for the same period.   Complaint ¶ 42(a); Exhibit 3 at p.2.[4]   The difference between the revenue figure in the Cash

---

[4]      Exhibit 3 is referenced in the Complaint at ¶¶ 42, 42(a), and 42(b), and may therefore be considered by the Court.   Exhibit 3 was provided to plaintiffs by defendants Luce and Munsch at a meeting in July 2007, and was represented to be the internal financial documents of LeaseCo.

Flow Projections and the internally budgeted revenue figure was $1,373,904, an amount of money that would quite literally mean the difference between a successful year in which the Property operates well in the black and plaintiffs receive their expected return on investment, and one which is an unmitigated financial disaster in which the Property operates so far in the red that a cash infusion of hundreds of thousands of dollars would be required to prevent foreclosure.

Thus, the Complaint alleges very specifically that in November 2005, contemporaneously with the publication of the PPM (Complaint ¶ 42), and at a time when Golf Club still owned Stallion Mountain and was therefore the ultimate source of all information regarding its operations (*id.* ¶ 25), defendants had internally budgeted revenue figures that were materially lower than the figures they published in the PPM Cash Flow Projections.  The Complaint cites, and this Opposition attaches, an internal LeaseCo document received from defendants that corroborates these highly specific allegations.  Exhibit 3.

> **3.      The False and Misleading Net Cash Flow Representations in the Cash Flow Projections are Specifically Alleged**

In addition to citing the disparate gross revenue figures discussed above, the Complaint alleges that defendants had internally budgeted cash flow projections that contradicted the rosy picture created by the Cash Flow Projections contained in the PPM.  Complaint ¶¶ 42, 42(b). Specifically, the PPM projected *positive* net cash flow of $54,173 in the first year as of January 2007.  *Id.* ¶ 42(b); Exhibit 1.  However, the undisclosed contemporaneous internal operating budget for the Property projected *negative* net cash flow in the amount of $684,899.  Complaint ¶¶ 42, 42(b); Exhibit 3 at p. 7.  This difference of over $739,000 between the undisclosed internal projections and the projections published in the PPM is highly material.  Under the Cash Flow Projections in the PPM, the Property would be expected to generate sufficient positive cash flow in the first year to not only service the debt, but also pay the plaintiffs their return on investment and provide $54,173 in profit to LeaseCo.  By contrast, under the undisclosed

internal budget, the cash flow generated by the Property would be insufficient to service the Property's obligations, LeaseCo's $500,000 in cash reserves would be entirely depleted within the first year of operations, plaintiffs would not be paid their expected return on investment, and large cash infusions would be required to prevent foreclosure.  This is precisely what occurred. Complaint ¶ 51.

### 4. The Failure to Disclose Material Negative Information Regarding Golf Round Projections and Declining Membership is Specifically Alleged

The Complaint further alleges that the golf round figures presented in the Cash Flow Projections were false and misleading because Defendants failed to disclose material negative information in their possession that was contained in the PwC Appraisal, including golf round projections that were much lower in the near term than what was projected in the PPM, and downward trending membership levels that were projected to decline over the first few years of operation.  Complaint ¶¶ 43, 43(b), 43(c).

With respect to the undisclosed information in the PwC Appraisal relating to golf round projections, the Complaint alleges that the PwC Appraisal projected significantly fewer golf rounds each year during the first three years of operation than the Cash Flow Projections. Specifically, for Year One PwC projected 47,320 rounds compared to 51,901 in the Cash Flow Projections.  For Year Two, PwC projected 45,931 rounds compared to 53,198 in the Cash Flow Projections.  And for Year Three, PwC projected 45,119 rounds compared to 54,262 in the Cash Flow Projections.  *Id.* ¶ 43(b); Exhibit 1; Exhibit 4.

With respect to membership levels, the Complaint alleges that defendants failed to disclose the fact that membership levels had been in decline, and that the PwC Appraisal contained negative projections relating to membership levels.  Complaint ¶ 43(c).  In this regard, the undisclosed PwC Appraisal stated:

Historically, the full ***dues paying membership has exhibited an overall declining trend over the last five to seven years***. Based on the club's recent performance and interviews with ownership, it is believed that the full dues paying membership may encounter further downfall and resignation of members as ***the current membership market remains soft and sales are expected to be slow in the short term (about two to three years).*** Thus the net effect is anticipated to be a decline in members.

*   *   *

Although our market research indicates that private clubs in the Las Vegas area realize member turnover rates ranging from 5% to 15% per year, and the national average is approximately 7% to 9%, we must acknowledge and be cognizant of the current situation at the subject club, i.e, closing of two 18-hole golf courses, current marketing of the subject club for sale, etc. which quite possibly resulted in disheartened members and their departure from the club. ***Therefore, we estimate attrition in 25% in Year One, 15% in Year Two, 10% in Year Three, and stabilizing at 6% in Year Four*** (when the surrounding residential developments are proposed to reach build-out) and thereafter.

Exhibit 5 (emphasis added).

Thus, the PwC Appraisal was contrary to the Cash Flow Projections regarding Stallion Mountain's financial performance during the first three years of operations, both in terms of golf rounds and dues paying membership. The failure to disclose this information concerning the near term performance of Stallion Mountain renders the Cash Flow Projections misleading. Although a reasonable investor would certainly be interested PwC's conclusion as to the overall value of the Property based upon the cumulative total of seven years of projected income data, a reasonable investor would also be interested in information relating to the near term performance of the Property. A reasonable investor would certainly want to know whether the Property was expected to face significant financial challenges of this nature in the near term since cash flow shortages could eliminate any return on investment and potentially require additional infusions of cash to avoid foreclosure. Accordingly, the negative information regarding the expected near term performance of Stallion Mountain contained in the PwC Appraisal is material, and its disclosure was required, notwithstanding the fact that PwC's ultimate valuation conclusion based

upon the cumulative total of seven years of projected income data arguably supported the offering price.

### 5.   The Failure to Disclose the Dependence upon the Walters Defendants for Golf Round Referrals is Specifically Alleged

The Complaint alleges that defendants failed to fully and accurately disclose the fact that a material portion of Stallion Mountain's golf rounds, which constituted $3.25 million of Stallion Mountain's total revenue of $5.79 million for the time period referenced in the Historical Performance Representations, were derived from referrals from Walters and his affiliated companies, rather than from revenue generated independently of Walters.  Complaint ¶ 44.  The PwC Appraisal specifically referenced Stallion Mountain's "reciprocal affiliation with other clubs" and "exclusive agreement with Las Vegas Hotels" through Walters/Golf Club as "salient features" of Stallion Mountain and its market.  *Id.*; Exhibit 6.  The Complaint alleges that Walters' exclusive relationships with many of the major resorts on the Las Vegas Strip gave him control over a large portion of the local resort referral business for golf rounds.  Complaint ¶ 44.

The Complaint alleges that the failure to disclose this dependence on Walters was a critical and material omission because golf round referrals from Walters diminished and ultimately stopped following the sale of Stallion Mountain to the plaintiffs.  *Id.* ¶45.  This had a materially adverse impact on Stallion Mountain revenue that contributed to the failure of the investment.  *Id.*  None of the generalized disclosures regarding conflicts of interest specifically references Walters, his exclusive agreement with Las Vegas hotels, or the fact that a material portion of Stallion Mountain's golf rounds were dependant upon his referrals.

### 6.   The Failure to Disclose Material Negative Information Regarding Historical Declines in Net Operating Income is Specifically Alleged

Finally, the Complaint alleges that defendants failed to disclose that net operating income, which was projected to substantially increase each year in the Cash Flow Projections,

was down 73% in 2004 compared to prior years, and down 43% for the twelve month trailing period from April 2004 through March 2005.   Complaint ¶ 43(c); Exhibit 2.   The failure to disclose this alarmingly negative trend renders the single column of historical data comprising the Historical Performance Representations (*see* Exhibit 1) misleading in a number of respects. First, the Historical Performance Representations are presented as a single year "snapshot" of financial data without further context.  Exhibit 1.  In retrospect, it is obvious why the defendants did this rather than presenting more than one year's worth of data, *i.e.*, to avoid disclosing and attempting to explain to potential investors the alarming downward trend of net operating income.  A reasonable investor presented with such a snapshot would want to know if it was part of a steep downward trend.   Presenting this data without disclosing its negative context is misleading.   Second, the Historical Performance Representations are presented as a baseline from which the Cash Flow Projections are then projected using positive growth assumptions. Such positive growth assumptions may not appear reasonable to a potential investor if the baseline figures are part of an alarming downward trend that would need to be completely reversed in a very short time in order for the positive growth assumptions in the Cash Flow Projections to be accurate.  In this context, the use of the Historical Performance Representations as a baseline from which to build the Cash Flow Projections is misleading due to defendants' failure to disclose the steep downward NOI trend that preceded them.

C.     **Allegations of Scienter – Defendants' Intentional or Reckless Conduct in Making the False and Misleading Statements and Omitting Negative Information**

The Complaint alleges that Golf Club owned and operated Stallion Mountain when the PPM was issued in November 2005.  Complaint ¶ 25.  Plaintiffs allege that because Stallion Mountain was owned and operated by Golf Club during the relevant time, Golf Club and its principals, including Walters and Luce, were in possession of all the detailed financial,

operational, and market information relating to Stallion Mountain at the time that the false and misleading statements and omissions were made. *Id.* ¶¶ 25, 26. The Complaint alleges that Golf Club and its principals Walters and Luce, as well as Munsch as a business associate of Luce and Walters and a principal of Fairway and EAGL, had complete access to nine years of operational and financial performance information for Stallion Mountain. *Id.* ¶ 29. Further, the Complaint alleges that Walters, Luce and Munsch, the principals of Golf Club, Fairway, LeaseCo and EAGL, systematically and intentionally made the false and misleading statements and omissions armed with knowledge of their falsity based upon nine years of operational and financial performance information for Stallion Mountain. *Id.* ¶ 29. Walters, Luce, Munsch and their respective entities, Fairway, LeaseCo, EAGL and Golf Club each played a significant role and substantially participated in the drafting and preparation of the PPM. *Id.* ¶ 30.

In addition to having actual access to and knowledge of nine years of operational and financial performance information for Stallion Mountain, the Complaint alleges that Golf Club, Walters, Luce Munsch and Fairway had possession of the PwC Appraisal, which was referenced in the PPM at page 1, but never provided to Plaintiffs. Complaint ¶ 43. Moreover, the Complaint alleges that Luce and Munsch, through their commonly owned and controlled entity LeaseCo, generated an internal operating budget in November 2005, contemporaneous with the publication of the PPM. *Id.* ¶ 42. This budget is reflected in an internal LeaseCo income statement for the 2006 calendar year, which is referenced in paragraph 42 of the Complaint, and attached to this Opposition as Exhibit 3. Since Stallion Mountain was owned and operated by Golf Club and its principals Walters and Luce during this time, the source of the information in the internal budget, as well as in the PPM, is necessarily Golf Club.

Thus, with respect to the misrepresentation of net operating income in the Historical Performance Representations (*see* section II.B.1., above), the Complaint alleges that the true net

operating income figure was in the possession of Walters, Luce, Munsch, Golf Club, Fairway and EAGL, and that the inconsistent net operating income figure contained in the PwC Appraisal was in their possession.  Complaint ¶¶ 25, 26, 29, 43.  Accordingly, if the allegation that the net operating income figure in the PPM's Historical Performance Representations was false and misleading is accepted (as it must be on this Motion), the Complaint alleges that this actionable statement was made with actual knowledge of its falsity by each of these defendants, who necessarily would have been in possession of the true information.  *Id.*  At a minimum, the facts alleged in the Complaint support a strong inference of actual knowledge or recklessness in making this statement.

With respect to the false and misleading gross revenue figure in the Cash Flow Projections (*see* section II.B.2., above), the Complaint alleges that this figure was contradicted by the contemporaneous internal budget created by Luce and Munsch.  Complaint ¶ 42(a); Exhibit 1; Exhibit 3 at p.2.  Since Golf Club owned and operated Stallion Mountain in November 2005, and was the ultimate source and custodian of financial and operational information relating to Stallion Mountain, and since Luce and Munsch, the principals of LeaseCo, created the budget, Golf Club, Walters, Luce Munsch Golf necessarily had actual knowledge of the internal budget.  Complaint ¶¶ 25, 26, 29.  Similarly, EAGL had the knowledge of its president, Mr. Munsch, a common principal of LeaseCo, which issued the internal budget.  *Id.*  Accordingly, the Complaint alleges that these defendants made the misleading statement and omission relating to the gross revenue figure in the Cash Flow Projections with actual knowledge of its false and misleading nature, and with actual knowledge of contradictory internal budget information that was not disclosed in the PPM.  At a minimum, the facts alleged in the Complaint support a strong inference of intentional deceit or recklessness disregard of the facts by these defendants in publishing the gross revenue projection in the PPM.

With respect to the false and misleading net cash flow figure in the Cash Flow Projections (*see* section II.B.3., above), the analysis and allegations are exactly the same as for the gross revenue figure in the Cash Flow Projections discussed immediately above.  In both cases, the source of the undisclosed contradictory information is the internal budget prepared by Luce and Munsch through LeaseCo.  Thus, the Complaint alleges that defendants made the misleading statement and omission relating to the cash flow figure in the Cash Flow Projections with actual knowledge or reckless disregard of its false and misleading nature, and with actual knowledge or reckless disregard of contradictory internal budget information that was not disclosed in the PPM.

With respect to the failure to disclose the negative information in the PwC Appraisal relating to golf round projections and declining membership (*see* section II.B.4., above), the Complaint alleges that the PwC appraisal was in the possession of Walters, Luce and Munsch, the collective principals of Golf Club, Fairway, LeaseCo and EAGL.  Complaint ¶ 43.  Thus, the Complaint alleges that each of these defendants knowingly withheld this negative information from plaintiffs, or at least acted recklessly in withholding it.  Further, the PwC Appraisal specifically states that the declining membership projections were based in part on "interviews with ownership" (Exhibit 5), which provides additional confirmation that this negative information was knowingly or recklessly withheld.

With respect to the failure to disclose the dependence upon the Walters Defendants for golf round referrals (*see* section II.B.5., above), the Complaint alleges actual knowledge by Walters, Luce, Munsch, Golf Club, Fairway, LeaseCo and EAGL.  Obviously, Golf Club and its principals, Walters and Luce, had knowledge of their own exclusive contracts and referral agreements with Las Vegas hotels and other golf clubs.  Complaint ¶ 44.  They also necessarily had knowledge of the referrals given to Stallion Mountain under these agreements.  *Id.* ¶¶ 25, 26,

29, 44.   Similarly, Luce and Munsch and the entities they controlled, Fairway, LeaseCo and EAGL, had total access and detailed knowledge of Stallion Mountain's operations, and therefore necessarily knew about the Golf Club referrals.   *Id.* ¶¶ 25, 26, 29.   Finally, Walters, Luce, Munsch, Golf Club, Fairway, LeaseCo and EAGL all were in possession of the PwC Appraisal identifying Golf Club's exclusive agreements with Las Vegas hotels and reciprocal affiliations with other clubs as "salient features" of Stallion Mountain's market demand and trends.   *Id.* ¶¶ 43, 44; Exhibit 6.   Thus, the Complaint alleges that each of these defendants knowingly withheld this information which was not disclosed in the PPM they all drafted.   Complaint ¶ 30.

With respect to the failure to disclose the historical declines in net operating income (*see* section II.B.6., above), the Complaint alleges that the historical net operating income figures were in the direct possession of Walters, Luce, Munsch, Golf Club, Fairway and EAGL because they had access to and intimate knowledge of Stallion Mountain's operations and financial performance over the prior nine years.   Complaint ¶¶ 25, 26, 29.   In addition, the Complaint alleges these defendants were in possession of the PwC Appraisal, which also contained these net operating income figures taken from Stallion Mountain's financial records.   *Id.* ¶ 43; Exhibit 2.   Accordingly, the Complaint alleges that each of these defendants knowingly, or at least recklessly, withheld this information, which was not disclosed in the PPM they all drafted.   *Id.* ¶ 30.

## III.   ARGUMENT

### A.   Legal Standards

The legal standards applicable to a motion to dismiss a federal securities fraud claim under Rule 9(b) of the Federal Rules of Civil Procedure ("F.R.C.P.") and the Private Securities Reform Act of 1995 ("PSLRA") are well settled.   "When ruling on a 12(b)(6) motion to dismiss a § 10(b) action, courts must consider the complaint in its entirety, including documents

incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Rosenbaum Capital, LLC v. McNulty*, 549 F.Supp.2d 1185, 1189 (N.D. Cal. 2008). "In considering a Motion to Dismiss, the factual allegations of a complaint must be presumed to be true, and this Court must draw all reasonable inferences in favor of the plaintiff. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). The issue is not whether the plaintiffs will ultimately prevail, but whether they are entitled to offer evidence in support of their claims. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)." *In re Stratosphere Corp. Sec. Litig.*, 1 F. Supp. 2d 1096, 1103 (D. Nev. 1998).

"It is not the Court's role to weigh evidence which could possibly be presented at trial, the Court must merely determine if the Complaint itself is legally sufficient. *In re Health Management, Inc. Sec. Litig.*, 970 F.Supp. 192, 199 (E.D.N.Y. 1997)." *Stratosphere Corp. Sec. Litig.*, 1 F. Supp. 2d at 1103. "A complaint should not be dismissed unless it appears beyond a doubt that the plaintiff cannot prove any set of facts in support of the claim that would entitle him or her to relief." *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 931 (9th Cir. 2003).

### B.    The Complaint Alleges Fraudulent Statements and Omissions with the Requisite Particularity

"Under Rule 9(b), a plaintiff must set forth an 'explanation as to why the statement or omission complained of was false or misleading.' *In re GlenFed*, 42 F.3d at 1548. The most direct method of proving false or misleading statements is to cite inconsistent contemporaneous statements or internal information available to defendants. *Id.* at 1549. A plaintiff may also use later statements by defendants, such as 'I knew it was false all along.' *Id.* at 1549 n. 9. Additionally, circumstantial evidence will satisfy Rule 9(b) if it explains how and why the statements were misleading when made. *Fecht v. Price Co.*, 70 F.3d 1078, 1083 (9th Cir. 1995)." *Stratosphere Corp. Sec. Litig.*, 1 F.Supp.2d at 1103-1104.

Under the PSLRA the complaint "shall specify each statement alleged to have been misleading, and the reason or reasons why the statement is misleading ...." 15 U.S.C. § 78u-4(b)(1). If the defendant's state of mind is an element of the cause of action, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

### 1.    The Complaint Specifically Alleges a False Representation of Historical Fact

Defendants fail to address the specific allegations of false and misleading statements and omissions discussed in section II., above. Instead, Defendants simply state in conclusory fashion that the Complaint is "devoid of any specific identification of a misrepresentation of any historical fact." However, as demonstrated in detail in section II.B.1. above, the Complaint specifically alleges that the Net Operating Income figure of $1,358,950 for the 12 month trailing period from September 2004 through August 2005 contained in the PPM's Historical Performance Representations is false and misleading. *Id.* ¶ 38; Exhibit 1. Further, this allegation is corroborated by the undisclosed PwC Appraisal, which shows net operating revenue of $492,535 for the 12 month trailing period from April 2004 through March 2005. Exhibit 2. Thus, the Complaint does, in fact, identify with specificity a false representation of historical fact.

### 2.    The Complaint Specifically Alleges Actionable Material Omissions

Defendants also argue that the Complaint fails to allege actionable omissions, but they once again ignore many of plaintiffs' allegations. For example, the Motion does not address the failure to disclose the contemporaneous internal operating budget for Stallion Mountain that contradicts the Cash Flow Projections. *See* Sections II.B.2 and II.B.3., above; Complaint ¶¶ 42, 42(a), 42(b); Exhibit 3. This was clearly a material omission.

1    Materiality is determined under the reasonable investor standard.  *No. 84 Employer-*

2    *Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 934

3    (9th Cir. 2003).  In the Section 10(b) and Rule 10b-5 context, "a fact is material if there is a

4    substantial likelihood that a reasonable investor would consider it important in his or her decision

5    making." *Id.*  "[T]o fulfill the materiality requirement, there must be a substantial likelihood that

6    the disclosure of the omitted fact would have been viewed by the reasonable investor as having

7    significantly altered the total mix of information made available.  In other words, materiality

8    depends on the significance the reasonable investor would place on the withheld or

9    misrepresented information." *Id.* (citation omitted).  Moreover, "[w]hether an omission is

10   material is a determination that requires delicate assessments of the inferences a reasonable

11   shareholder would draw from a given set of facts and the significance of those inferences to him,

12   and these assessments are peculiarly ones for the trier of fact." *Provenz v. Miller*, 102 F.3d 1478,

13   1489 (9th Cir. 1996) (citations omitted).

14   It cannot be disputed that a reasonable investor considers financial projections important

15   in making a decision about whether to invest in a particular investment.  *Id.* (denying motion for

16   summary judgment because jury could find defendants' omissions regarding negative internal

17   forecasts were material).  Withholding internal projections or other material facts necessary to

18   make statements or projections not misleading gives rise to a Rule 10b-5 claim.  *Rosenbaum*

19   *Capital, LLC*, 549 F.Supp.2d at 1189 (N.D. Cal. 2008); 17 C.F.R. § 240.10b-5 ("It shall be

20   unlawful…[t]o make any untrue statement of a material fact or to omit to state a material fact

21   necessary in order to make the statements made, in the light of the circumstances under which

22   they were made, not misleading.").

23   Defendants' Motion also fails to address defendants' concealment of the sharply

24   declining trend in net operating income in the years leading up to the twelve month trailing

1   period that is the subject of the Historical Performance Representations.  *See* Section II.B.6.,

2   above; Complaint ¶ 43(c), 42(b); Exhibit 2.[5]  This was also a material omission under the law, as

3   it rendered the snapshot of net operating income provided in the PPM misleading, particularly as

4   the starting point for the Cash Flow Projections which assumed positive growth that would

5   represent a rapid and unlikely reversal of the undisclosed historical trend.  *See No. 84 Employer-*

6   *Teamster Joint Council Pension Trust Fund*, 320 F.3d at 934.

7          Although the Motion does address the failure to disclose the negative information in the

8   PwC Appraisal relating to golf round projections, defendants argue that they were free to

9   withhold negative projections in the PwC Appraisal, because an "issuer need not reveal all

10  projections" so long as the projections provided have a reasonable basis.  Motion p. 19, citing

11  dicta from *In re Stac Electronics Sec. Litig.*, 89 F.3d 1399, 1411 (9th cir. 1996).  However, this

12  argument asks the Court to assume that defendants, as a matter of fact, had a reasonable basis for

13  the Cash Flow Projections that are contradicted by the PwC Appraisal.  *In re Stac Electronics*

14  *Sec. Litig.* certainly does not support such an assumption in this case.  The issue in *In re Stac*

15  *Electronics Sec. Litig.* was whether the complaint adequately alleged that outside directors,

16  venture capital providers, or underwriters were involved in making made certain statements

17  issued by the company.  *Id.* at 1411.

18         The PwC Appraisal, on its face, appears to have a reasonable basis for the number of

19  rounds forecasted, which were substantially lower in the near term than the rounds forecasted in

20  the Cash Flow Projections.  Defendants were not free to withhold this information from

21  Plaintiffs, particularly since the Complaint alleges ample facts demonstrating that the Cash Flow

22  Projections lacked a reasonable basis, including the existence of undisclosed contradictory

23  internal budget projections.  Whether adverse facts were adequately disclosed are generally

24

KUMMER KAEMPFER BONNER
RENSHAW & FERRARIO
Seventh Floor
3800 Howard Hughes Parkway
Las Vegas, Nevada 89169

---

[5]     The Motion also does not address defendants' failure to disclose other material historical

questions that should be left to the trier of fact. *Fecht v. The Price Co.*, 70 F.3d 1078, 1081 (9th Cir.1995), *cert. denied*, 517 U.S. 1136, 116 S.Ct. 1422, 134 L.Ed.2d 547 (1996). "[O]nly if the adequacy of the disclosure or the materiality of the statement is 'so obvious that reasonable minds [could] not differ' are these issues 'appropriately resolved as a matter of law.' " *Id.* (quoting *Durning v. First Boston Corp.*, 815 F.2d 1265, 1268 (9th Cir.), *cert. denied*, 484 U.S. 944, 108 S.Ct. 330, 98 L.Ed.2d 358 (1987)).

**C.    The Bespeaks Caution Doctrine does not bar Plaintiffs' Claims Because the Generalized Cautionary Language is Inadequate in Light of the Specific Information Omitted**

"The bespeaks caution doctrine provides a mechanism by which a court can rule as a matter of law… that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud." *In re Worlds of Wonder*, 35 F.3d 1407, 1413 (9th Cir. 1994).   "[A]n overbroad application of the doctrine would encourage management to conceal deliberate misrepresentations beneath the mantle of broad cautionary language.   To prevent this from occurring, the bespeaks caution doctrine applies only to precise cautionary language which directly addresses itself to future projections, estimates or forecasts in a prospectus.   By contrast, blanket warnings that securities involve a high degree of risk [are] insufficient to ward against a federal securities fraud claim." *Id.* at 1414.

The bespeaks caution doctrine does not grant a speaker a license to lie.   A speaker cannot wash away the misleading nature of a statement merely by bathing it in a sea of general cautionary language.   "If the forward-looking statement is made with actual knowledge that it is false or misleading, the accompanying cautionary language can only be meaningful if it either states the belief of the speaker that it is false or misleading, or, at the very least, clearly

---

information, such declining dues paying membership (Complaint ¶ 43(c); Exhibit 5).

KUMMER KAEMPFER BONNER
RENSHAW & FERRARIO
Seventh Floor
3800 Howard Hughes Parkway
Las Vegas, Nevada  89169

1    articulates the reasons why it is false or misleading." *Rosenbaum Capital, LLC*, 549 F.Supp.2d

2    at 1191 citing *In re SeeBeyond Tech. Corp. Sec. Litig.*, 266 F.Supp.2d 1150, 1165 (C.D. Cal.

3    2003).  As one court colorfully noted, the "doctrine of bespeaks caution provides no protection to

4    someone who warns his hiking companion to walk slowly because there might be a ditch ahead

5    when he knows with near certainty that the Grand Canyon lies one foot away." *In re Prudential*

6    *Sec. Inc. Ltd. Partnerships Litig.*, 930 F. Supp. at 72.

7         Thus, on a motion to dismiss, the Court should not find as a matter of law that statements

8    are inactionable due to the bespeaks caution doctrine unless the "adequacy of the disclosure or

9    the materiality of the statement is 'so obvious that reasonable minds [could] not differ'...." *In re*

10   *Syntex Corp. Sec. Litig.*, 95 F.3d 922, 926 (9th Cir. 1996); *In re Stratosphere Corp. Sec. Litig.*, 1

11   F. Supp. 2d at 1117.  A court may only rule that the bespeaks caution doctrine applies, and bars

12   an action, where statements contain enough cautionary language that no reasonable inference can

13   be drawn that the statement was misleading.  *In re Worlds of Wonder*, 35 F.3d at 1413.

14        Here, none of the generalized warning language in the PPM is sufficient to insulate

15   defendants' misleading statements in the Cash Flow Projections.  Defendants argue that they are

16   insulated by bespeaks caution because the PwC Appraisal is insufficient to demonstrate that the

17   defendants either (1) did not believe the Cash Flow Projections, (2) did not have a reasonable

18   basis to support a belief, or (3) were in possession of undisclosed facts tending to seriously

19   undermine the accuracy of the Cash Flow Projections.  Motion p. 18, citing *Provenz*, 102 F.3d at

20   1487.  However, Defendants' argument once again conveniently ignores critical allegations in

21   the Complaint.

22        None of the cautionary language in the PPM reveals that defendants were in possession

23   of an internal budget that contradicted the gross revenue and cash flow figures in the Cash Flow

24   Projections, and projected massive losses that would require large infusions of cash within the

first two years of operation in order to prevent foreclosure.  Complaint ¶¶ 42, 42(a), 42(b); Exhibit 1; Exhibit 3 pp. 2, 7.  This internal budget demonstrates that defendants did not, in fact, actually believe the Cash Flow Projections in the PPM, or at a minimum, that defendants were in possession of undisclosed information tending to seriously undermine the accuracy of the Cash Flow Projections.

Similarly, none of the cautionary language in the PPM reveals that net operating income, which was projected to substantially increase each year in the Cash Flow Projections, was down 73% in 2004 compared to prior years, and down 43% for the twelve month trailing period from April 2004 through March 2005.  Complaint ¶ 43(c); Exhibit 2.  The bespeaks caution doctrine cannot insulate defendants' positive growth statements in the Cash Flow Projections when the cautionary language failed to reveal the fact that an alarming downward trend in NOI would need to be completely reversed in a very short time in order for the positive growth assumptions in the Cash Flow Projections to be accurate.  Not surprisingly, this dramatic reversal of Stallion Mountain's fortunes did not occur, and the downward NOI trend continued.  Complaint ¶¶ 38, 51.  The Defendants were not free to withhold this critically material information merely because they included general warning language about the speculative nature of projections and future market conditions.

Finally, defendants' Motion argues at length that the cautionary language regarding conflicts of interest in the PPM is sufficient to insulate defendants from liability relating to the nondisclosure of Stallion Mountain's dependence on Walters for golf round referrals from Las Vegas hotels and golf clubs.  For the many reasons discussed above, it is ultimately inconsequential whether the cautionary language on this point is sufficient because the Cash Flow Projections would be fraudulent and actionable even without this particular omission.  However, the cautionary language relating to conflicts of interest does not insulate defendants

1   from liability because it does not disclose the fact that a material portion of Stallion Mountain's

2   golf round revenue is dependent upon Walters.   Nowhere does the cautionary language mention

3   Walters.   Instead, the cautionary language is directed at the principals of the Master Lessee

4   (LeaseCo), the Sponsor (Fairway), and the Property Manager (EAGL), i.e., Luce and Munsch.

5   Motion at p. 17.   Further, the cautionary language does not disclose the most salient point, which

6   is that the moment the Property is purchased, a significant portion of its revenue is likely to

7   evaporate because it is directly controlled by an undisclosed competitor.

8          These general warnings, like the warnings in *Stratosphere*, are insufficient to insulate

9   defendants from liability through the bespeaks caution doctrine.   *Stratosphere Corp. Sec. Litig.*, 1

10   F. Supp. 2d at 1118 ("Defendants knew of existing, specific cost overruns and construction

11   delays which would necessarily affect operating revenues once Stratosphere opened, they cannot

12   insulate these statements with general language about the risks inherent in every construction

13   enterprise. Therefore, this Court cannot rule as a matter of law that the bespeaks caution doctrine

14   insulates Defendants' statements.").

15          **D.      Scienter is Adequately Alleged**

16          In *Tellabs, Inc. v. Makor Issues & Rights, LTD.*, 127 S.Ct. 2499, 2509-2511, 168 L.Ed.2d

17   179 (2007), the Supreme Court set forth the analysis for evaluating the adequacy of scienter

18   allegations on a motion to dismiss a federal securities claim:

19          We establish the following prescriptions: First, faced with a Rule
           12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any

20          motion to dismiss for failure to plead a claim on which relief can be
           granted, accept all factual allegations in the complaint as true.

21
                                *    *    *
22
           Second, courts must consider the complaint in its entirety, as well as

23          other sources courts ordinarily examine when ruling on Rule 12(b)(6)
           motions to dismiss, in particular, documents incorporated into the
           complaint by reference, and matters of which a court may take judicial

24          notice. *See* 5B Wright & Miller § 1357 (3d ed.2004 and Supp.2007). The

1

2

inquiry, as several Courts of Appeals have recognized, is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.

3

\*   \*   \*

4

5

Third, in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences.

6

\*   \*   \*

7

8

9

10

11

12

The inference that the defendant acted with scienter need not be irrefutable, i.e., of the "smoking-gun" genre, or even the "most plausible of competing inferences," *Fidel*, 392 F.3d, at 227 (quoting *Helwig v. Vencor, Inc.*, 251 F.3d 540, 553 (C.A.6 2001) (en banc)). . . . Yet the inference of scienter must be more than merely "reasonable" or "permissible"--it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

13

\*   \*   \*

14

15

16

We reiterate, however, that the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically. *See supra*, at 2509 - 2510; 437 F.3d, at 601. **In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?**

17

*Tellabs*, 127 S.Ct. at 2509-2511, 168 L.Ed.2d 179 (emphasis added).

18

Thus, scienter is adequately alleged if the facts pled in the Complaint, taken as a whole,

19

support an inference of scienter that is at least as strong as any opposing inference.   Stated

20

another way, a tie goes to the plaintiffs.  *Id.*  Of course, one of the best ways to plead scienter is

21

to point to contemporaneous inconsistent statements by the defendants, or to information in their

22

possession showing different results from what was stated or predicted.  *Nursing Home Pension*

23

*Fund v. Oracle Corporation*, 242 F.Supp.2d 671, 680 (N.D. Cal. 2002); *Aldridge v. A.T. Cross*

24

*Corp.*, 284 F.3d 72, 83 (1st Cir.2002) ("the fact that the defendants published statements when

they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter."); *Rosenbaum Capital, LLC*, 549 F.Supp.2d at 1193 (denying defendants' motion to dismiss, stating "Plaintiff has alleged that Defendants knew of the problems with the integration yet still stated, in the May 4 press release, that the integration was going well and that its success would contribute to increased revenue. If these factual allegations are accepted as true, then Plaintiff has sufficiently pleaded violations of the Securities Exchange Act. . . . The totality of this evidence, combined with the fact that Secure missed its revenue projections, gives rise to a cogent and compelling inference of scienter.").

Here, as discussed in detail in section II.C., above, the Complaint alleges facts giving rise to a compelling inference of scienter with respect to each of the misrepresentations and omissions forming the basis of the securities fraud claims.  The Complaint alleges that Walters, Luce and Munsch and their affiliated entities, including Golf Club, were each personally involved in developing the scheme to defraud, and that they each substantially participated in the drafting of the PPM.  Complaint ¶¶ 25-30.  In addition, Golf Club and its principals, Walters and Luce, through their ownership and operation of Stallion Mountain over the course of nine years prior to the issuance of the PPM, as well as Munsch as a business associate of Luce and Walters and a principal of Fairway, LeaseCo and EAGL, were in possession and had actual knowledge of the true information relating to Stallion Mountain, and intentionally (or at lease recklessly) made misrepresentations and omitted material facts in their possession in order to make the offering appear more attractive to potential investors.  *Id.*

In addition, the Complaint alleges that each of the defendants were in possession of the PwC Appraisal, which was referenced in the PPM at page 1, but never provided to Plaintiffs. Complaint ¶ 43.  Moreover, the Complaint alleges that Luce and Munsch, through their commonly owned and controlled entity LeaseCo, generated an internal operating budget in

November 2005, contemporaneous with the publication of the PPM.  *Id.* ¶ 42.  This budget is reflected in an internal LeaseCo income statement for the 2006 calendar year, which is referenced in paragraph 42 of the Complaint, and attached to this Opposition as Exhibit 3.  Since Stallion Mountain was owned and operated by Golf Club and its principals Walters and Luce during this time, the source of the information in the internal budget, as well as in the PPM, is necessarily Golf Club.

Defendants' Motion ignores the allegations in paragraphs 25 – 30, 42, 42(a), 42(b) and 43 of the Complaint, focusing instead exclusively on the summary allegation at paragraph 68. Based on this paragraph, defendants argue that scienter is not adequately alleged because the group pleading doctrine (under which statements of an entity are attributed to those individuals with direct involvement in the everyday business of the company) does not apply and/or was eliminated by the PSLRA.  Motion p. 22.  Defendants are wrong on all counts.

First, the allegations of scienter are not confined to paragraph 68, and the Complaint, taken as a whole, supports an inference of intentional or reckless misrepresentations and omissions by defendants.

Second, this Court has held that the group pleading doctrine was not abolished by the PSLRA, and that it is permissible to allege that individual defendants, based upon their high-level positions, were privy to the undisclosed facts and participated in the drafting of the misleading statements issued by the entity.  *In re Stratosphere Corp. Sec. Litig.*, 1 F. Supp. 2d at 1108.

Third, it has long been held that an entity is imputed with the knowledge of its principals. *See Chartrand v. Barney's Club, Inc.*, 380 F.2d 97 (9th Cir. 1967) (imputing knowledge of a pre-incorporation contract to the corporation based upon the knowledge of its director); *Donovan v. Schmoutey*, 592 F.Supp. 1361, 1399 (1984) ("[t]he knowledge of a director, officer, sole

shareholder or controlling person of a corporation is imputable to that corporation."). Thus, Defendant's attack on the scienter allegations based upon "group pleading" are without merit.

### E.  Defendants' Remaining Arguments Should be Rejected

#### 1.  Because the Complaint Alleges Valid Primary Violations by Defendants, the Section 20(A) Claim Should be Sustained

As demonstrated above, the Complaint alleges a viable claim for primary violations by the defendants in the first claim for relief. Accordingly, defendants challenge of the section 20(a) claim for control person liability should be denied.

#### 2.  The Supplemental Claims Should be Sustained Because they are Related to the Federal Securities Claims

This court should retain supplemental jurisdiction of the state law claims in the Complaint because they are intimately related to the valid federal claims for securities fraud. Further, the court should retain jurisdiction of the state claims in any event because fairness considerations do weigh in favor of the plaintiffs. Neither of the state actions involves the same facts as the instant lawsuit, and it would be unfair to allow plaintiffs' claims to be subordinated to and delayed by the bank's foreclosure action and Walter's defensive claims for "waste" against the bank and the plaintiffs.

## IV.  CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that defendants' Motion be denied in its entirety. Plaintiffs further request that the hearing on this Motion be scheduled at

///

///

///

///

///

KUMMER KAEMPFER BONNER
RENSHAW & FERRARIO
Seventh Floor
3800 Howard Hughes Parkway
Las Vegas, Nevada  89169

30

1   the earliest possible opportunity so that plaintiffs are not subjected to an extended stay of

2   discovery under the PSLRA.

3   Respectfully submitted.

4   Dated:  December 1, 2008         **KUMMER KAEMPFER BONNER RENSHAW & FERRARIO**
                                     **EISENBERG RAIZMAN THURSTON & WONG LLP**

5

6

7                                    By: _____/s/ Adam J. Thurston_____
                                            ADAM J. THURSTON
                                            10880 Wilshire Boulevard, Eleventh Floor
8                                           Los Angeles, California 90024

9                                           WILLIAM L. BRYSON
                                            3800 Howard Hughes Parkway, Seventh Floor
10                                          Las Vegas, Nevada 89169
                                            *Attorneys for Plaintiffs*
11                                          *FSP Stallion 1, LLC through*
                                            *FSP Stallion 26, LLC*

12

13

14

15

16

17

18

19

20

21

22

23

24