Doris Nehme-Tomalka
**NEHME-TOMALKA & ASSOCIATES**
2620 Regatta Drive, Suite 102
Las Vegas, Nevada 89128
Tel: 702-240-5280
Fax: 702-240-5380
E-mail: doris@nehme-tomalka.com

Thomas N. FitzGibbon (*Pro Hac Vice Pending*)
**PFEIFFER THIGPEN FITZGIBBON & ZIONTZ LLP**
233 Wilshire Boulevard, Suite 220
Santa Monica, California 90401
Tel: (310) 451-5800
Fax: (310) 496-3175
E-mail: tnf@ptflaw.com

Attorneys for Third-Party Defendants
*TIC Capital Markets, Inc.; Direct Capital Securities, Inc.*

## UNITED STATES DISTRICT COURT

## DISTRICT NEVADA

| | |
|---|---|
| FSP STALLION 1, LLC, a Nevada limited liability company, et al.<br><br>      Plaintiffs,<br><br>      v.<br><br>MICHAEL F. LUCE, an individual, et al.<br><br>      Defendants. | CASE NO.: 2:08-CV-01155-PMP-PAL<br>[Assigned to the Hon. Philip M. Pro]<br><br>**MOTION OF THIRD-PARTY DEFENDANTS TIC CAPITAL MARKETS, INC. AND DIRECT CAPITAL SECURITIES, INC. TO DISMISS OR STAY THE THIRD-PARTY COMPLAINT OF WILLIAM T. WALTERS** |
| WILLIAM T. WALTERS, an individual,<br><br>      Third-Party Plaintiff,<br><br>      vs.<br><br>TIC CAPITAL MARKETS, INC., a Delaware corporation; and DIRECT CAPITAL SECURITIES, INC., a Delaware corporation, et al.<br><br>      Third-Party Defendants. | **Oral Argument Requested** |
| AND RELATED COUNTERCLAIMS. | |

Pfeiffer Thigpen FitzGibbon & Ziontz LLP
233 Wilshire Blvd., Suite 220
Santa Monica, California 90401

PTRDOCS K3B5x4x2 Motion_to_Dismiss_Walters_Third_Party_Complaint

MOTION TO DISMISS OR STAY OF THIRD-PARTY DEFENDANTS TIC CAPITAL MARKETS, INC. AND DIRECT CAPITAL SECURITIES, INC.

**Pfeiffer Thigpen FitzGibbon & Ziontz LLP**
233 Wilshire Blvd., Suite 220
Santa Monica, California 90401

1   Third-Party Defendants TIC Capital Markets, Inc. ("TICCM") and Direct Capital

2   Securities, Inc. ("DCS")(collectively the "Third Party Defendants" or the "Moving Parties")

3   respectfully move the Court, pursuant to Federal Rules of Civil Procedure 12(b)(1) and

4   12(b)(6), for an order dismissing or staying the Third-Party Complaint (the "Complaint") of

5   Third-Party Plaintiff William T. Walters ("Walters") in its entirety against them on the

6   grounds: (1) that it is entirely duplicative of another action that Walters has already filed in the

7   Nevada State Court against the Third Party Defendants (the "State Court Action"), and (2)

8   that it fails to state a claim for relief. In the alternative they move for a more definite

9   statement under Federal Rules of Civil Procedure 12(e).

10   The Court should apply the *Colorado River* abstention doctrine to find that there is no

11   jurisdiction over this Third-Party Complaint, and dismiss the action pursuant to Federal Rules

12   of Civil Procedure 12(b)(1), or in the alternative stay this action pending the outcome of the

13   duplicative and parallel State Court Action.  If the Court elects not to dismiss or stay the

14   action based on the existence of the State Court Action, it should dismiss the Third-Party

15   Complaint pursuant to Rule 12(b)(6) as it fails to state a claim for relief as pled, as further

16   explained in the accompanying Memorandum Of Points And Authorities. At minimum

17   Walters should have to replead to allege whether the purported contract is oral or written,

18   who the parties were and the essential terms of the contract.

19   In addition, Moving Parties move to dismiss the sole third-party claim for contribution

20   and indemnity on the separate and independent grounds that the Court should decline to

21   exercise supplemental jurisdiction over these third-party claims, and therefore dismiss them

22   because such claims are being asserted in the State Court Action, a forum chosen by Third-

23   Party Plaintiff Walters. In the alternative, Moving Parties request and move the Court to stay

24   these third-party claims.

25   The Motion is based on this Motion, the accompanying Memorandum Of Points And

26   Authorities and the concurrently filed Request for Judicial Notice.

27   //

28   //

1

2  Dated: July 7, 2009

3                                          _____/s/_____
                                           **DORIS NEHME-TOMALKA**
4                                          **NEHME-TOMALKA & ASSOCIATES**
                                           2620 Regatta Drive, Suite 102
5                                          Las Vegas, Nevada 89128
                                           Tel: 702-240-5280
6                                          Attorney for Third Party Defendants
                                           *TIC Capital Markets, Inc.; Direct Capital Securities, Inc.*
7

8  DATED:  July 7, 2009

9                                          _____
                                           *Thomas N. Fyle*
10                                         THOMAS N. FITZGIBBON
                                           **PFEIFFER THIGPEN FITZGIBBON &**
11                                         **ZIONTZ LLP**
                                           233 Wilshire Blvd., Suite 220
12                                         Santa Monica, California 90401
                                           Tel: (310) 451-4325
13                                         Attorneys for Third-Party Defendants
                                           *TIC Capital Markets, Inc.; Direct Capital Securities, Inc.*
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      INTRODUCTION.**

Third-Party Defendants TIC Capital Markets, Inc. ("TICCM") and Direct Capital Securities, Inc. ("DCS")(collectively the "Third Party Defendants" or the "Moving Parties") respectfully move the Court, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), for an order dismissing or staying the Third-Party Complaint (the "Complaint") of Third-Party Plaintiff William T. Walters ("Walters") in its entirety against them on the grounds: (1) that it is entirely duplicative of another action that Walters has already filed in the Nevada State Court against the Third Party Defendants (the "State Court Action"), and (2) that it fails to state a claim for relief. There is no basis for this duplicative action to have been filed against the Moving Parties, given that (a) the State Court Action was pending and (b) Moving Parties were not even parties to this action.  The Complaint contains a single claim that seeks indemnity and contribution from DCS and TICCM based on an ambiguous and unspecified contractual relationship; in fact, the Complaint does not even allege whether the contract is oral or written. Certainly the only basis for federal jurisdiction over the claim is based on supplemental jurisdiction, which should not be exercised in this instance, in particular because the Third Party Defendants have already moved to the dismiss the same claims in the State Court Action and that motion is pending hearing.

The Court should apply the *Colorado River* abstention doctrine to find that there is no jurisdiction over this Third-Party Complaint, and dismiss the action pursuant to Federal Rules of Civil Procedure 12(b)(1), or in the alternative stay this action pending the outcome of the duplicative and parallel State Court Action.  Similarly, Moving Parties respectfully request that the Court dismiss the sole third-party claim for contribution and indemnity on the separate and independent grounds that the Court should decline to exercise supplemental jurisdiction over such third-party claim, and therefore dismiss the claim because it is being asserted in the State Court Action, a forum chosen by Third-Party Plaintiff Walters. In the alternative, Moving Parties request and move the Court to stay these third-party claims.

Pfeiffer Thigpen FitzGibbon & Ziontz LLP
233 Wilshire Blvd., Suite 220
Santa Monica, California 90401

FTDOCS 434756 v1 Motion to Dismiss Walters Third-Party Complaint

-4-

MOTION TO DISMISS OR STAY OF THIRD-PARTY DEFENDANTS TIC CAPITAL MARKETS, INC. AND DIRECT CAPITAL SECURITIES, INC.

Pfeiffer Thigpen FitzGibbon & Ziontz LLP
233 Wilshire Blvd., Suite 220
Santa Monica, California 90401

1    If the Court elects not to dismiss or stay the action based on the existence of the State

2    Court Action, it should dismiss the Third-Party Complaint pursuant to Rule 12(b)(6) as it fails

3    to state a claim for relief as pled because the investors' Complaint in this action (attached as

4    Exhibit A to the Third-Party Complaint and referred to as the "Underlying Complaint")

5    (Docket Exh. No. 1) does not allege that the investors were not accredited or that they did

6    not meet the Investor Suitability Requirements, or that DCS or TICCM caused any breaches

7    of the securities laws. Instead the Underlying Complaint alleges that certain

8    misrepresentations were made about the historical performance of the golf course—matters

9    for which DCS or TICCM are not alleged to be responsible.  In addition, the Third-Party

10   Complaint does not state whether the purported contract is oral or written, who the parties

11   were to the contract, or the essential terms of the contract. In short, the Complaint simply is

12   not sufficient to state a claim or put the Moving Parties on notice of the basis for the claims.

13   In the event the agreement referred to in the Complaint is the Managing Broker-Dealer

14   Agreement ("MBD Agreement") by which DCS was selected as the managing broker dealer,

15   that agreement clearly shows that (1) Third-Party Plaintiff Walters is not a party to or an

16   intended beneficiary of the MBD Agreement, (2) TICCM is not obligated under the

17   Agreement, (3) that the allegations in the Third Party Complaint, based on the TIC

18   Complaint, are insufficient to allege a breach by DCS of its obligations under the Agreement.

19   A true and correct copy of the MBD Agreement is attached as **Exhibit A**.[1]/ Further, it is

20   evident that the sponsor of the tenant-in-common arrangement (Fairway Signature Properties,

21   LLC) approved, in writing, every investor in the Stallion Mountain TIC entities and therefore

22   Walters cannot argue that TICCM or DCS was responsible for the investors' involvement in

23   the investment.  It is "convenient" that Third-Party Plaintiff would not attach the allegedly

24   operative agreement between himself and the Third-Party Defendants as he knows it would

25   [1]/    Counsel for Moving Parties is aware that the MBD Agreement cannot be substantively

26   considered in a Rule 12(b)(6) motion, given that it is outside the pleadings, but it is being

27   provided to the Court for reference to show that the Complaint as drafted simply is not
     sufficient to state a claim in this instance.

28

Pfeiffer Thigpen FitzGibbon & Ziontz LLP
233 Wilshire Blvd., Suite 220
Santa Monica, California 90401

1   show that he is simply not entitled to the relief requested in the Third-Party Complaint. At

2   minimum, the Third Party Complaint is sufficiently unclear that Third-Party Defendants'

3   alternative motion for a more definite statement should be granted.  *See* FRCP 12(e).

4          Based on the foregoing, the Third-Party Defendants respectfully request that the Court

5   grant the Motion and either dismiss the Third Party Complaint as against them or stay the

6   action pending the conclusion of the State Court Action.

7   **II.    FACTUAL BACKGROUND.**

8          **A.     The Course Background & the Sale to the TIC's.**

9          This case is one of several cases arising out of the sale and leaseback of a golf course

10  called Stallion Mountain to investors using a tenant-in-common arrangement in early 2006.

11  (Und. Compl. ¶¶  17-18.) The seller was a corporation called Golf Club of Nevada, Inc., with

12  which Mr. Walters was affiliated through Walters Golf, a division of his company The

13  Walters Group.  (Und. Compl. ¶¶ 24-27.) The sponsor of the tenant-in-common arrangement

14  was a company called Fairway Signature Properties, LLC ("Fairway" or the "Sponsor"). (Und.

15  Compl. ¶¶  31-33.) The master lessee was a company Stallion Mountain LeaseCo, LLC.

16  ("LeaseCo").  (Und. Compl. ¶ 34.)  The post-sale manager of the course was Evergreen

17  Alliance Golf Limited, L.P. ("EAGL"). (Und. Compl. ¶¶ 53-58.)  Mr. Walters was not directly

18  associated with Fairway.  As a part of the sale transaction, the investors borrowed money for

19  the purchase from the Community Bank of Nevada (the "Bank"), and Mr. Walters offered a

20  guaranty (the "Guaranty") to Bank for the loan. (State Court Compl. ¶¶ 101-02, Req. for Jud.

21  Notice Tab 1.)

22         Eventually the golf course did not perform as expected and the loan fell into default.

23  In an effort to improve the financial performance of the course, the investors, who were then

24  the owners as tenants-in-common, replaced EAGL as the manager of the course and made

25  certain physical changes to the course, allegedly without approval of the Bank.  (State Court

26  Compl. ¶¶ 109-115.) These changes did not fix the problems and the tenant-in-common

27  owners were unable to cure the defaults under the loan to the Bank.  The Bank, alleging the

28  conditions to non-recourse treatment of the loan were not satisfied, foreclosed upon the golf

FT700G3 #34TI4=1 Notion 16: Dismiss Walters_Third Party Complaint

-6-

MOTION TO DISMISS OR STAY OF THIRD-PARTY DEFENDANTS TIC CAPITAL
MARKETS, INC. AND DIRECT CAPITAL SECURITIES, INC.

1  course, and has looked to Walters to pay certain sums under the Guaranty.  (State Court

2  Compl. ¶¶  116-20, 124.)

3          DCS and TICCM have not yet appeared in this action, except by the filing of this

4  Motion to Dismiss.

5          **B.      The Sale Of the TIC Interests by DCS.**

6          To accomplish the marketing and sale of the tenant-in-common interests, Fairway

7  entered into the MBD Agreement with Third-Party Defendant DCS dated October 30, 2005.

8  It appears from the Third-Party Complaint that is the agreement upon which Third-Party

9  Plaintiff Walters is basing his claims.  Mr. Walters does not allege any facts to show that he is

10 or was associated with Fairway, such as a member, manager, officer or director, such that he

11 would be entitled to indemnity from DCS.  DCS and other brokers marketed and sold the

12 tenant-in-common interests to the investors, each of whom signed a written Purchaser

13 Questionnaire representing (1) they had received and read the Private Placement

14 Memorandum ("PPM"), (2) they were accredited investors and authorized to invest in the

15 offering, and (3) that they knew Fairway would have to approve each investor prior to

16 purchase. The offering was fully subscribed and the sale and leaseback of the golf course was

17 completed.

18         The MBD Agreement provides, *inter alia* in Sections 2.4 and 3.3, that the Sponsor is

19 responsible for the content of the Private Placement Memorandum, not DCS.  The allegations

20 of the Underlying Complaint involve actions and/or inactions on the part of the Sponsor or

21 Walters, not the actions of DCS. (State Court Compl. ¶¶ 173-74.)

22         **C.      The Walters Claims In the Third-Party Complaint.**

23         Walters alleges in the Third Party Complaint that DCS and TICCM breached an

24 unspecified agreement with him and have a duty to indemnify him because of the filing of the

25 Underlying Complaint. (Comp. ¶¶ 14-15.)  Specifically, Third-Party Plaintiff alleges that the

26 Third-Party Defendants "promised to ensure that the investors in the Offering complied with

27 the investor suitability requirements which were set forth in the PPM."  (Compl. ¶ 5.)

28 Paragraphs 6, 7 and 8 contain a further description of the investor suitability requirements.

Pfeiffer Thigpen FitzGibbon & Ziontz LLP
233 Wilshire Blvd., Suite 220
Santa Monica, California 90401

Pfeiffer Thigpen FitzGibbon & Ziontz LLP
233 Wilshire Blvd., Suite 220
Santa Monica, California 90401

1    (Compl. ¶¶ 6-8.)  In Paragraph 9, Walters alleged that the Third-Party Defendants promised

2    that "the Offering would fully comply with all of [sic] federal and state securities laws and

3    regulations."

4         In Paragraph 10, Walters alleges that the Underlying Complaint contended (a) that the

5    investors were "unsophisticated" and (b) that the "Offering violated federal and state

6    securities laws."  Finally, in Paragraph 11, Walters describes the answer of the TIC Third-

7    Party Defendants in the State Court Action in which they asserted the affirmative defense

8    that Walters "made a misrepresentation or omitted and failed to disclose necessary

9    information and [the TIC Third-Party Defendants] relied on this representation and/or

10   omission."

11        As explained in the Argument below, these allegations are insufficient to state a claim

12   because the Underlying Complaint simply does not allege violations of any laws by DCS or

13   TICCM that could trigger an indemnity right, even as alleged in the Complaint.  In addition,

14   these allegations are inconsistent with the express terms of the MBD Agreement. For

15   example, Section 4.3 provides as follows:

16        Dealer will limit the offering of the Interests to persons whom Dealer has
          reasonable grounds to believe, and in fact believes, meet the financial
17        suitability and other investor suitability requirements set forth in the
          Memorandum under "Purchaser Suitability Requirements".
18

19   Sections 4.4 through 4.8 contain additional procedural requirements regarding the offering of

20   the interests.  Section 4.10 provides the securities compliance representations:

21        Dealer shall complete all steps necessary to permit Dealer to offer the
          Interests pursuant to exemptions available under the federal securities laws,
22        and rules and regulations thereunder, the securities laws of Nevada and other
          applicable states, other than any steps required to be taken by the Company
23        pursuant to Section 3. Dealer shall conduct all of its solicitation and sales
          efforts in conformity with Regulation D and a Rule 506 offering under the
24        Securities Act, and exemptions available under applicable state law.

25   Section 4.14 provides:

26

27        In soliciting persons to acquire the Interests, Dealer shall comply with any
          applicable requirements of the Securities Act, the Securities Exchange Act of
28        1934, as amended (the "Exchange Act"), applicable state securities laws, the

PT9DOCS #38354 v3 Motion_to_Dismiss_Walters_Third Party Complaint

-8-

MOTION TO DISMISS OR STAY OF THIRD-PARTY DEFENDANTS TIC CAPITAL
MARKETS, INC. AND DIRECT CAPITAL SECURITIES, INC.

Pfeiffer Thigpen FitzGibbon & Ziontz LLP
233 Wilshire Blvd., Suite 220
Santa Monica, California 90401

1  published rules and regulations thereunder, and NASD rules and, in particular,
2  Dealer agrees that Dealer will not give any information or make any
   representations other than those contained in the Memorandum and in any
3  supplemental sales literature furnished to Dealer by the Company for use in
   making such solicitations.

4  In Section 5.4 DCS represents and warrants that:

5      Dealer is, and during the term of this Agreement will be, duly registered as a
6      broker-dealer pursuant to the provisions of the Exchange Act, a broker or
       dealer duly registered as such in California, a member in good standing of the
7      NASD, and a broker or dealer duly registered as such in any other state where
8      offers are made by Dealer and such registration is required. Dealer will comply
       with all applicable laws, regulations and requirements of the Securities Act, the
9      Exchange Act, applicable state law and the NASD.

10  At the same time, the Sponsor made certain promises and commitments to DCS, including

11  those representations and warranties in Section 2.4 that:

12      Neither the Memorandum, nor any sales literature or other materials prepared
        by or for the Company in connection with the offering of Interests, as
13      applicable, contain, nor will they contain, at any time during such period up to
14      and including the Offering Termination Date, any untrue statement of a
        material fact nor do they or will they at any time during such period omit to
15      state a material fact required to be stated therein or necessary to make the
        statements therein, under the circumstances in which they were made, not
16      misleading.

17  as well as the covenants in Section 3.3:

18      If at any time any event occurs as a result of which the Memorandum would
19      include an untrue statement of a material fact or, in view of the circumstances
        under which they were made, omit to state any material fact necessary to make
20      the statements therein not misleading, it will notify Dealer thereof, and effect
21      the preparation of an amended or supplemental Memorandum, as the case
        may be, which will correct such statement or omission, and deliver to Dealer
22      as many copies of such amended or supplemental Memorandum as Dealer
        may reasonably request.
23

24  These provisions about the contents and/or omissions with respect to the PPM appear to be

25  what is really at issue in the Underlying Complaint, not whether the investors met the

26  suitability requirements.

27      The provisions in the MBD Agreement that would entitle Fairway to indemnity from

28  DCS are in Section 10.1:

FITOOL5 #3#794+1 Motion_to_Dismiss_Waldron_Third_Party_Complaint

-9-

MOTION TO DISMISS OR STAY OF THIRD-PARTY DEFENDANTS TIC CAPITAL
MARKETS, INC. AND DIRECT CAPITAL SECURITIES, INC.

Pfeiffer Thigpen FitzGibbon & Ziontz LLP
233 Wilshire Blvd., Suite 220
Santa Monica, California 90401

Subject to the conditions set forth below, Dealer agrees to indemnify and hold harmless the Company and its **partners, directors, officers, managers, employees, members and agents, and its attorneys and accountants** ("Parties"), against any and all loss, liability, claim, damage and expense whatsoever ("loss") arising out of or based upon:

(a) Any unauthorized verbal or written representations in connection with the offering made by Dealer or the Soliciting Dealers or each of their agents (other than by the Company or its employees or affiliates), employees, or affiliates in violation of the Securities Act, or any other applicable federal or state securities laws and regulations;

(b) Dealer's failure to comply with any of the applicable provisions of the Securities Act, the Exchange Act, Regulation D (including Rule 506), or the rules and regulations under such acts, applicable requirements and rules of the NASD, or any applicable state laws or regulations, other than any failure to comply which results from acts of the Company;

(c) The breach by Dealer of any term, condition, representation, warranty, or covenant of this Agreement; or

(d) The failure by any purchaser of Interests to comply with the investor suitability requirements set forth in the sections captioned "Purchaser Suitability Requirements" in the Memorandum.

(emphasis added). As explained below, neither the allegations of the Underlying Complaint nor the defenses in the State Court Action trigger the indemnity on the part of DCS. This language also shows that Plaintiff Walters is not a party or person protected by the indemnity.

To the extent Walters alleges he is entitled to indemnity or contribution from DCS or TICCM pursuant to some other contract, additional specificity about the parties, existence and terms of such purported agreement is required as neither DCS nor TICCM are aware of any such agreement or contract, or its terms, given the allegations of the Third-Party Complaint.

**D.      The Walters Claims In the State Court Action.**

The claims by Walters in the Second Amended Complaint in the State Court Action are essentially identical to the claim in the Third-Party Complaint. The factual allegations, though vague and insufficient, are nearly word-for-word the same in both complaints.. The Second Amended Complaint seeks recovery from DCS and TICCM under the same purported and unspecified agreement, with the only difference being there are two causes of

Pfeiffer Thigpen FitzGibbon & Ziontz LLP
233 Wilshire Blvd., Suite 220
Santa Monica, California 90401

1    action in the Second Amended Complaint, one for breach of contract and one for

2    contribution and indemnity. At bottom, however, those two causes of action seek the same

3    relief, which is the same as that sought here—indemnity based on the claims of the TIC

4    investors as alleged in the Underlying Complaint.

5         DCS and TICCM have moved to the dismiss the Complaint in the State Court Action

6    and a hearing is pending.  This Third-Party Complaint is entirely duplicative of the Second

7    Amended Complaint as against DCS and TICCM in the State Court Action.

8    **III.     LEGAL ARGUMENT.**

9         **A.     The Legal Standard for A Motion to Dismiss.**

10        Section 12(b) of the Federal Rules of Civil Procedure provides that a party may

11   assert certain defenses by motion, and as applicable here: (1) lack of subject-matter

12   jurisdiction and (6) failure to state a claim upon which relief can be granted.  Fed. R. Civ.

13   P. 12(b)(1) and 12(b)(6).

14        **B.     Dismissal Or Stay Is Warranted Based on the Existence of the State**

15        **Court Action Under the *Colorado River* Doctrine.**

16        The Supreme Court has provided that district courts have the discretion to abstain

17   from exercising jurisdiction over an action where a concurrent state proceeding is

18   pending based upon "considerations of wise judicial administration, giving regard to

19   conservation of judicial resources and comprehensive disposition of litigation." *Colorado*

20   *River Water Conservation District*, 424 U.S. at 817 (citations omitted); *Nakash v. Marciano*, 882

21   F.2d 1411, 1415 (9th Cir. 1989) (noting that "a federal court may stay its proceedings in

22   deference to  pending state proceedings."); *Beardmore v. American Summit Financial Holdings*,

23   2001 WL 1586785, *6 (D. Minn. 2001) (dismissing counterclaims brought in federal court

24   where they overlapped with claims already pending in state court because it would

25   unnecessarily duplicate parallel claims). "[T]he federal courts frequently follow *Colorado*

26   *River* by abstaining from exercising jurisdiction in deference to parallel state actions."

27   *Wiggin & Co. v. Ampton Investments, Inc.*, 66 F.Supp.2d 549, 551 (S.D.N.Y. 1999) (granting

28   motion to stay district court action because of pending state court litigation.). The

FTDOCS #387614.2 Motion to Dismiss, Waiver, Third Party Complaint

-11-

MOTION TO DISMISS OR STAY OF THIRD-PARTY DEFENDANTS TIC CAPITAL
MARKETS, INC. AND DIRECT CAPITAL SECURITIES, INC.

1   importance of the *Colorado River* doctrine is clear. "When a case proceeds on parallel

2   tracks in state and federal court, the threat to efficient adjudication is self-evident.

3   [Moreover, t]he legitimacy of the court system in the eyes of the public and fairness to the

4   individual litigants also are endangered by duplicative suits that are the product of

5   gamesmanship or that result in conflicting adjudications." *Lumen Construction, Inc. v. Brant*

6   *Construction Co., Inc.*, 780 F.2d 691, 694 (7th Cir. 1986).

7         *1.   The Colorado River Factors*

8   In determining whether to dismiss claims under the *Colorado River* doctrine, the Court

9   must apply the following factors "in a pragmatic and flexible way, as part of a balancing

10   process:"

11         (1) whether either court has assumed jurisdiction over a res;

12         (2) the relative convenience of the forums;

13         (3) the desirability of avoiding piecemeal litigation;

14         (4) the order in which the forums obtained jurisdiction;

15         (5) whether state or federal law controls;

16         (6) whether the state proceeding is adequate to protect the parties' rights;

17         (7) whether the concurrent proceeding is a result of forum shopping; and

18         (8) the state and federal actions are substantially similar.

19   *Nakash*, 882 F.2d at 1415 (affirming District Court's order staying federal proceedings

20   because of a concurrent state court proceeding); *Fireman's Fund Ins. Co. v. Quackenbush*, 87

21   F.3d 290, 297 (9th Cir. 1996) (affirming dismissal of claims under the *Colorado River*

22   doctrine).

23         *2.   The First and Second Factor*

24         The first two factors are not applicable here because neither forum has assumed

25   jurisdiction over a res and the two courthouses are in essentially the same location in Las

26   Vegas, so they are equally convenient.

27

28

Pfeiffer Thigpen FitzGibbon & Ziontz LLP
233 Wilshire Blvd., Suite 220
Santa Monica, California 90401

MOTION TO DISMISS OR STAY OF THIRD-PARTY DEFENDANTS TIC CAPITAL
MARKETS, INC. AND DIRECT CAPITAL SECURITIES, INC.

Pfeiffer Thigpen FitzGibbon & Ziontz LLP
233 Wilshire Blvd., Suite 220
Santa Monica, California 90401

3.    *The Third Factor*

The third factor, piecemeal litigation, weighs strongly in favor of dismissal because "[m]aintaining virtually identical suits in two forums under these circumstances would waste judicial resources and invite duplicative effort." *Wiggin & Co.*, 66 F.Supp.2d at 553 (noting that under such circumstances "avoidance of piecemeal litigation is best served by leaving these suits in the state court."). Allowing the challenged third-party claims to proceed would guarantee maximum inefficiency and result in piecemeal litigation. It would require simultaneously litigating identical claims in two different courts and would require this court to needlessly expend its limited judicial resources on issues that will likely be first decided in the State Court Action.

The Third Party Defendants understand that Walters indicated in the proposed discovery plan that a significant amount of discovery is needed and that even though the Court recently approved a 180-day discovery period, Walters and other defendants requested a discovery period of 365 days. The Third Party Defendants are advised that the Court indicated it will consider extending the length of the discovery period if it is requested. In the proposed discovery plan, Walters requested a trial date beyond July 2010, and at least four months after the March 9, 2010 trial date set in the State Court Action.  Dismissing the challenged third-party claims will streamline this action by eliminating the contractual indemnity claims which are pending in the State Court Action. Moreover, doing so will not in any way prejudice Walters because all his claims are already being heard in the ongoing State Court Action.

4.    *The Fourth Factor*

The fourth factor, order of obtaining jurisdiction, weighs decisively in favor of dismissal. Walters filed the State Court Action over a year ago, and filed the Second Amended Complaint which added DCS and TICCM as defendants in March of 2009, months before filing the duplicative third-party claim in federal court. However, "priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions." *Moses H. Cone Memorial Hospital*

FTTDOCS #38766 v2 Motion_to_Dismiss Walters_Third_Party_Compliance

MOTION TO DISMISS OR STAY OF THIRD-PARTY DEFENDANTS TIC CAPITAL MARKETS, INC. AND DIRECT CAPITAL SECURITIES, INC.

Pfeiffer Thigpen FitzGibbon & Ziontz LLP
233 Wilshire Blvd., Suite 220
Santa Monica, California 90401

*v. Mercury Construction Corporation*, 460 U.S. 1, 21 (1983). Progress has been made on Walters' claims in the State Court Action, including because the Motion to Dismiss of DCS and TICCM is in the process of being briefed and heard.

In State Court Action, the court has already issued at least 19 orders and the parties have filed more than 18 motions including a motion to dismiss, a motion for summary judgment and at least three motions to compel. Moreover, the state court has already heard two ex parte applications and conducted a discovery conference. In addition, the state court has already consolidated the State Court Action with an action filed by Community Bank. Finally, substantial discovery has already taken place in the State Court Action, including extensive document requests and nine or ten depositions.

In contrast, because the Third-Party Complaint was only recently filed, no progress has been made on the third-party claims in this action and no trial date has been set. In fact, discovery has just recently commenced in this action because the discovery stay imposed by the PSLRA while defendants' motion to dismiss was pending was only lifted very recently. However, the discovery stay did not affect the State Court Action which continued to move forward during that time.

   5.   *The Fifth Factor*

The fifth factor, whether state or federal law controls, weighs in favor of dismissal because "the absence of a federal question... slightly favors abstention." *Wiggin & Co.*, 66 F.Supp.2d at 554. The claims in the Third-Party Complaint which involve breach of contract and claims for indemnity are brought solely under state law. Thus, all substantive issues relating to this claim will be determined by state law.

   6.   *The Sixth Factor*

The sixth factor also weighs in favor of dismissal because there is no reason to believe that the State Court Action is inadequate to protect the parties' rights. Indeed, Walters initially selected the state forum, and has continued to pursue his claims in state court even after serving the Third-Party Complaint in this action. Thus, Walters cannot

1  legitimately contend that his interests cannot be adequately protected in the forum he

2  selected.

3       7.    *The Seventh Factor*

4       The seventh factor, forum shopping, also weights in favor of dismissal. Walters

5  appears to be trying to keep his options open by initiating claims in this Court while

6  continuing to prosecute the same claims in the State Court Action. By prosecuting parallel

7  actions he can eventually elect to try the case in the forum he believes will allow him the

8  best chance to prevail after having an opportunity to evaluate the advantages and

9  disadvantages of the respective courts. Walters initiated and has been litigating the same

10  exact claims in the State Court Action. He should not now be permitted to relitigate those

11  same claims in this forum in the hope that it may someday allow him a better chance to

12  prevail.

13       8.    *The Eighth Factor*

14       The eighth factor, substantial similarity between the state and federal actions,

15  weighs decisively in favor of dismissal. It is well-settled that the two actions need not be

16  exactly parallel; "[i]t is enough if the two proceedings are 'substantially similar.'" *Nakash*,

17  882 F.2d at 1416 (finding the two actions to be substantially similar even though they

18  involved different parties because both disputes "concern how the respective parties have

19  conducted themselves since [the transaction]"). "A suit is parallel when substantially the

20  same parties are contemporaneously litigating substantially the same issues in another

21  forum." *Caminiti and Iatarola, v. Behnke Warehousing, Inc.*, 962 F.2d 698, 700 (7th Cir. 1992)

22  (finding that *Colorado River* doctrine applied even though the state and federal proceedings

23  involved differing parties). Walters' third-party claim is not only substantially similar, but

24  is virtually identical and wholly duplicative of the claims against DCS and TICCM alleged

25  in the Second Amended Complaint in the State Court Action and therefore ought to be

26  dismissed.

27       Only two of the *Colorado River* doctrine factors are neutral or not applicable. The

28  remaining six factors weigh strongly in favor of dismissal. Accordingly, granting this

Pfeiffer Thigpen FitzGibbon & Ziontz LLP
233 Wilshire Blvd., Suite 220
Santa Monica, California 90401

Pfeiffer Thigpen FitzGibbon & Ziontz LLP
233 Wilshire Blvd., Suite 220
Santa Monica, California 90401

1  Motion is proper under the *Colorado River* doctrine. At minimum the Court should stay

2  this action pending the conclusion of the State Court Action.

3  **C.    The Third-Party Claim Is Not Compulsory**

4  DCS and TICCM understand that Walters has asserted that the counterclaims

5  against the TIC Plaintiffs are compulsory and may somehow try to take the position that

6  the third-party claim against DCS and TICCM is also compulsory or must be brought in

7  this action. Any such purported justification for filing the Third-Party Complaint is

8  erroneous. As an initial matter, claims under Rule 14 are not ever compulsory, except as

9  provided in Rule 19(a)(1). Fed. R. Civ. P.  14, 19.  In this instance, there is no allegation

10  or suggestion that either DCS or TICCM are required to be joined by Walters to accord

11  complete relief among the parties, therefore the Third Party Defendants are not required

12  to be joined, whether under Rule 14 or Rule 19.

13  Further, the state law claims for contractual indemnity are more properly litigated

14  after the claims against Walters are decided—whether in this forum or the State Court

15  Action.  If the Plaintiffs do not prevail, then no indemnity is required. If they do prevail,

16  it will likely be evident whether such claims are ones for which indemnity is available.

17  Further, to the extent the Court looks to Rule 13 for guidance on whether Walters

18  needed to bring his Third-Party Complaint against DCS and TICCM now, Rule

19  13(a)(2)(A) expressly provides that a party need not file what would otherwise be a

20  compulsory counterclaim if "when the action was commenced, the claim was the subject

21  of another pending action." Because the claims alleged in the Third-Party Complaint were

22  pending in the State Court Action when the Second Amended Complaint was filed,

23  Walters was under no obligation whatsoever to bring a claim against DCS and TICCM for

24  indemnity in this action.

25  Because Walters has sophisticated counsel who is certainly aware of the legal

26  requirements, the most reasonable inference is that Walters, a wealthy businessman, is

27  trying to drive up the cost of litigation to gain a strategic advantage over his adversaries

28  and/or to forum shop.

Pfeiffer Thigpen FitzGibbon & Ziontz LLP
233 Wilshire Blvd., Suite 220
Santa Monica, California 90401

D.    The Court Should Decline To Exercise Supplemental Jurisdiction.

In addition to dismissing the challenged Third-Party Complaint under the *Colorado River* doctrine, it is also appropriate for the Court to dismiss the challenged Third-Party Complaint by declining to exercise supplemental jurisdiction. The basis for jurisdiction in this Court for the single claim in the Third-Party Complaint is solely based on supplemental jurisdiction. 28 U.S.C. § 1367 provides that the court "may decline to exercise supplemental jurisdiction over a claim…[if] in exceptional circumstances, there are other compelling reasons for declining jurisdiction." Where as here, a party unnecessarily brings identical claims in multiple forums as part of a strategy to drive up the cost of litigation, the Court should to decline to exercise supplemental jurisdiction.

E.    Dismissal Is Warranted As the Third-Party Complaint Fails to State a Claim.

In the event the Court elects to substantively hear the Third-Party Complaint, it should dismiss it under Rule 12(b)(6) because it fails to state a claim.  On its face it demands indemnity for Walters because of purported securities law violations arising out of the suitability or accreditation of the TIC investors, and alleging they did not meet the Investor Suitability Requirements.  (Compl. ¶¶ 5, 13.)  Specifically, as written, the allegations by the investors in the TIC Complaint and the Answer in the State Court Action DO NOT show that DCS solicited them in a manner that violated the securities laws or rendered them not suitable. (Compl. ¶¶ 10-11, Und. Compl. ¶ 20.)  There are simply no such allegations in the Underlying Complaint.  Instead, the Underlying Complaint alleges that Third-Party Plaintiff Walters and others made misrepresentations or omissions in the offering documents— matters for which Fairway (or others acting in concert with it) are responsible, not DCS, and certainly not TICCM. (Und. Compl. ¶¶ 36-47.)

In addition, the substance of the Third-Party Complaint is a claim for contractual indemnity.  Walters does not allege whether the purported contract for indemnity is in writing, which is required by the Statute of Frauds for such a contract to be enforceable.  N.R.S. § 111.220.  That statute provides, in pertinent part:

FTPDOCS+10704 v2 Motion_to_Dismiss_Walters_Third-Party Complaint

-17-

MOTION TO DISMISS OR STAY OF THIRD-PARTY DEFENDANTS TIC CAPITAL MARKETS, INC. AND DIRECT CAPITAL SECURITIES, INC.

Pfeiffer Thigpen FitzGibbon & Ziontz LLP
233 Wilshire Blvd., Suite 220
Santa Monica, California 90401

**Agreements not in writing: When void**

In the following cases every agreement is void, unless the agreement, or some note or memorandum thereof expressing the consideration, is in writing, and subscribed by the person charged therewith:

[…]

2. Every special promise to answer for the debt, default or miscarriage of another.

Here, Walters is clearly seeking indemnity from DCS and TICCM, which requires the contract to be in writing to be enforceable. *See Insurance Co. of the West v. Gibson Tile Co., Inc.,* 122 Nev. 455, 464, 134 P.3d 698, 704 (2006). Further, Walters fails to allege the terms that purportedly provide him with a right to indemnity, nor does he allege the contracting parties. In fact, the allegations are directly contrary to the MBD Agreement, assuming that it is the contract at issue. (Exh. A.)  Under these circumstances, Third-Party Complaint fails to state a claim.

If the Third-Party Complaint is based on the MBD Agreement, it does not state a claim because Walters is not a party to or beneficiary of the Agreement and because TICCM has no burdens under the Agreement.  It is acknowledged that Walters is not a signatory party to the Agreement, as those were DCS and Fairway. (Exh. A.) Section 21 of the MBD Agreement specifically defines who is to benefit from the Agreement:

Parties. This Agreement shall be binding upon and inure solely to the benefit of the parties hereto, the controlling persons referred to in Section 9, the Parties described in Section 10 hereof and their respective successors, legal representatives, heirs and assigns, and no other person shall have or be construed to have any legal or equitable right, remedy or claim under, in respect of, or by virtue of, this Agreement or any provision herein contained.

The controlling persons in Section 9 are those relating to DCS as the dealer, not Fairway. As to the parties described in Section 10, they are: "partners, directors, officers, managers, employees, members and agents, and its attorneys and accountants."  Third-Party Plaintiff Walters is not a member of any of these categories with respect to Fairway, and he does not allege that he has such status. Given the absence of any allegation showing that Walters is in the classes of persons protected by the indemnity, he is not a beneficiary of the Agreement,

1   given the restrictions in Section 21.  Thus, the Third-Party Complaint fails. Likewise, Walters

2   has sued TICCM, even though it is not a party to the Agreement. (Exh. A.) While TICCM

3   may be a beneficiary of the indemnity by Fairway, it has no obligations under the Agreement.

4   The "Dealer" is defined as DCS, and it is the party with the indemnity obligations under

5   Section 10.1, not TICCM. Thus, assuming Third-Party Plaintiff has any rights at all to bring

6   the action, TICCM is not a proper defendant and dismissal should be granted in its favor.

7        Finally, the Third Party Complaint does not state a claim for breach of contract

8   against DCS or TICCM because the sole cause does not have sufficient information about

9   the terms of the alleged contract.  For example, it does not state (a) whether the contract is

10  oral or written, (b) who the contracting parties were, or (c) what the terms were that were

11  allegedly breached, but only references language in the PPM which is a separate document.

12  (Compl. ¶¶ 5-8.)  Under these circumstances, Third-Party Plaintiff should not be permitted to

13  proceed unless allegations showing that DCS and TICCM actually could be liable to Third-

14  Party Plaintiff are made. Here, Third-Party Plaintiff should be required to be plead with

15  greater specificity the terms of the alleged contract, including whether it is oral or written.  *See*

16  Fed. R. Civ. P. 12(e) and N.R.S. § 111.220.  Once the terms are alleged (if they can be), then

17  DCS and TICCM can fairly respond.

18       Thus, if the Court elects to decide the issues raised by the Third-Party Complaint

19  rather than to dismiss or stay for lack of jurisdiction, Third Party Defendants respectfully

20  request that the Motion to Dismiss, or at minimum the Motion for a More Definite

21  Statement, be granted.

22  **IV.    CONCLUSION.**

23       Based on the foregoing, Third Party Defendants DCS and TICCM respectfully request

24  that the Court Dismiss the Third Party Complaint against DCS and TICCM, either based on

25  a lack of jurisdiction by applying the *Colorado River* doctrine or substantively based on Rule

26  12(b)(6), or at minimum, grant the Motion for a More Definite Statement and require Third -

27  Party Plaintiff to plead with greater specificity.

28

**Pfeiffer Thigpen FitzGibbon & Ziontz LLP**
233 Wilshire Blvd., Suite 220
Santa Monica, California 90401

PFTD0C5 #385n+2 Motion_to_Dismiss_Motion_Third_Party_Complaint

-19-

MOTION TO DISMISS OR STAY OF THIRD-PARTY DEFENDANTS TIC CAPITAL
MARKETS, INC. AND DIRECT CAPITAL SECURITIES, INC.

1   Dated: July 7, 2009

2                                                    _____ /s/ _____

3                                                    **DORIS NEHME-TOMALKA**
                                                     Nevada Bar No.:  006431
4                                                    **NEHME-TOMALKA & ASSOCIATES**
                                                     2620 Regatta Drive, Suite 102
5                                                    Las Vegas, Nevada 89128
                                                     Tel: 702-240-5280
6                                                    Attorney for Third Party Defendants
                                                     *TIC Capital Markets, Inc.; Direct Capital Securities, Inc.*
7

8   DATED:  July 7, 2009

9                                                    _____

10                                                   THOMAS N. FITZGIBBON
                                                     **PFEIFFER THIGPEN FITZGIBBON &**
                                                     **ZIONTZ LLP**
11                                                   233 Wilshire Blvd., Suite 220
12                                                   Santa Monica, California 90401
                                                     Tel: (310) 451-4325
13                                                   Attorneys for Third Party Defendants
                                                     *TIC Capital Markets, Inc.; Direct Capital Securities, Inc.*
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION TO DISMISS OR STAY OF THIRD-PARTY DEFENDANTS TIC CAPITAL
MARKETS, INC. AND DIRECT CAPITAL SECURITIES, INC.

# Exhibit A

# To

# Memorandum Of Points And Authorities

Pfeiffer Thigpen FitzGibbon & Ziontz LLP
233 Wilshire Blvd., Suite 220
Santa Monica, California 90401

**FAIRWAY SIGNATURE PROPERTIES, LLC**
5500 East Flamingo Road
Las Vegas, Nevada 89122
October 30, 2005

Direct Capital Securities, Inc.
1333 2nd Street
Suite 600
Santa Monica, CA 90401

Re:      Managing Broker-Dealer Agreement

Gentlemen:

  This letter confirms and comprises the agreement ("Agreement") among Fairway Signature Properties, LLC, a Delaware Limited Liability Company, (the "Company") and Direct Capital Securities, Inc. ("Dealer"), regarding the offering and sale by the Company of up to $24,480,000 of undivided interests ("Interests") in the Stallion Mountain Golf Course located at 5500 East Flamingo Road, Nevada (the "Property"). Capitalized terms used herein and not otherwise defined herein shall have the same meaning as in the Fairway Signature Properties, LLC Stallion Mountain Private Placement Memorandum dated October 30, 2005, as supplemented from time to time (the "Memorandum").

1.  <u>Appointment of Dealer.</u>

  1.1.  On the basis of the representations, warranties and covenants herein contained, but subject to the terms and conditions herein set forth, Dealer is hereby appointed and agrees to sell the Interests on a "best efforts" basis through a private, limited offering exempt from registration pursuant to: (i) Rule *506* of Regulation D promulgated under the Securities Act of 1933, as amended (the "Securities Act"); and (ii) applicable state blue sky exemptions. Dealer is authorized to enlist other members of the National Association of Securities Dealers, Inc. ("NASD") acceptable to the Company ("Selling Group Members" or "Soliciting Dealers") to sell Interests on a "best efforts" basis.

  1.2.  It is understood that no sale shall be regarded as effective unless and until accepted by the Company for sales of Interests. The Company reserves the right in its sole discretion to accept or reject any subscription for Interests in whole or in part for a period of 15 days after receipt of the subscription for Interests. Any subscription for Interests not accepted within 15 days of receipt shall be deemed rejected. The Interests will be offered during a period commencing on the date of the Memorandum October 30, 2005, and continuing until the earlier of (i) the date that $24,480,000 of Interests have been sold or (ii) December 31, 2005 which date may be extended in the Company's sole discretion.

  1.3.  Subject to the performance by the Company, of all the obligations to be performed hereunder, and to the completeness and accuracy of all the representations and warranties contained herein, Dealer hereby accepts such agency and agrees on the terms and conditions herein set forth to use its best efforts during the offering period to find, through Soliciting Dealers, qualified subscribers for the Interests.

2.  <u>Representations and Warranties of the Company.</u> The Company hereby represents and warrants to Dealer, as applicable, that:

  2.1.  The Company has been duly organized and is validly existing as a limited liability company in good standing under the laws of the State of Delaware, has all requisite authority to enter into this Agreement and has all requisite authority to conduct its business as described in the Memorandum.

  2.2.  No defaults exist in the due performance and observance of any material obligation, term, covenant or condition of any agreement or instrument to which the Company is a party or by which the Company is bound.

  2.3.  Subject to the performance of the Company's obligations hereunder, the holders of Interests ("Interestholders") will have the rights described in the Memorandum.

  2.4.  Neither the Memorandum, nor any sales literature or other materials prepared by or for the Company in connection with the offering of Interests, as applicable, contain, nor will they contain, at any time

during such period up to and including the Offering Termination Date, any untrue statement of a material fact nor do they or will they at any time during such period omit to state a material fact required to be stated therein or necessary to make the statements therein, under the circumstances in which they were made, not misleading.

3.         <u>Covenants of the Company</u>. The Company agrees that:

        3.1.     It will deliver to Dealer such numbers of copies of the Memorandum, as appropriate, and any amendment or supplement thereto, with all appendices thereto, as Dealer may reasonably request for the purposes contemplated by federal, Nevada and other state securities laws. It will submit drafts of the Memorandum to Dealer prior to use, will not use any Memorandum to which Dealer may reasonably object, and shall make such modifications, amendments or supplements to the Memorandum as reasonably requested by Dealer to eliminate any inaccurate or misleading statement contained therein, but no failure to make any objection or to request any modification, amendment or supplement shall constitute any representation by Dealer regarding the accuracy or completeness of the Memorandum.

        3.2.     It will comply with all requirements imposed upon it by the rules and regulations of the Securities and Exchange Commission ("SEC"), and by all applicable Nevada and applicable state securities laws and regulations, to permit the continuance of offers and sales of the Interests, in accordance with the provisions hereof and in the Memorandum, and will amend or supplement the Memorandum at any time if required to make the Memorandum comply with the requirements of federal, Nevada, and other state securities laws and regulations.

        3.3.     If at any time any event occurs as a result of which the Memorandum would include an untrue statement of a material fact or, in view of the circumstances under which they were made, omit to state any material fact necessary to make the statements therein not misleading, it will notify Dealer thereof, and effect the preparation of an amended or supplemental Memorandum, as the case may be, which will correct such statement or omission, and deliver to Dealer as many copies of such amended or supplemental Memorandum as Dealer may reasonably request.

        3.4.     Each will apply the net proceeds from the offering received by it in the manner set forth in the Memorandum.

        3.5.     Each will timely file a Form D relating to the offering with the SEC under Regulation D of the Securities Act.

        3.6.     Subject to Dealer's actions and the actions of others in connection with the offering, the Company will comply with all requirements imposed upon it by Rule 506 of Regulation D and applicable state securities laws.

        3.7.     The Company will furnish the Interestholders with the reports described in the Memorandum under the Asset Management Agreement, and will deliver to Dealer one copy of each such report at the time that such reports are furnished to the Interestholders, and such other information concerning the Company as the case may be, as may reasonably be requested.

        3.8.     The Company shall not make any written or oral representations or statements to investors that contradict or are inconsistent with the statements made in the Memorandum, as amended or supplemented.

        3.9.     The Company shall not permit the purchase of Interests by any investors who do not qualify as "accredited investors" under Rule 501(a) of Regulation D.

        3.10.    Any officer, director, employee or affiliate of the Company who buys any Interests in connection with the offering shall do so for investment purposes only and not for resale or distribution.

4.         <u>Duties and Obligations of the Dealer</u>.

        4.1.     Dealer will serve in a "best efforts" capacity in the offering, sale and distribution of the Interests. Dealer may offer the Interests as an agent, but all sales shall be made by the Company acting through Dealer as an agent, and not by Dealer as a principal. Dealer shall have no authority to appoint any person or other entity as an agent or sub-agent of Dealer or the Company, except to appoint Selling Group Members acceptable to the Company.

        4.2.     Dealer shall make no representations to any prospective investor other than those contained in the Memorandum, and will not allow any other written materials to be used to describe the potential investment to prospective investors other than the Memorandum or factual summaries and sales brochures of the offering prepared

by the Company, except as authorized by the Company.

4.3.     Dealer will limit the offering of the Interests to persons whom Dealer has reasonable grounds to believe, and in fact believes, meet the financial suitability and other investor suitability requirements set forth in the Memorandum under "Purchaser Suitability Requirements".

4.4.     Dealer will provide each prospective investor with a copy of the Memorandum and appendices, amendments and supplements thereto during the course of the offering and before sale and advise each such prospective investor at the time of the initial offering to him or her that the Company and/or its agents and consultants will, during the course of the offering and prior to any sale, accord said investor and his or her purchaser representative, if any, including Dealer, the opportunity to ask questions of and to receive answers from the Company and/or its agents and consultants concerning the terms and conditions of the offering and to obtain any additional information, which information is possessed by the Company or may be obtained by it without unreasonable effort or expense and which is necessary to verify the accuracy of the information contained in the Memorandum.

4.5.      Before making any sale of the Interests, Dealer will inform the prospective investor and his or her purchaser representative, if any, of all pertinent facts relating to the liquidity and marketability of the Interests, during the term of the investment as set forth in the Memorandum, as applicable.

4.6.     In recommending the purchase or sale of the Interests to a prospective investor that Dealer is soliciting to acquire Interests, the Dealer or any person associated with the Dealer shall:

(a)       have reasonable grounds to believe, on the basis of information obtained from the prospective investor concerning his or her investment objectives, other investments, financial situation and needs, and any other information known by the Dealer or an associated person, that:

(i)       the prospective investor meets the investor suitability requirements set forth in the Memorandum, as appropriate;

(ii)      the prospective investor has a fair market net worth sufficient to sustain the risks inherent in an investment in the Interests, including, but not limited to, total loss of his or her investment, lack of liquidity and other risks described in the Memorandum; and

(iii) an investment in Interests is otherwise suitable for the prospective investor.

(b)       maintain in Dealer's files, for a reasonable period following the Offering Termination Date, documents disclosing the basis upon which the above determination of suitability was reached as to each investor.

4.7.     Dealer shall not execute any transaction in which an investor invests in the Interests in a discretionary account without prior written approval of the transaction by the investor.

4.8.     Dealer will comply in all respects with the subscription procedures and distribution plan set forth in the Memorandum.

4.9.     In the event Dealer receives any customer funds for the Interests, Dealer will transmit such customer funds as soon as practicable following receipt of such funds for the Interests to escrow at Nevada Title, or such other escrow company, as determined by the Company, ("Escrow Agent").

4.10.    Dealer shall complete all steps necessary to permit Dealer to offer the Interests pursuant to exemptions available under the federal securities laws, and rules and regulations thereunder, the securities laws of Nevada and other applicable states, other than any steps required to be taken by the Company pursuant to Section 3. Dealer shall conduct all of its solicitation and sales efforts in conformity with Regulation D and a Rule 506 offering under the Securities Act, and exemptions available under applicable state law.

4.11.    Dealer will furnish to the Company upon request a complete list of all persons who have been offered the Interests and such persons' states of residence.

4.12.    Dealer will immediately bring to the attention of the Company any circumstance or fact which

causes Dealer to believe the Memorandum, or any other literature distributed pursuant to the offering, or any information supplied by prospective investors in their subscription materials, may be inaccurate or misleading.

4.13.    Dealer shall thoroughly review all pertinent organizational documents of the Company, the receipt of which is hereby acknowledged.

4.14.    In soliciting persons to acquire the Interests, Dealer shall comply with any applicable requirements of the Securities Act, the Securities Exchange Act of 1934, as amended (the "Exchange Act"), applicable state securities laws, the published rules and regulations thereunder, and NASD rules and, in particular, Dealer agrees that Dealer will not give any information or make any representations other than those contained in the Memorandum and in any supplemental sales literature furnished to Dealer by the Company for use in making such solicitations.

4.15.    Dealer plans to engage in activities hereunder in all 50 states unless Company provides in writing that such state(s) has been rejected for offer and sale activity.

4.16.    When Selling Group Members are utilized in the offering, Dealer agrees to use its best efforts to cause such Selling Group Members to comply with all the foregoing obligations.

5. Representations and Warranties of Dealer. Dealer represents and warrants to the Company that:

5.1.    Dealer is a duly organized corporation.

5.2.    This Agreement, when executed by Dealer, will have been duly authorized and will be a valid and binding agreement of Dealer, enforceable in accordance with its terms.

5.3.    The consummation of the transactions contemplated herein and those contemplated by the Memorandum will not result in a breach or violation of any order, rule or regulation directed to Dealer by any court or any federal or state regulatory body or administrative agency having jurisdiction over Dealer or its affiliates.

5.4.    Dealer is, and during the term of this Agreement will be, duly registered as a broker-dealer pursuant to the provisions of the Exchange Act, a broker or dealer duly registered as such in California, a member in good standing of the NASD, and a broker or dealer duly registered as such in any other state where offers are made by Dealer and such registration is required. Dealer will comply with all applicable laws, regulations and requirements of the Securities Act, the Exchange Act, applicable state law and the NASD.

5.5.    This Agreement, or any supplement or amendment hereto, may be filed by the Company with the SEC, if such should be required, and may be filed with, and may be subject to the approval of, any applicable federal, Nevada or other state securities regulatory agencies, if required.

5.6.    No agreement will be made by Dealer with any person permitting the resale, repurchase or distribution of any Interests purchased by such person.

6.    Compensation. As compensation for services rendered by Dealer under this Agreement, Dealer will be entitled to receive from the Company or the Company, as appropriate:

6.1.    A selling commission equal to 7.5% of the gross proceeds of the Interests sold in the offering by Dealer and Selling Group Members, which Dealer may reallow, in whole or in part, to Selling Group Members, provided, however, that such amount may be reduced if a lower commission rate is negotiated with a Selling Group Member;

6.2.    A due diligence fee equal to 1.25% of the gross proceeds of the offering of Interests which Dealer may reallow, in whole or in part, to Selling Group Members;

6.3.    A non-accountable marketing and due diligence expense allowance equal to 2% of the gross proceeds of the offering of Interests for serving as Managing Dealer;

6.4.    Reimbursement of documented expenses incurred in connection with due diligence conducted on the Property; and

6.5.    Such other fees and reimbursements pursuant to the terms of an engagement letter dated October 26, 2005, between Walters Golf and Affiliates and Dealer ("Engagement Letter").

The commissions, allowances and due diligence fees described in Sections 6.1, 6.2 and 6.3 shall collectively be referred to herein as "Compensation."

Notwithstanding the foregoing provisions of this Section 6, the Company reserves the right, in its discretion, to refuse to accept any or all subscriptions for the Interests tendered by Dealer and/or to terminate the offering of the Interests at any time before the Offering Termination Date.

7.    Offering. The offering of the Interests shall be at the offering price and upon the terms and conditions set forth in the Memorandum and the appendices thereto and any supplements thereto.

8.    Conditions to Payment of Compensation.

8.1.    No Compensation will be payable with respect to any subscriptions for Interests that are rejected by the Company, or if the Company terminates the offering for any reason whatsoever. No Compensation will be payable to Dealer with respect to any sale of the Interests unless and until such time as the Company has received the total proceeds of any such sale from escrow.

8.2.    All other expenses incurred by Dealer in the performance of Dealer's obligations hereunder, including but not limited to expenses related to the offering of the Interests and any attorneys' fees, shall, to the extent not reimbursed pursuant to the Engagement Letter, be at Dealer's sole cost and expense, and the foregoing shall apply notwithstanding the fact that the offering is not consummated for any reason.

9.    Indemnification of Dealer.

9.1.    Subject to the conditions set forth below, the Company agrees to indemnify and hold harmless Dealer, the Soliciting Dealers and each person, if any, who controls Dealer, or the Soliciting Dealers, and each of their respective partners, directors, officers, managers, employees and agents, and each of their respective attorneys and accountants ("Dealer Parties"), against any and all loss, liability, claim, damage and expense whatsoever ("loss") arising out of or based upon:

(a)    Any untrue statement or alleged untrue statement of a material fact contained in the Memorandum (as from time to time is amended and supplemented), or in any application or other document filed in any jurisdiction in order to qualify the Interests under or exempt the offering of the Interests from the registration or qualification requirements of the securities laws thereof;

(b)    The omission or alleged omission from the Memorandum (as from time to time is amended and supplemented) of a material fact required to be stated therein or necessary to make the statements therein not misleading;

(c)    The failure of the Company to comply with any of the applicable provisions of the Securities Act, the Exchange Act, Regulation D (including Rule 506), or the rules and regulations under such acts, or any applicable state laws or regulations, other than any failure to comply which results from acts of the Dealer Parties;

(d)    Any unauthorized verbal or written representations in connection with the offering made by the Company or its agents (other than by Dealer Parties), employees or affiliates in violation of the Securities Act, or any other applicable federal or state securities laws and regulations; or

(e)    The breach by the Company of any term, condition, representation, warranty or covenant of this Agreement.

9.2.    If any action is brought against Dealer Parties in respect of which indemnity may be sought hereunder, Dealer shall promptly notify the party or parties against whom indemnification is to be sought in writing of the institution of such action, and the Company shall assume the defense of such action. Dealer Parties shall have the right to employ counsel in any such case. The fees and expenses of such counsel shall be at the Company's expense and authorized in writing by the Company.

9.3.     The Company agrees to promptly notify Dealer of the commencement of any litigation or proceedings against the Company or any of its officers or agents in connection with the issuance and sale of the Interests, or in connection with the Memorandum.

9.4.     The indemnity provided to Dealer Parties pursuant to this Section 9 shall not apply to the extent that any loss arises out of or is based upon any untrue statement or alleged untrue statement of material fact made by Dealer Parties, or any omission or alleged omission of a material fact required to be stated by Dealer Parties. The foregoing shall not apply to any untrue statement or alleged untrue statement or omission that is based on statements or representations in the Memorandum, as amended or supplemented.

10.     Indemnification of the Company.

10.1.     Subject to the conditions set forth below, Dealer agrees to indemnify and hold harmless the Company and its partners, directors, officers, managers, employees, members and agents, and its attorneys and accountants ("Parties"), against any and all loss, liability, claim, damage and expense whatsoever ("loss") arising out of or based upon:

(a)     Any unauthorized verbal or written representations in connection with the offering made by Dealer or the Soliciting Dealers or each of their agents (other than by the Company or its employees or affiliates), employees, or affiliates in violation of the Securities Act, or any other applicable federal or state securities laws and regulations;

(b)     Dealer's failure to comply with any of the applicable provisions of the Securities Act, the Exchange Act, Regulation D (including Rule 506), or the rules and regulations under such acts, applicable requirements and rules of the NASD, or any applicable state laws or regulations, other than any failure to comply which results from acts of the Company;

(c)     The breach by Dealer of any term, condition, representation, warranty, or covenant of this Agreement; or

(d)     The failure by any purchaser of Interests to comply with the investor suitability requirements set forth in the sections captioned "Purchaser Suitability Requirements" in the Memorandum.

10.2.     If any action is brought against any Parties in respect of which indemnity may be sought hereunder, the Parties shall promptly notify Dealer in writing of the institution of such action, and Dealer shall assume the defense of such action. The Parties shall have the right to employ counsel in any such case. The fees and expenses of such counsel shall be at Dealer's expense and authorized in writing by Dealer.

10.3.     Dealer agrees to promptly notify the Company of the commencement of any litigation or proceedings against Dealer or any of Dealer's officers, directors, partners, affiliates, or agents in connection with the issuance and sale of the Interests or in connection with the Memorandum.

11.     Contribution. To provide for just and equitable contribution in circumstances in which the indemnification provided pursuant to Sections 9 and 10 is for any reason held to be unavailable from the Company or Dealer, as the case may be, the Company, on the one hand, and Dealer, on the other, shall contribute to the aggregate losses, liabilities, claims, damages and expenses (including any amount paid in settlement of any action, suit, or proceeding or any claims asserted) in such amounts as a court of competent jurisdiction may determine (or in the case of settlement, in such amounts as may be agreed upon by the parties) in such proportion to reflect the relative fault of the Company, on the one hand, and the Dealer, on the other hand, in connection with the events described in Sections 9 and 10, as the case may be, which resulted in such losses, liabilities, claims, damages or expenses, as well as any other equitable considerations. The relative fault of the parties shall be determined by reference to, among other things, whether any untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Company, on the one hand, or Dealer, on the other, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such omission or statement. The other Parties and Dealer Parties shall also have rights to contribution under this Section 11.

12.     Compliance. All actions, direct or indirect, by Dealer, its respective agents, employees and affiliates, shall conform to (i) requirements applicable to broker-dealers under federal and applicable state securities laws, rules and regulations, and (ii) applicable requirements and rules of the NASD.

13.   Representations and Agreements to Survive Sale and Payment. Except as the context otherwise requires, all representations, warranties and agreements contained in this Agreement shall be deemed to be representations, warranties and agreements at and as of any time during the offering period up to and including the Offering Termination Date, and such representations, warranties and agreements by Dealer, the Company, including the indemnity agreements contained in Sections 9 and 10, shall remain operative and in full force and effect regardless of any investigation made by Dealer, the Company and/or any controlling person, and shall survive the sale of, and payment for, the Interests.

14.   Costs of Offering.

14.1.   Except for the Compensation payable to Dealer described in Section 6, which is the sole obligation of the Company, Dealer will pay all of its own costs and expenses, including, but not limited to, all expenses necessary for Dealer to remain in compliance with any applicable federal, state or NASD laws, rules or regulations in order to participate in the offering as a broker-dealer, and the fees and costs of Dealer's counsel, except to the extent reimbursed pursuant to the Engagement Letter, the Company agrees to pay all other expenses incident to the performance of its obligations hereunder, including all expenses incident to filings with federal and state regulatory authorities and to the exemption of the Interests under federal, Nevada and other state securities laws, including fees and disbursements of the Company's and the Company's counsel, and all costs of reproduction and distribution of the Memorandum, and any amendment or supplement thereto.

15.   Termination. This Agreement is terminable by any party at any time upon written notice to the other parties, subject to the Engagement Letter. Such termination shall not affect the indemnification agreements set forth in Sections 9 and 10.

16.   Construction. This Agreement shall be governed by, subject to and construed in accordance with, the laws of the State of California without regard to conflict of law provisions.

17.   Severability. If any portion of this Agreement shall be held invalid or inoperative, then so far as is reasonable and possible (a) the remainder of this Agreement shall be considered valid and operative and (b) effect shall be given to the intent manifested by the portion held invalid or inoperative.

18.   Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, and together which shall constitute one and the same instrument.

19.   Modification or Amendment. This Agreement may not be modified or amended except by written agreement executed by the parties hereto.

20.   Notices. All communications hereunder, except as herein otherwise specifically provided, shall be in writing and, if sent to Dealer, shall be mailed or delivered Direct Capital Securities, and if sent to the Company, shall be mailed or delivered to the Company (5500 East Flamingo Road, Las Vegas, Nevada 89122). The notice shall be deemed to be received on the date of its actual receipt by the party entitled thereto.

21.   Parties. This Agreement shall be binding upon and inure solely to the benefit of the parties hereto, the controlling persons referred to in Section 9, the Parties described in Section 10 hereof and their respective successors, legal representatives, heirs and assigns, and no other person shall have or be construed to have any legal or equitable right, remedy or claim under, in respect of, or by virtue of, this Agreement or any provision herein contained.

22.   Delay. Neither the failure nor any delay on the part of any party to this Agreement to exercise any right, remedy, power, or privilege under this Agreement shall operate as a waiver thereof, nor shall a waiver of any right, remedy, power, or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power, or privilege with respect to any subsequent occurrence.

23.   Recovery of Costs. If any legal action or other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding (and any additional proceeding for the enforcement of a judgment) in addition to any other relief to which it or they may be entitled.

24.   Entire Agreement. This Agreement contains the entire understanding between the parties hereto and supersedes any prior understandings or written or oral agreements between them respecting the subject matter hereof

with the exception of the Engagement Letter. To the extent there is a conflict between the terms of the Engagement Letter and this Agreement, this Agreement shall control.

If the foregoing correctly sets forth the understanding among Dealer and the Company, please so indicate in the space provided below for that purpose, and return one of the signed copies of this letter agreement to the Company in the envelope provided for this purpose, whereupon this letter agreement shall constitute a binding agreement among us.

Very truly yours,

Signature Fairway Properties, LLC
a Delaware Limited Liability Company ("COMPANY")

By: _____

Name: _____

Title: _____

Dealer:

DIRECT CAPITAL SECURITIES, INC.

By. _____

Name: _____

Title: _____

## CERTIFICATE OF SERVICE

I hereby certify that a copy of **MOTION OF THIRD-PARTY DEFENDANTS TIC CAPITAL MARKETS, INC. AND DIRECT CAPITAL SECURITIES, INC. TO DISMISS OR STAY THE THIRD-PARTY COMPLAINT OF WILLIAM T. WALTERS** was filed electronically with the Clerk of the Court this 7th day of July, 2009, and will be served electronically to designated CM/ECF participant counsel through the court's electronic filing system and mail served to the other interested parties in this action.

Ryan Fife - rfife@ertwllp.com
Edward Gartenberg - egartenberg@ggwslaw.com
Craig A Henderson - chenderson@baileykennedy.com, klebel@baileykennedy.com
Dennis L. Kennedy - dkennedy@baileykennedy.com, srusso@baileykennedy.com
Kimberly R. McGhee - kmcghee@baileykennedy.com, bolaughlin@baileykennedy.com
Kristin Sciarra - ksciarra@ggwslaw.com
Kyle O Stephens - ecf@lslawnv.com, shac@lslawnv.com
Adam J Thurston - athurston@ertwllp.com
Christopher F Wong - cwong@ertwllp.com
Thomas N. FitzGibbon – tnf@ptflaw.com

I declare under penalty of perjury that the foregoing is true and correct.  Executed on July 7, 2009, at Las Vegas, Nevada.

_____/s/_____
Doris Nehme-Tomalka

Pfeiffer Thigpen FitzGibbon & Ziontz LLP
233 Wilshire Blvd., Suite 220
Santa Monica, California 90401