Thomas N. FitzGibbon (*Admitted Pro Hac Vice*)
**PFEIFFER THIGPEN FITZGIBBON & ZIONTZ LLP**
233 Wilshire Boulevard, Suite 220
Santa Monica, California 90401
Tel: (310) 451-5800
Fax: (310) 496-3175
E-mail: tnf@ptflaw.com

Doris Nehme-Tomalka
**NEHME-TOMALKA & ASSOCIATES**
2620 Regatta Drive, Suite 102
Las Vegas, Nevada 89128
Tel: 702-240-5280
Fax: 702-240-5380
E-mail: doris@nehme-tomalka.com

Attorneys for Counterdefendants
*TIC Capital Markets, Inc.; Direct Capital Securities, Inc.*

# UNITED STATES DISTRICT COURT

# DISTRICT NEVADA

| | |
|---|---|
| FSP STALLION 1, LLC, a Nevada limited liability company, et al.<br><br>                    Plaintiffs,<br><br>          v.<br><br>MICHAEL F. LUCE, an individual, et al.<br><br>                    Defendants. | CASE NO.: 2:08-CV-01155-PMP-PAL<br>[Assigned to the Hon. Philip M. Pro]<br><br>**MOTION OF COUNTERDEFENDANTS TIC CAPITAL MARKETS, INC. AND DIRECT CAPITAL SECURITIES, INC. TO DISMISS THE COUNTERCLAIMS OF FAIRWAY SIGNATURE PROPERTIES, LLC AND RELATED PARTIES; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |
| EAGL, LEASECO, FAIRWAY SIGNATURE PROPERTIES, LLC, et al.<br><br>                    Counterclaimants,<br><br>          vs.<br><br>FSP STALLION 1, LLC,  et al.<br><br>                    Counterdefendants. | **Oral Argument Requested** |
| AND RELATED THIRD PARTY CLAIMS. | |

PTFDOCS #39288-v2-Motion_to_Dismiss_-_Fairway_Counterclaim_-_July_09

MOTION TO DISMISS OF COUNTERDEFENDANTS TIC CAPITAL MARKETS, INC. AND DIRECT CAPITAL SECURITIES, INC.

Pfeiffer Thigpen FitzGibbon & Ziontz LLP
233 Wilshire Blvd.  Suite 220
Santa Monica, California 90401

1   Counterdefendants TIC Capital Markets, Inc. ("TICCM") and Direct Capital

2   Securities, Inc. ("DCS")(collectively the "Counterdefendants" or the "Moving Parties")

3   respectfully move the Court, pursuant to Federal Rules of Civil Procedure 12(b)(3) and

4   12(b)(6),[1] for an order dismissing those three Counterclaims (the "Counterclaims") of

5   Counterclaimants Evergreen Alliance Golf Limited, L.P. ("EAGL"), Fairway Signature

6   Properties, LLC ("Fairway"), Stallion Mountain Leaseco, LLC ("LeaseCo"), Joe R. Munsch

7   ("Munsch"), and Michael F. Luce ("Luce") (collectively "Counterclaimants") in their entirety

8   against them on the grounds that (1) venue is improper based on a venue selection clause in

9   the purported agreement, and (2) they fail to state a claim for relief. In the alternative Moving

10  Parties move for a more definite statement under Federal Rules of Civil Procedure 12(e).

11  The Court should dismiss the three Counterclaims pursuant to Rule 12(b)(3) because

12  venue is improper in this Court, as the contract upon which Counterclaimants are apparently

13  relying has a venue selection clause that requires any litigation to be brought in Los Angeles

14  County.[2]  The venue selection clause is reasonable and should be enforced in this instance.

15  If this Court hears the matter on a substantive basis, the Counterclaims should be

16  dismissed under Rule 12(b)(6) as they fail to state a claim for relief as pled because all three

17  Counterclaims wholly rely on the assumption that the TIC Plaintiffs have alleged in the

18  _____

19  [1]     As an alternative, the Motion to Dismiss for improper venue is made under Rule
    12(b)(1), in addition to Rule 12(b)(3) and Rule 12(b)(6).

20  [2]     Counsel for DCS and TICCM received on July 15, 2009, an Opposition to a Motion to
21  Dismiss in the State Court Action in which Walters argued that the operative agreement was
    an engagement agreement between TICCM and certain entities generally described as "The
22  Walters Group."  In a Declaration signed by Mr. Luce in support of that Opposition, it was
23  admitted that no signed copy of the engagement letter could be found, even though the
    agreement was negotiated back and forth for nearly a year.  Luce testified that he thought the
24  engagement agreement was signed at closing. Counsel for DCS and TICCM had not seen
    these various engagement letter drafts until the receipt of the Opposition and were under the
25  impression that the operative agreement was the Managing Broker-Dealer Agreement ("MBD
26  Agreement") between Fairway and DCS, even though a signed copy of that agreement could
    not be located either.  Every single draft of the engagement letter, however, contains a venue
27  selection clause that limits all litigation to courts located in Los Angeles County, California.

28

Pfeiffer Thigpen FitzGibbon & Ziontz LLP
233 Wilshire Blvd. Suite 220
Santa Monica, California 90401

1  Complaint that they were not accredited investors and/or did not meet the Investor

2  Suitability Requirements.  The Counterclaims, however, expressly recite the language of the

3  Complaint in which it is evident that the TIC Plaintiffs DO NOT allege that they were

4  unaccredited or did not meet the Investor Suitability Requirements.  Because those allegations

5  have not been made, the entire basis for the Counterclaims fails.  Instead, the gravamen of

6  the claims of the TIC Plaintiffs is that the historical performance representations about the

7  golf course were false or materially misleading—matters that were solely the responsibility of

8  the Sponsor, not the Moving Parties.

9          In addition, the Counterclaims fail to state a claim because (1) they allege absolutely no

10  facts about the purported contract, including to show that any of the Counterclaimants were

11  parties or intended beneficiaries thereof, and (2) they do not allege whether the contract was

12  in writing, and a contract of indemnity must be in writing under either Nevada or California

13  law to be enforceable.  Thus, at minimum the Counterclaimants should have to replead to

14  allege whether the purported contract is oral or written, who the parties were and the essential

15  terms of the contract. Once that it is done, it will be evident that (a) venue is entirely

16  improper in this Court, and/or (b) none of these Counterclaimants are entitled to indemnity

17  from DCS or TICCM, under the current posture of the case.  Further, it will be clear that

18  TICCM has no indemnity obligations to any of the Counterclaimants under the MBD

19  Agreement, to the extent that is the agreement upon which the allegations of the

20  Counterclaims are based.

21          In addition, Moving Parties move to dismiss the Counterclaims for contribution and

22  indemnity on the separate and independent grounds that the Court should decline to exercise

23  supplemental jurisdiction over these claims, and therefore dismiss them because such claims

24  can and should be asserted in (a) California as contemplated, or (b) the state court action

25  pending in the Clark County courts, a forum in which this litigation is being vigorously

26  pursued and which it is already far along, as further explained in the Motion to Dismiss the

27  Walters Third Party Claim. (*See* Docket No. 297.)

28

The Motion is based on this Motion, the accompanying Memorandum Of Points And Authorities and the concurrently filed Request for Judicial Notice, as well as all pleadings on file in this action and on any oral argument of counsel at the hearing of this Motion.

DATED:  July 24, 2009

_____
THOMAS N. FITZGIBBON
**PFEIFFER THIGPEN FITZGIBBON & ZIONTZ LLP**
233 Wilshire Blvd., Suite 220
Santa Monica, California 90401
Tel: (310) 451-4325
Attorneys for Counterdefendants
*TIC Capital Markets, Inc.; Direct Capital Securities, Inc.*

Dated: July 24, 2009

_____
/s/
**DORIS NEHME-TOMALKA**
**NEHME-TOMALKA & ASSOCIATES**
2620 Regatta Drive, Suite 102
Las Vegas, Nevada 89128
Tel: 702-240-5280
Attorney for Counterdefendants
*TIC Capital Markets, Inc.; Direct Capital Securities, Inc.*

PTFDOCS #39288-v2-Motion_to_Dismiss_-_Fairway_Counterclaim_-_July_09

MOTION TO DISMISS OF COUNTERDEFENDANTS TIC CAPITAL MARKETS, INC. AND DIRECT CAPITAL SECURITIES, INC.

Pfeiffer Thigpen FitzGibbon & Ziontz LLP
233 Wilshire Blvd., Suite 220
Santa Monica, California 90401

Pfeiffer Thigpen FitzGibbon & Ziontz LLP
233 Wilshire Blvd. Suite 220
Santa Monica, California 90401

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION.

Counterdefendants TIC Capital Markets, Inc. ("TICCM") and Direct Capital Securities, Inc. ("DCS")(collectively the "Counterdefendants" or the "Moving Parties") respectfully move the Court, pursuant to Federal Rules of Civil Procedure 12(b)(3) and 12(b)(6), for an order dismissing Counterclaims Fourteen, Fifteen and Sixteen (the "Counterclaims") of Evergreen Alliance Golf Limited, L.P. ("EAGL"), Fairway Signature Properties, LLC ("Fairway"), Stallion Mountain Leaseco, LLC ("LeaseCo"), Joe R. Munsch ("Munsch"), and Michael F. Luce ("Luce") (collectively "Counterclaimants") in their entirety against them on the grounds that (1) venue is improper based on a venue selection clause in the purported agreement, and (2) they fail to state a claim for relief. In the alternative they move for a more definite statement under Federal Rules of Civil Procedure 12(e).

The Court is well aware of the background facts of this matter involving the sale of the Stallion Mountain golf course in Las Vegas to the tenant-in-common investors by Fairway and the subsequent foreclosure upon the golf course and the loss of the investment by the Plaintiffs in this action. The Counterclaims alleged against Moving Parties are brought by five Counterclaimants, all of whom had varying relationships to the golf course and the sale transaction. At this point it appears that the Counterclaims for indemnity are based on a purported engagement agreement (the "Engagement Letter") between TICCM and various persons described as the "Walters Group." [3/] The table below summarizes the relationships among the various parties, as well as the Counterclaimant's connection with the two

---

[3/]     In a Declaration signed by Mr. Luce in support of an Opposition filed in the State Court Action, he admitted that no signed copy of the Engagement Letter (between TICCM and the Walters Group) could be found, even though the agreement was negotiated back and forth for nearly a year. Luce testified that he thought the Engagement Letter was signed at closing. (*See* Request for Judicial Notice, Tab 1.) TICCM and DCS have not located a signed copy of the Engagement Letter, nor have they located a signed copy of the MBD Agreement that was negotiated between DCS and Fairway, although they believe one exists.

PTFDOCS #39288-v2-Motion_to_Dismiss_-_Fairway_Counterclaim_-_July_09

-5-

MOTION TO DISMISS OF COUNTERDEFENDANTS TIC CAPITAL MARKETS, INC. AND DIRECT CAPITAL SECURITIES, INC.

potentially operative agreements, assuming they were actually signed by their respective

parties:

| Counterclaimant | Role | MBD Agt. | Eng. Agt. |
|---|---|---|---|
| Fairway Signature | Sponsor of TIC Offering; Luce and Munsch were managers of the limited liability company | Party & Potential Indemnitee | Party & Potential Indemnitee |
| Mike Luce | President of the Walters Group | Non-Party; Potential Indemnitee Only | Party & Potential Indemnitee |
| LeaseCo | Master Tenant after the sale by Fairway to the TIC Investors; Luce and Munsch were managers | Non-Party; Not an Indemnitee | Party & Potential Indemnitee |
| EAGL | Property Manager after sale to TIC investors | Non-Party; Not an Indemnitee | Non-Party; Not an Indemnitee |
| Joe Munsch | President of EAGL and manager of Fairway and LeaseCo | Non-Party; Potential Indemnitee Only | Party & Potential Indemnitee |
| TICCM | Investment Banker for Walters Group | Non-Party; Potential Indemnitee Only | Party & Potential Indemnitee |
| DCS | Managing Broker-Dealer for sale of TIC Interests | Party & Potential Indemnitee | Party & Potential Indemnitee |

Thus, it is evident that EAGL has no claims for breach of contract and/or indemnity

as against DCS or TICCM as it was simply not a party to any agreement—whether oral or

written—with DCS or TICCM.[4]/  Likewise LeaseCo has no indemnity rights under the MBD

Agreement.  As to the other Counterclaimants, although they are potential indemnitees under

the Engagement Letter and/or the MBD Agreement, the express language of the limited

indemnity reveals that Moving Parties CANNOT be liable based on the allegations of the

Counterclaims and the Complaint of the Plaintiffs. For the purposes of this Motion, however,

the key provision is the venue selection clause of the Engagement Letter that requires all legal

---

[4]/    To the extent EAGL claims to be a party or beneficiary of the Engagement Letter (as it alleges in the Counterclaims), it is bound by the venue selection clause.

Pfeiffer Thigpen FitzGibbon & Ziontz LLP
233 Wilshire Blvd., Suite 220
Santa Monica, California 90401

PTFDOCS #39288-v2-Motion_to_Dismiss_-_Fairway_Counterclaim_-_July_09

Pfeiffer Thigpen FitzGibbon & Ziontz LLP
233 Wilshire Blvd., Suite 220
Santa Monica, California 90401

1  actions relating to the agreement to be brought in Los Angeles.  Specifically, the purported

2  agreement provides in Section 15(c) that: "This Agreement and any related documents shall

3  be governed by, and construed in accordance with, the laws of the State of California, without

4  regard to the principles of conflicts of law. *Venue for any legal action shall be Los Angeles,*

5  *California.* The parties hereby consent to the jurisdiction of said courts." (emphasis added)

6  This forum selection clause is mandatory and reasonable and enforceable, thus, this Court

7  should dismiss the Counterclaims for improper venue.

8       If the Court elects to consider the matter on the merits, no claim for relief has been

9  stated because: (a) the purported breach of contract (Counterclaim Fourteen) alleged is not

10 supported by the underlying allegations of the TIC investors in the Complaint, and (b) the

11 claims for indemnity (Counterclaims Fifteen and Sixteen) are based on an indemnity provided

12 to Counterclaimants that is very limited and applies only in certain circumstances which, based

13 on the facts alleged in the Counterclaim, do not exist in this instance.  As to the first point, the

14 investors' Complaint in this action (Docket No. 1) does not allege that the investors were not

15 accredited or that they did not meet the Investor Suitability Requirements, or that DCS or

16 TICCM caused any breaches of the securities laws. Instead the Complaint alleges that certain

17 misrepresentations were made about the historical performance of the golf course—matters

18 for which DCS or TICCM are not alleged to be responsible and cannot be responsible under

19 the Engagement Letter or the MBD Agreement.  As to the second point, the indemnity

20 obligations on the part of TICCM and DCS only apply if two requirements are met: (1) gross

21 negligence by TICCM or DCS, AND, (2) a violation of the federal or state securities laws or a

22 breach of the Engagement Letter.  (*See* Counterclaims ¶ 212.)  Neither the Complaint nor the

23 Counterclaims allege any facts at all to show that TICCM or DCS were (a) grossly negligent,

24 (b) violated the securities laws, or (c) materially breached the Engagement Letter.

25      Instead, as a matter of pleading, the Counterclaims essentially seek indemnity and

26 contribution from DCS and TICCM based on ambiguous and unspecified contractual

27 relationships.  (*See* Answer to Complaint and Counterclaims, Docket No. 71 [the

28 "Counterclaims"], ¶ 201.)  The Counterclaims do not even allege who the contracting parties

Pfeiffer Thigpen FitzGibbon & Ziontz LLP
233 Wilshire Blvd. Suite 220
Santa Monica, California 90401

1  were, the name of the purportedly operative agreement(s), whether the contract is oral or

2  written, or the essential terms of the agreement. It appears at this point from activity in the

3  State Court Action, that the claims for relief purport to be based on the Engagement Letter,

4  (*see* Request for Judicial Notice, Tab 1), but from a pleading standpoint the Counterclaims

5  simply are insufficient to put TICCM and DCS on notice of this contention or state a claim

6  for relief under California or Nevada law.

7      In addition, the only basis for federal jurisdiction over the Counterclaims is based on

8  supplemental jurisdiction, which should not be exercised in this instance because venue is

9  contractually improper in this Court.

10     To the extent the agreement referred to in the Counterclaim is the Managing Broker-

11  Dealer Agreement ("MBD Agreement") by which DCS was selected as the managing broker

12  dealer, that agreement clearly shows that (1) EAGL is not a party to or an intended

13  beneficiary, (2) TICCM is not obligated under the Agreement, (3) that the allegations in the

14  Counterclaims, based on the investors' Complaint, are insufficient to allege a breach by DCS

15  of its obligations under the Agreement.  A true and correct copy of the MBD Agreement is

16  attached as **Exhibit A**.[5]/ Further, it is evident that Fairway, as the sponsor of the tenant-in-

17  common arrangement, approved, in writing, every investor in the Stallion Mountain TIC

18  entities and therefore Counterclaimants cannot argue that TICCM or DCS was responsible

19  for the investors' involvement in the investment.  It is "convenient" that Counterclaimants

20  would not attach the allegedly operative agreement(s) between them and the

21  Counterdefendants as they knows it would show that they are simply not entitled to the relief

22  requested in the Counterclaims. At minimum, the Counterclaims are sufficiently unclear that

23  Moving Parties' alternative motion for a more definite statement should be granted.  *See* FRCP

24  12(e).

_____

25  [5]/     Counsel for Moving Parties is aware that the MBD Agreement cannot be substantively
26  considered in a Rule 12(b)(6) motion, given that it is outside the pleadings, but it is being
    provided to the Court for reference to show that the Counterclaims as drafted simply are not
27  sufficiently clear to state a claim in this instance, given the complicated set of operative facts.

28

1    Based on the foregoing, the Counterdefendants respectfully request that the Court

2    grant the Motion and dismiss the Counterclaims.

3    **II.    FACTUAL BACKGROUND.**

4        **A.    The Course Background & the Sale to the TIC's.**

5        This case is one of several cases arising out of the sale and leaseback of a golf course

6    called Stallion Mountain to investors using a tenant-in-common arrangement in early 2006.

7    (Compl. ¶¶ 17-18.) The seller was a corporation called Golf Club of Nevada, Inc., with which

8    Mr. Walters was affiliated through Walters Golf, a division of his company The Walters

9    Group. (Compl. ¶¶ 24-27.) The sponsor of the tenant-in-common arrangement, and the

10   eventual seller, was a company called Fairway Signature Properties, LLC ("Fairway" or the

11   "Sponsor"). (Compl. ¶¶ 31-33.) The master lessee was a company Stallion Mountain LeaseCo,

12   LLC. ("LeaseCo"). (Compl. ¶ 34.) The post-sale manager of the course was Evergreen

13   Alliance Golf Limited, L.P. ("EAGL"). (Compl. ¶¶ 53-58.) EAGL is not alleged to be a

14   member of the Walters Group. (Compl. ¶ 27.)

15       As a part of the sale transaction, the investors borrowed money for the purchase from

16   the Community Bank of Nevada (the "Bank"), and Mr. Walters offered a guaranty (the

17   "Guaranty") to Bank for the loan. (Req. for Jud. Notice dated July 14, 2009, Docket No. 302

18   at Tab 1.)

19       Eventually the golf course did not perform as expected and the loan fell into default.

20   In an effort to improve the financial performance of the course, the investors, who were then

21   the owners as tenants-in-common, replaced EAGL as the manager of the course and made

22   certain physical changes to the course, allegedly without approval of the Bank. These changes

23   did not fix the problems and the tenant-in-common owners were unable to cure the defaults

24   under the loan to the Bank. The Bank, alleging the conditions to non-recourse treatment of

25   the loan were not satisfied, foreclosed upon the golf course, and has looked to Walters to pay

26   certain sums under the Guaranty.

27

28

Pfeiffer Thigpen FitzGibbon & Ziontz LLP
233 Wilshire Blvd., Suite 220
Santa Monica, California 90401

PTFDOCS #39288-v2-Motion_to_Dismiss_-_Fairway_Counterclaim_-_July_09

-9-

MOTION TO DISMISS OF COUNTERDEFENDANTS TIC CAPITAL MARKETS, INC. AND DIRECT CAPITAL SECURITIES, INC.

**B.    The Sale Of the TIC Interests by DCS.**

To accomplish the marketing and sale of the tenant-in-common interests, Fairway entered into the MBD Agreement with DCS dated October 30, 2005.  There was also an Engagement Letter negotiated over a long period of time between TICCM and the Walters Group, but no party has yet been able to find an executed copy of either agreement.

DCS and other brokers marketed and sold the tenant-in-common interests to the investors, each of whom signed a written Purchaser Questionnaire representing (1) they had received and read the Private Placement Memorandum ("PPM"), (2) they were accredited investors and authorized to invest in the offering, and (3) that they knew Fairway would have to approve each investor prior to purchase. (Counterclaims ¶ 122.)  The offering was fully subscribed and the sale and leaseback of the golf course was completed.

The MBD Agreement provides, *inter alia* in Sections 2.4 and 3.3, that the Sponsor is responsible for the content of the Private Placement Memorandum, not DCS.  The Engagement Letter also places the responsibility for the accuracy of the offering information upon the Walters Group.  Section 7 of that document provides:

> 7.    <u>Walters Group Covenants and Warranties</u>.  Walters Group represents, warrants and covenants that: (a) all materials and information provided to TICCM and DCS to be furnished to investors and/or potential investors in TIC Transactions ("Offering Information") will conform to the requirements of the Securities Act of 1933, as amended ("1933 Act"), the 1933 Act Regulations, and state securities laws and regulations and Walters Group will otherwise comply with such acts and regulations, (b) *all Offering Information does not contain and will not include any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading,* (c) Walters Group will not make any untrue statement of a material fact in any application or other document filed in any jurisdiction in order to qualify the TIC Transaction under or exempt the offering from the registration or qualification requirements of the securities laws thereof, (d) in connection with the TIC Transactions, Walters Group will comply with all of the applicable provisions of the 1933 Act, the Exchange Act, Regulation D (including Rule 506), and the rules and regulations under such acts, or any applicable state laws or regulations, other than such duties which shall be required of TICCM and DCS under this Agreement,, and (e) Walters Group will not make any unauthorized verbal or written representations in connection with TIC

Pfeiffer Thigpen FitzGibbon & Ziontz LLP
233 Wilshire Blvd.  Suite 220
Santa Monica, California 90401

Transaction offerings in violation of the 1933 Act, or any other applicable federal or state securities laws  and regulations. (emphasis added)

The allegations of the Complaint involve actions and/or inactions on the part of the Sponsor or the Walters Group, not the actions of DCS or TICCM. (Complaint ¶¶ 37-47.)

**C.    The Claims In the Counterclaims.**

The Counterclaimants allege in the Counterclaims that DCS and TICCM breached an unspecified agreement with them and have a duty to indemnify them because of the filing of the investors' Complaint. (Counterclaims ¶¶ 201-09.)  Specifically, Counterclaimants allege that the Counterdefendants "promised to ensure that the investors in the Offering complied with the investor suitability requirements which were set forth in the PPM."  (Counterclaims ¶ 201.)  Paragraphs 202, 203 and 204 contain a further description of the investor suitability requirements.  (Counterclaims ¶¶ 202-04.)  In Paragraph 205, Counterclaimants allege that the Counterdefendants promised that "the Offering would fully comply with all of [sic] federal and state securities laws and regulations."  In Paragraph 206, Counterdefendants allege that the Complaint contended (a) that the investors were "unsophisticated" and (b) that the "Offering violated federal and state securities laws."

As explained in the Argument below, these allegations are insufficient to state a claim because the investors' Complaint simply does not allege violations of any laws by DCS or TICCM that could trigger an indemnity right, even as alleged in the Counterclaims.  In addition, these allegations are inconsistent with the express terms of the Engagement Letter and the MBD Agreement.

   1.    *The Engagement Letter Does Not Require Indemnity of The Walters Group Based on the Facts Alleged.*

As to the Engagement Letter, the indemnity provisions run in both directions, with the indemnity provided by TICCM and DCS as much narrower than that provided to them by the Walters Group.  The indemnity of TICCM and DCS is as follows:

1.1    Client agrees to indemnify and hold harmless TICCM, DCS, and each of their respective partners, directors, officers, consultants, managers, advisors, employees, agents, attorneys and accountants ("TICCM Parties"), against any

Pfeiffer Thigpen FitzGibbon & Ziontz LLP
233 Wilshire Blvd., Suite 220
Santa Monica, California 90401

and all loss, liability, claim, damage and expense whatsoever ("loss") arising out of or based upon:

> (a)    *Any untrue statement or alleged untrue statement of a material fact contained in the Offering Information* or in any application or other document filed in any jurisdiction in order to qualify the TIC Transaction under or exempt the offering from the registration or qualification requirements of the securities laws thereof;

> (b)    The omission or *alleged omission from the Offering Information of a material fact required to be stated therein* or necessary to make the statements therein not misleading; (emphasis added)

This provision is to protect TICCM and DCS and is consistent with the allegations of the investors' Complaint that the "Historical Performance Representations" were not true. (Complaint ¶¶ 37-47.)  In contrast, the indemnity provision for "Clients" is in Section 2.1 and is as follows:

> 2.1    Subject to the conditions set forth below, TICCM and DCS agree to indemnify and hold harmless Client and its respective partners, directors, officers, managers, employees, members and agents, and each of their respective attorneys and accountants ("Parties"), against any and all loss, liability, claim, damage and expense whatsoever ("loss") *arising out of their gross negligence and based upon*:

> (a) Any *unauthorized verbal or written representations* in connection with a DCS TIC Transaction made by TICCM, DCS or its agents, employees, or affiliates in violation of the 1933 Act, or any other applicable federal or state securities laws and regulations;

> (b) In connection with a DCS TIC Transaction, DCS's failure to comply with any of the applicable provisions of the 1933 Act, the Exchange Act, Regulation D (including Rule 506), or the rules and regulations under such acts, applicable requirements and rules of the NASD, or any applicable state laws or regulations, *other than any failure to comply which results from acts or omissions of Client*;

> (c) The breach by TICCM or DCS of any term, condition, representation, warranty, or covenant of this Agreement. (emphasis added)

This limited indemnity provision requires gross negligence by TICCM or DCS and also requires (1) unauthorized representations, or (2) securities laws violations other than those that for which the Client is responsible.  Certainly the allegations of the Complaint do not

**Pfeiffer Thigpen FitzGibbon & Ziontz LLP**
233 Wilshire Blvd, Suite 220
Santa Monica, California 90401

satisfy this requirement, as the persons and/or entities in the Walters Group are alleged to be responsible for the alleged misrepresentations about the performance of the golf course.

2.    *The MBD Agreement Does Not Require Indemnity of The Walters Group Based on the Facts Alleged.*

The requirements of the MBD Agreement deal with the suitability requirements. For example, Section 4.3 of the MBD Agreement provides as follows:

> Dealer will limit the offering of the Interests to persons whom Dealer has reasonable grounds to believe, and in fact believes, meet the financial suitability and other investor suitability requirements set forth in the Memorandum under "Purchaser Suitability Requirements".

Sections 4.4 through 4.8 contain additional procedural requirements regarding the offering of the interests. Section 4.10 provides the securities compliance representations:

> Dealer shall complete all steps necessary to permit Dealer to offer the Interests pursuant to exemptions available under the federal securities laws, and rules and regulations thereunder, the securities laws of Nevada and other applicable states, other than any steps required to be taken by the Company pursuant to Section 3. Dealer shall conduct all of its solicitation and sales efforts in conformity with Regulation D and a Rule 506 offering under the Securities Act, and exemptions available under applicable state law.

Section 4.14 provides:

> In soliciting persons to acquire the Interests, Dealer shall comply with any applicable requirements of the Securities Act, the Securities Exchange Act of 1934, as amended (the "Exchange Act"), applicable state securities laws, the published rules and regulations thereunder, and NASD rules and, in particular, Dealer agrees that Dealer will not give any information or make any representations other than those contained in the Memorandum and in any supplemental sales literature furnished to Dealer by the Company for use in making such solicitations.

In Section 5.4 DCS represents and warrants that:

> Dealer is, and during the term of this Agreement will be, duly registered as a broker-dealer pursuant to the provisions of the Exchange Act, a broker or dealer duly registered as such in California, a member in good standing of the NASD, and a broker or dealer duly registered as such in any other state where offers are made by Dealer and such registration is required. Dealer will comply with all applicable laws, regulations and requirements of the Securities Act, the Exchange Act, applicable state law and the NASD.

Pfeiffer Thigpen FitzGibbon & Ziontz LLP
233 Wilshire Blvd., Suite 220
Santa Monica, California 90401

Pfeiffer Thigpen FitzGibbon & Ziontz LLP
233 Wilshire Blvd., Suite 220
Santa Monica, California 90401

At the same time, the Sponsor made certain promises and commitments to DCS, including those representations and warranties in Section 2.4 that:

> Neither the Memorandum, nor any sales literature or other materials prepared by or for the Company in connection with the offering of Interests, as applicable, contain, nor will they contain, at any time during such period up to and including the Offering Termination Date, any untrue statement of a material fact nor do they or will they at any time during such period omit to state a material fact required to be stated therein or necessary to make the statements therein, under the circumstances in which they were made, not misleading.

as well as the covenants in Section 3.3:

> If at any time any event occurs as a result of which the Memorandum would include an untrue statement of a material fact or, in view of the circumstances under which they were made, omit to state any material fact necessary to make the statements therein not misleading, it will notify Dealer thereof, and effect the preparation of an amended or supplemental Memorandum, as the case may be, which will correct such statement or omission, and deliver to Dealer as many copies of such amended or supplemental Memorandum as Dealer may reasonably request.

These provisions about the contents and/or omissions with respect to the PPM are what is alleged in the investors' Complaint, not whether the investors met the suitability requirements. The words "unsophisticated" or "ordinary people" in Paragraphs 19 and 20 simply are not enough to transform the investors' Complaint into one alleging that they investors were not properly solicited or were unaccredited. In fact, the Counterclaims admit that the investors each represented that they were qualified and met the Investor Suitability Requirements. (Counterclaims ¶ 122.)

The provisions in the MBD Agreement that would entitle Fairway to indemnity from DCS are in Section 10.1:

> Subject to the conditions set forth below, Dealer agrees to indemnify and hold harmless the Company and its **partners, directors, officers, managers, employees, members and agents, and its attorneys and accountants** ("Parties"), against any and all loss, liability, claim, damage and expense whatsoever ("loss") arising out of or based upon:
>
> (a) Any unauthorized verbal or written representations in connection with the offering made by Dealer or the Soliciting Dealers or each of their agents (other

PTFDOCS:439288-v2-Motion_to_Dismiss_-_Fairway_Counterclaim_-_July_09

-14-

MOTION TO DISMISS OF COUNTERDEFENDANTS TIC CAPITAL MARKETS, INC. AND DIRECT CAPITAL SECURITIES, INC.

Pfeiffer Thigpen FitzGibbon & Ziontz LLP
233 Wilshire Blvd., Suite 220
Santa Monica, California 90401

than by the Company or its employees or affiliates), employees, or affiliates in violation of the Securities Act, or any other applicable federal or state securities laws and regulations;

(b) Dealer's failure to comply with any of the applicable provisions of the Securities Act, the Exchange Act, Regulation D (including Rule 506), or the rules and regulations under such acts, applicable requirements and rules of the NASD, or any applicable state laws or regulations, other than any failure to comply which results from acts of the Company;

(c) The breach by Dealer of any term, condition, representation, warranty, or covenant of this Agreement; or

(d) The failure by any purchaser of Interests to comply with the investor suitability requirements set forth in the sections captioned "Purchaser Suitability Requirements" in the Memorandum.

(emphasis added).  As explained below, the allegations of the investors' Complaint do not trigger any indemnity obligations on the part of DCS under the MBD Agreement. This language also shows that neither EAGL nor LeaseCo are parties protected by the indemnity.

Finally, to the extent the Counterclaimants allege they are entitled to indemnity or contribution from DCS or TICCM pursuant to some other contract (besides the two described above), additional specificity about the parties, existence and terms of such purported agreement is required as neither DCS nor TICCM are aware of any such agreement or contract, or its terms, given the allegations of the Counterclaims.

**D.    The Venue Requirements.**

Although there is not yet a signed copy before the Court, the Counterclaimants appear to allege that the Engagement Letter is the operative agreement. (*See* Request for Judicial Notice, Tab 1.)  Every version of this document that has been identified includes a venue selection clause that requires all litigation under the agreement to be brought in Los Angeles County, California.  Section 15(c) provides that: "This Agreement and any related documents shall be governed by, and construed in accordance with, the laws of the State of California, without regard to the principles of conflicts of law. *Venue for any legal action shall be Los Angeles, California.* The parties hereby consent to the jurisdiction of said courts."

Because the Counterclaimants are basing their claims on the Engagement Letter, they are admitting that they are bound by its terms, including the venue selection clause.

Pfeiffer Thigpen FitzGibbon & Ziontz LLP
233 Wilshire Blvd., Suite 220
Santa Monica, California 90401

III.    **LEGAL ARGUMENT**.

A.    **The Legal Standard for A Motion to Dismiss.**

Section 12(b) of the Federal Rules of Civil Procedure provides that a party may assert certain defenses by motion, and as applicable here: (1) improper venue and (6) failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(3) and 12(b)(6).

B.    **Dismissal Is Warranted Based on Improper Venue.**

Although federal courts nationally are split on whether a motion to dismiss pursuant to a contractual forum-selection clause should be treated as a motion under Rule 12(b)(1) (lack of subject matter jurisdiction, 12(b)(3) (improper venue), 12(b)(6) (failure to state a claim on which relief can be granted, or 28 USC § 1406(a) (dismissal or transfer for improper venue), the Ninth Circuit holds that 12(b)(3) is the appropriate mechanism to challenge venue based on a contractual selection clause.  *Argueta v. Banco Mexicano, S.A.*,  87 F.3d 320, 324 (9th Cir. 1996).[6/]  This means that the court can consider evidence outside the pleadings and that the pleadings need not be accepted as true as is required under Rule 12(b)(6). *Lipcon v. Underwriters at Lloyd's, London*, 148 F. 3d 1285, 1290 (11th Cir. 1998) (stating that Rule 12(b)(3) is the "more appropriate vehicle"); *Continental Ins. Co. v. M/V ORSULA*, 354 F.3d 603, 606–607 & fn. 2 (7th Cir. 2003).

Forum selection clauses are prima facie valid, and are enforceable absent a strong showing by the party opposing the clause "that enforcement would be unreasonable or unjust, or that the clause [is] invalid for such reasons as fraud or overreaching." *Manetti-Farrow, Inc. v. Gucci America, Inc.*, 858 F.2d 509, 514-15 (9th Cir. 1988); *citing M/S Bremen v. Zapata Off-Shore Company*, 407 U.S. 1, 15, 92 S. Ct. 1907, 1916 (1972); *see also Pelleport Investors, Inc. v. Budco Quality Theatres, Inc.*, 741 F.2d 273, 279 (9th Cir. 1984); *Crown Beverage Co. v. Cerveceria Moctezuma, S.A.*, 663 F.2d 886, 888 (9th Cir. 1981).  The opposing party has the

---

[6/]    To the extent the Court believes this motion to dismiss for improper venue should be made under Rule 12(b)(1), Moving Parties make that as an alternative request.

PTFDOCS #39288-v2-Motion_to_Dismiss_-_Fairway_Counterclaim_-_July_09

MOTION TO DISMISS OF COUNTERDEFENDANTS TIC CAPITAL MARKETS,
INC. AND DIRECT CAPITAL SECURITIES, INC.

Pfeiffer Thigpen FitzGibbon & Ziontz LLP
233 Wilshire Blvd. Suite 220
Santa Monica, California 90401

1  burden "to show that trial in the contractual forum would be so gravely difficult and

2  inconvenient that he will for all practical purposes be deprived of his day in court." *The*

3  *Bremen*, 407 U.S. at 18, 92 S. Ct. at 1917.

4       The venue selection clause in Section 15(a) is a mandatory clause as it uses the word

5  "shall." It provides: "Venue for any legal action shall be Los Angeles, California." This

6  language requires that all litigation be brought in Los Angeles County, it does not simply

7  make an available option. This clause is prima facie enforceable, and there is no reason that

8  it should not be enforced here.

9       In light of the foregoing, the Court should follow the controlling law and dismiss the

10  Counterclaims against the Moving Parties in accordance with Rule 12(b)(3).

11  **C.**     **The Court Should Decline To Exercise Supplemental Jurisdiction.**

12       In addition to dismissing the challenged Counterclaims based on improper venue, it is

13  also appropriate for the Court to dismiss the challenged Counterclaims by declining to

14  exercise supplemental jurisdiction. The basis for jurisdiction in this Court for the

15  Counterclaims is solely based on supplemental jurisdiction. 28 U.S.C. § 1367 provides that

16  the court "may decline to exercise supplemental jurisdiction over a claim…[if] in exceptional

17  circumstances, there are other compelling reasons for declining jurisdiction." Where as here,

18  the parties have agreed to venue elsewhere, the Court should to decline to exercise

19  supplemental jurisdiction.

20  **D.**     **Dismissal Is Warranted As the Counterclaims Fail to State a Claim.**

21       In the event the Court elects to substantively hear the Counterclaims, it should

22  dismiss them under Rule 12(b)(6) because they fail to state a claim. As to EAGL, it is not an

23  indemnitee under any of the possible agreements, so its claims fail as a matter of law.

24  Similarly, LeaseCo is not an indemnitee under the MBD Agreement. As to the

25  Counterclaimants who are potential indemnitees, their claims demand indemnity because of

26  purported securities law violations arising out of the suitability or accreditation of the TIC

27  investors, and alleging they did not meet the Investor Suitability Requirements.

28  (Counterclaims ¶ 208.) Specifically, however, as written the allegations by the investors in the

PTFDOCS #39288 v2-Motion_to_Dismiss_-_Fairway_Counterclaim_-_July_09

-17-

MOTION TO DISMISS OF COUNTERDEFENDANTS TIC CAPITAL MARKETS,
INC. AND DIRECT CAPITAL SECURITIES, INC.

Pfeiffer Thigpen FitzGibbon & Ziontz LLP
233 Wilshire Blvd.  Suite 220
Santa Monica, California 90401

1  Complaint DO NOT show that DCS solicited them in a manner that violated the securities

2  laws or rendered them not suitable. (Counterclaims ¶ 206; Compl. ¶ 20.)  There are simply no

3  such allegations in the Complaint.  Instead, it alleges that Walters, Luce, Munsch and others

4  made misrepresentations or omissions about the performance of the golf course in the

5  offering documents—matters for which Fairway (or others acting in concert with it) are

6  responsible, not DCS, and certainly not TICCM. (Compl. ¶¶ 36-47.)  All of the potential

7  agreements upon which Counterclaimants can be seeking recovery state that neither TICCM

8  nor DCS are responsible for the challenged representations.  For example, Section 1.1 of the

9  indemnity portion of the Engagement Letter provides as follows:

10

11      1.1     Client agrees to indemnify and hold harmless TICCM, DCS, and each
of their respective partners, directors, officers, consultants, managers, advisors,

12  employees, agents, attorneys and accountants ("TICCM Parties"), against any
and all loss, liability, claim, damage and expense whatsoever ("loss") arising out

13  of or based upon:

14          (a)     Any untrue statement or alleged untrue statement of a material
fact contained in the Offering Information or in any application or

15  other document filed in any jurisdiction in order to qualify the TIC
Transaction under or exempt the offering from the registration or

16  qualification requirements of the securities laws thereof;

17          (b)     The omission or alleged omission from the Offering
Information of a material fact required to be stated therein or

18  necessary to make the statements therein not misleading;

19

20  This is what the Complaint alleges—not that anything associated with the sale of the interests

21  to the investors was improper. (Request for Judicial Notice, Tab 1.)

22        In addition, the substance of the Counterclaims is a claim for contractual indemnity.

23  The Counterclaimants do not allege whether the purported contract for indemnity is in

24  writing, which is required by the Statute of Frauds for such a contract to be enforceable.  Cal.

25  Civ. Code § 1624(a)(2) (2009) ("The following contracts are invalid, unless they, or some note

26  or memorandum thereof, are in writing and subscribed by the party to be charged or by the

27  party's agent: […] A special promise to answer for the debt, default, or miscarriage of

28

Pfeiffer Thigpen FitzGibbon & Ziontz LLP
233 Wilshire Blvd., Suite 220
Santa Monica, California 90401

1     another, except in the cases provided for in Section 2794"); *see also* N.R.S. § 111.220.  That

2     statute provides, in pertinent part:

3     **Agreements not in writing: When void**

4     In the following cases every agreement is void, unless the agreement, or some
note or memorandum thereof expressing the consideration, is in writing, and

5     subscribed by the person charged therewith:

6     […]

7     2. Every special promise to answer for the debt, default or miscarriage of
another.

8     Here, Counterclaimants are clearly seeking indemnity from DCS and TICCM, which requires

9     the contract to be in writing to be enforceable.  *See Insurance Co. of the West v. Gibson Tile Co.,*

10     *Inc.*, 122 Nev. 455, 464, 134 P.3d 698, 704 (2006). Further, the Counterclaims fail to allege the

11     terms that purportedly provide them with a right to indemnity, nor do they allege the

12     contracting parties.  In fact, the allegations are directly contrary to both the Engagement

13     Letter and the MBD Agreement, assuming one of them is the contract at issue.  (*See* Request

14     for Judicial Notice, Tab 1 and Exh. A.)  Under these circumstances, the Counterclaims fail to

15     state a claim.

16     If the Counterclaims are based on the MBD Agreement, they do not state a claim on

17     the part of EAGL or LeaseCo because neither is a party to or beneficiary of that Agreement

18     and because TICCM has no burdens under the Agreement.  It is acknowledged that the only

19     signatory parties to such Agreement were DCS and Fairway. (Exh. A.) Section 21 of the

20     MBD Agreement specifically defines who is to benefit from the Agreement:

21     <u>Parties</u>. This Agreement shall be binding upon and inure solely to the benefit
of the parties hereto, the controlling persons referred to in Section 9, the

22     Parties described in Section 10 hereof and their respective successors, legal
representatives, heirs and assigns, and no other person shall have or be

23     construed to have any legal or equitable right, remedy or claim under, in
respect of, or by virtue of, this Agreement or any provision herein contained.

24

25     The controlling persons in Section 9 are those relating to DCS as the dealer, not Fairway. As

26     to the parties described in Section 10, they are: "partners, directors, officers, managers,

27     employees, members and agents, and its attorneys and accountants."  Counterclaimants

28

PTFDOCS #29288-v2-Motion_to_Dismiss_-_Fairway_Counterclaim_-_July_09

-19-

MOTION TO DISMISS OF COUNTERDEFENDANTS TIC CAPITAL MARKETS,
INC. AND DIRECT CAPITAL SECURITIES, INC.

Pfeiffer Thigpen FitzGibbon & Ziontz LLP
233 Wilshire Blvd., Suite 220
Santa Monica, California 90401

1   EAGL and LeaseCo are not a member of any of these categories with respect to Fairway, and

2   they does not allege that they have such status. Given the absence of any allegation showing

3   they are in the classes of persons protected by the indemnity, they are not a beneficiary of the

4   Agreement, given the restrictions in Section 21.  Thus, their Counterclaims fail. Likewise, the

5   Counterclaimants have sued TICCM, even though it is not a party to the MBD Agreement.

6   (Exh. A.) While TICCM may be a beneficiary of the indemnity by Fairway, it has no

7   obligations under that Agreement.  The "Dealer" is defined as DCS, and it is the party with

8   the indemnity obligations under Section 10.1, not TICCM.

9           Finally, the Counterclaims do not state a claim for breach of contract against DCS or

10  TICCM because none of the causes of action have sufficient information about the terms of

11  the alleged contract.  For example, it does not state (a) whether the contract is oral or written,

12  (b) who the contracting parties were, or (c) what the terms were that were allegedly breached,

13  but only references language in the PPM which is a separate document.  (Counterclaims ¶¶

14  201-09.)  Under these circumstances, Counterclaimants should not be permitted to proceed

15  unless allegations showing that DCS and TICCM actually could be liable to Counterclaimants

16  are made. Here, they should be required to be plead with greater specificity the terms of the

17  alleged contract, including whether it is oral or written.  *See* Fed. R. Civ. P. 12(e), Code of

18  Civil Procedure Section 430.10(g) and N.R.S. § 111.220.  Once the terms are alleged (if they

19  can be), then DCS and TICCM can fairly respond.

20          Thus, if the Court elects to decide the issues raised by the Counterclaims rather than

21  to dismiss for improper venue, Counterdefendants respectfully request that the Motion to

22  Dismiss under Rule 12(b)(6), or at minimum the Motion for a More Definite Statement

23  under Rule 12(e), be granted.

24  **IV.    <u>CONCLUSION</u>.**

25          Based on the foregoing, Counterdefendants DCS and TICCM respectfully request that

26  the Court Dismiss the Counterclaims against them based on improper venue.  In the

27  alternative, the Counterclaims should be dismissed substantively based on Rule 12(b)(6), or at

28

PTFDOCS #39288-v2-Motion_to_Dismiss_-_Fairway_Counterclaim_-_July_09

-20-

MOTION TO DISMISS OF COUNTERDEFENDANTS TIC CAPITAL MARKETS,
INC. AND DIRECT CAPITAL SECURITIES, INC.

1  minimum, the Court should grant the Motion for a More Definite Statement and require

2  Counterclaimants to plead with greater specificity.

3

4  DATED:  July 24, 2009

5  THOMAS N. FITZGIBBON

6  **PFEIFFER THIGPEN FITZGIBBON &**
   **ZIONTZ LLP**

7  233 Wilshire Blvd., Suite 220

8  Santa Monica, California 90401
   Tel: (310) 451-4325

9  Attorneys for Counterdefendants
   *TIC Capital Markets, Inc.; Direct Capital Securities, Inc.*

10

11  Dated: July 24, 2009

12                                    /s/

13  **DORIS NEHME-TOMALKA**
    Nevada Bar No.:  006431

14  **NEHME-TOMALKA & ASSOCIATES**
    2620 Regatta Drive, Suite 102

15  Las Vegas, Nevada 89128
    Tel: 702-240-5280

16  Attorney for Counterdefendants
    *TIC Capital Markets, Inc.; Direct Capital Securities, Inc.*

17

18

19

20

21

22

23

24

25

26

27

28

**Pfeiffer Thigpen FitzGibbon & Ziontz LLP**
233 Wilshire Blvd., Suite 220
Santa Monica, California 90401

PTFDOCS #39288-v2-Motion_to_Dismiss_-_Fairway_Counterclaim_-_July_09

-21-

MOTION TO DISMISS OF COUNTERDEFENDANTS TIC CAPITAL MARKETS,
INC. AND DIRECT CAPITAL SECURITIES, INC.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Pfeiffer Thigpen FitzGibbon & Ziontz LLP**
233 Wilshire Blvd., Suite 220
Santa Monica, California 90401

# Exhibit A

# To

# Memorandum Of Points And Authorities

**FAIRWAY SIGNATURE PROPERTIES, LLC**
**5500 East Flamingo Road**
**Las Vegas, Nevada  89122**
**October 30, 2005**

Direct Capital Securities, Inc.
1333 2nd Street
Suite 600
Santa Monica, CA 90401

Re:     Managing Broker-Dealer Agreement

Gentlemen:

      This letter confirms and comprises the agreement ("Agreement") among Fairway Signature Properties, LLC, a Delaware Limited Liability Company, (the "Company") and Direct Capital Securities, Inc. ("Dealer"), regarding the offering and sale by the Company of up to $24,480,000 of undivided interests ("Interests") in the Stallion Mountain Golf Course located at 5500 East Flamingo Road, Nevada (the "Property"). Capitalized terms used herein and not otherwise defined herein shall have the same meaning as in the Fairway Signature Properties, LLC Stallion Mountain Private Placement Memorandum dated October 30, 2005, as supplemented from time to time (the "Memorandum").

1.      <u>Appointment of Dealer</u>.

      1.1.    On the basis of the representations, warranties and covenants herein contained, but subject to the terms and conditions herein set forth, Dealer is hereby appointed and agrees to sell the Interests on a "best efforts" basis through a private, limited offering exempt from registration pursuant to: (i) Rule *506* of Regulation D promulgated under the Securities Act of 1933, as amended (the "Securities Act"); and (ii) applicable state blue sky exemptions. Dealer is authorized to enlist other members of the National Association of Securities Dealers, Inc. ("NASD") acceptable to the Company ("Selling Group Members" or "Soliciting Dealers") to sell Interests on a "best efforts" basis.

      1.2.    It is understood that no sale shall be regarded as effective unless and until accepted by the Company for sales of Interests. The Company reserves the right in its sole discretion to accept or reject any subscription for Interests in whole or in part for a period of 15 days after receipt of the subscription for Interests. Any subscription for Interests not accepted within 15 days of receipt shall be deemed rejected. The Interests will be offered during a period commencing on the date of the Memorandum October 30, 2005, and continuing until the earlier of (i) the date that $24,480,000 of  Interests have been sold or (ii) December 31, 2005 which date may be extended in the Company's sole discretion.

      1.3.    Subject to the performance by the Company, of all the obligations to be performed hereunder, and to the completeness and accuracy of all the representations and warranties contained herein, Dealer hereby accepts such agency and agrees on the terms and conditions herein set forth to use its best efforts during the offering period to find, through Soliciting Dealers, qualified subscribers for the Interests.

2.      <u>Representations and Warranties of the Company</u>. The Company hereby represents and warrants to Dealer, as applicable, that:

      2.1.    The Company has been duly organized and is validly existing as a limited liability company in good standing under the laws of the State of Delaware, has all requisite authority to enter into this Agreement and has all requisite authority to conduct its business as described in the Memorandum.

      2.2.    No defaults exist in the due performance and observance of any material obligation, term, covenant or condition of any agreement or instrument to which the Company is a party or by which the Company is bound.

      2.3.    Subject to the performance of the Company's obligations hereunder, the holders of Interests ("Interestholders") will have the rights described in the Memorandum.

      2.4.    Neither the Memorandum, nor any sales literature or other materials prepared by or for the Company in connection with the offering of Interests, as applicable, contain, nor will they contain, at any time

during such period up to and including the Offering Termination Date, any untrue statement of a material fact nor do they or will they at any time during such period omit to state a material fact required to be stated therein or necessary to make the statements therein, under the circumstances in which they were made, not misleading.

3.    <u>Covenants of the Company</u>. The Company agrees that:

3.1.    It will deliver to Dealer such numbers of copies of the Memorandum, as appropriate, and any amendment or supplement thereto, with all appendices thereto, as Dealer may reasonably request for the purposes contemplated by federal, Nevada and other state securities laws. It will submit drafts of the Memorandum to Dealer prior to use, will not use any Memorandum to which Dealer may reasonably object, and shall make such modifications, amendments or supplements to the Memorandum as reasonably requested by Dealer to eliminate any inaccurate or misleading statement contained therein, but no failure to make any objection or to request any modification, amendment or supplement shall constitute any representation by Dealer regarding the accuracy or completeness of the Memorandum.

3.2.    It will comply with all requirements imposed upon it by the rules and regulations of the Securities and Exchange Commission ("SEC"), and by all applicable Nevada and applicable state securities laws and regulations, to permit the continuance of offers and sales of the Interests, in accordance with the provisions hereof and in the Memorandum, and will amend or supplement the Memorandum at any time if required to make the Memorandum comply with the requirements of federal, Nevada, and other state securities laws and regulations.

3.3.    If at any time any event occurs as a result of which the Memorandum would include an untrue statement of a material fact or, in view of the circumstances under which they were made, omit to state any material fact necessary to make the statements therein not misleading, it will notify Dealer thereof, and effect the preparation of an amended or supplemental Memorandum, as the case may be, which will correct such statement or omission, and deliver to Dealer as many copies of such amended or supplemental Memorandum as Dealer may reasonably request.

3.4.    Each will apply the net proceeds from the offering received by it in the manner set forth in the Memorandum.

3.5.    Each will timely file a Form D relating to the offering with the SEC under Regulation D of the Securities Act.

3.6.    Subject to Dealer's actions and the actions of others in connection with the offering, the Company will comply with all requirements imposed upon it by Rule 506 of Regulation D and applicable state securities laws.

3.7.    The Company will furnish the Interestholders with the reports described in the Memorandum under the Asset Management Agreement, and will deliver to Dealer one copy of each such report at the time that such reports are furnished to the Interestholders, and such other information concerning the Company as the case may be, as may reasonably be requested.

3.8.    The Company shall not make any written or oral representations or statements to investors that contradict or are inconsistent with the statements made in the Memorandum, as amended or supplemented.

3.9.    The Company shall not permit the purchase of Interests by any investors who do not qualify as "accredited investors" under Rule 501(a) of Regulation D.

3.10.    Any officer, director, employee or affiliate of the Company who buys any Interests in connection with the offering shall do so for investment purposes only and not for resale or distribution.

4.    <u>Duties and Obligations of the Dealer</u>.

4.1.    Dealer will serve in a "best efforts" capacity in the offering, sale and distribution of the Interests. Dealer may offer the Interests as an agent, but all sales shall be made by the Company acting through Dealer as an agent, and not by Dealer as a principal. Dealer shall have no authority to appoint any person or other entity as an agent or sub-agent of Dealer or the Company, except to appoint Selling Group Members acceptable to the Company.

4.2.    Dealer shall make no representations to any prospective investor other than those contained in the Memorandum, and will not allow any other written materials to be used to describe the potential investment to prospective investors other than the Memorandum or factual summaries and sales brochures of the offering prepared

by the Company, except as authorized by the Company.

4.3.      Dealer will limit the offering of the Interests to persons whom Dealer has reasonable grounds to believe, and in fact believes, meet the financial suitability and other investor suitability requirements set forth in the Memorandum under "Purchaser Suitability Requirements".

4.4.      Dealer will provide each prospective investor with a copy of the Memorandum and appendices, amendments and supplements thereto during the course of the offering and before sale and advise each such prospective investor at the time of the initial offering to him or her that the Company and/or its agents and consultants will, during the course of the offering and prior to any sale, accord said investor and his or her purchaser representative, if any, including Dealer, the opportunity to ask questions of and to receive answers from the Company and/or its agents and consultants concerning the terms and conditions of the offering and to obtain any additional information, which information is possessed by the Company or may be obtained by it without unreasonable effort or expense and which is necessary to verify the accuracy of the information contained in the Memorandum.

4.5.       Before making any sale of the Interests, Dealer will inform the prospective investor and his or her purchaser representative, if any, of all pertinent facts relating to the liquidity and marketability of the Interests, during the term of the investment as set forth in the Memorandum, as applicable.

4.6.      In recommending the purchase or sale of the Interests to a prospective investor that Dealer is soliciting to acquire Interests, the Dealer or any person associated with the Dealer shall:

(a)      have reasonable grounds to believe, on the basis of information obtained from the prospective investor concerning his or her investment objectives, other investments, financial situation and needs, and any other information known by the Dealer or an associated person, that:

(i)      the prospective investor meets the investor suitability requirements set forth in the Memorandum, as appropriate;

(ii)      the prospective investor has a fair market net worth sufficient to sustain the risks inherent in an investment in the Interests, including, but not limited to, total loss of his or her investment, lack of liquidity and other risks described in the Memorandum; and

(iii) an investment in Interests is otherwise suitable for the prospective investor.

(b)      maintain in Dealer's files, for a reasonable period following the Offering Termination Date, documents disclosing the basis upon which the above determination of suitability was reached as to each investor.

4.7.      Dealer shall not execute any transaction in which an investor invests in the Interests in a discretionary account without prior written approval of the transaction by the investor.

4.8.      Dealer will comply in all respects with the subscription procedures and distribution plan set forth in the Memorandum.

4.9.      In the event Dealer receives any customer funds for the Interests, Dealer will transmit such customer funds as soon as practicable following receipt of such funds for the Interests to escrow at Nevada Title, or such other escrow company, as determined by the Company, ("Escrow Agent").

4.10.      Dealer shall complete all steps necessary to permit Dealer to offer the Interests pursuant to exemptions available under the federal securities laws, and rules and regulations thereunder, the securities laws of Nevada and other applicable states, other than any steps required to be taken by the Company pursuant to Section 3. Dealer shall conduct all of its solicitation and sales efforts in conformity with Regulation D and a Rule 506 offering under the Securities Act, and exemptions available under applicable state law.

4.11.      Dealer will furnish to the Company upon request a complete list of all persons who have been offered the Interests and such persons' states of residence.

4.12.      Dealer will immediately bring to the attention of the Company any circumstance or fact which

causes Dealer to believe the Memorandum, or any other literature distributed pursuant to the offering, or any information supplied by prospective investors in their subscription materials, may be inaccurate or misleading.

4.13.    Dealer shall thoroughly review all pertinent organizational documents of the Company, the receipt of which is hereby acknowledged.

4.14.    In soliciting persons to acquire the Interests, Dealer shall comply with any applicable requirements of the Securities Act, the Securities Exchange Act of 1934, as amended (the "Exchange Act"), applicable state securities laws, the published rules and regulations thereunder, and NASD rules and, in particular, Dealer agrees that Dealer will not give any information or make any representations other than those contained in the Memorandum and in any supplemental sales literature furnished to Dealer by the Company for use in making such solicitations.

4.15.    Dealer plans to engage in activities hereunder in all 50 states unless Company provides in writing that such state(s) has been rejected for offer and sale activity.

4.16.    When Selling Group Members are utilized in the offering, Dealer agrees to use its best efforts to cause such Selling Group Members to comply with all the foregoing obligations.

*5.* Representations and Warranties of Dealer. Dealer represents and warrants to the Company that:

5.1.    Dealer is a duly organized corporation.

5.2.    This Agreement, when executed by Dealer, will have been duly authorized and will be a valid and binding agreement of Dealer, enforceable in accordance with its terms.

5.3.    The consummation of the transactions contemplated herein and those contemplated by the Memorandum will not result in a breach or violation of any order, rule or regulation directed to Dealer by any court or any federal or state regulatory body or administrative agency having jurisdiction over Dealer or its affiliates.

5.4.    Dealer is, and during the term of this Agreement will be, duly registered as a broker-dealer pursuant to the provisions of the Exchange Act, a broker or dealer duly registered as such in California, a member in good standing of the NASD, and a broker or dealer duly registered as such in any other state where offers are made by Dealer and such registration is required. Dealer will comply with all applicable laws, regulations and requirements of the Securities Act, the Exchange Act, applicable state law and the NASD.

5.5.    This Agreement, or any supplement or amendment hereto, may be filed by the Company with the SEC, if such should be required, and may be filed with, and may be subject to the approval of, any applicable federal, Nevada or other state securities regulatory agencies, if required.

5.6.    No agreement will be made by Dealer with any person permitting the resale, repurchase or distribution of any  Interests purchased by such person.

6.    Compensation. As compensation for services rendered by Dealer under this Agreement, Dealer will be entitled to receive from the Company or the Company, as appropriate:

6.1.    A selling commission equal to 7.5% of the gross proceeds of the Interests sold in the offering by Dealer and Selling Group Members, which Dealer may reallow, in whole or in part, to Selling Group Members, provided, however, that such amount may be reduced if a lower commission rate is negotiated with a Selling Group Member;

6.2.    A due diligence fee equal to 1.25% of the gross proceeds of the offering of Interests which Dealer may reallow, in whole or in part, to Selling Group Members;

6.3.    A non-accountable marketing and due diligence expense allowance equal to 2% of the gross proceeds of the offering of Interests for serving as Managing  Dealer;

6.4.    Reimbursement of documented expenses incurred in connection with due diligence conducted on the Property; and

6.5.    Such other fees and reimbursements pursuant to the terms of an engagement letter dated October 26, 2005, between Walters Golf and Affiliates and Dealer ("Engagement Letter").

The commissions, allowances and due diligence fees described in Sections 6.1, 6.2 and 6.3 shall collectively be referred to herein as "Compensation."

Notwithstanding the foregoing provisions of this Section 6, the Company reserves the right, in its discretion, to refuse to accept any or all subscriptions for the Interests tendered by Dealer and/or to terminate the offering of the Interests at any time before the Offering Termination Date.

7.    <u>Offering</u>. The offering of the Interests shall be at the offering price and upon the terms and conditions set forth in the Memorandum and the appendices thereto and any supplements thereto.

8.    <u>Conditions to Payment of Compensation</u>.

8.1.    No Compensation will be payable with respect to any subscriptions for Interests that are rejected by the Company, or if the Company terminates the offering for any reason whatsoever. No Compensation will be payable to Dealer with respect to any sale of the Interests unless and until such time as the Company has received the total proceeds of any such sale from escrow.

8.2.    All other expenses incurred by Dealer in the performance of Dealer's obligations hereunder, including but not limited to expenses related to the offering of the Interests and any attorneys' fees, shall, to the extent not reimbursed pursuant to the Engagement Letter, be at Dealer's sole cost and expense, and the foregoing shall apply notwithstanding the fact that the offering is not consummated for any reason.

9.    <u>Indemnification of Dealer</u>.

9.1.    Subject to the conditions set forth below, the Company agrees to indemnify and hold harmless Dealer, the Soliciting Dealers and each person, if any, who controls Dealer, or the Soliciting Dealers, and each of their respective partners, directors, officers, managers, employees and agents, and each of their respective attorneys and accountants ("Dealer Parties"), against any and all loss, liability, claim, damage and expense whatsoever ("loss") arising out of or based upon:

(a)    Any untrue statement or alleged untrue statement of a material fact contained in the Memorandum (as from time to time is amended and supplemented), or in any application or other document filed in any jurisdiction in order to qualify the Interests under or exempt the offering of the Interests from the registration or qualification requirements of the securities laws thereof;

(b)    The omission or alleged omission from the Memorandum (as from time to time is amended and supplemented) of a material fact required to be stated therein or necessary to make the statements therein not misleading;

(c)    The failure of the Company to comply with any of the applicable provisions of the Securities Act, the Exchange Act, Regulation D (including Rule *506),* or the rules and regulations under such acts, or any applicable state laws or regulations, other than any failure to comply which results from acts of the Dealer Parties;

(d)    Any unauthorized verbal or written representations in connection with the offering made by the Company or its agents (other than by Dealer Parties), employees or affiliates in violation of the Securities Act, or any other applicable federal or state securities laws and regulations; or

(e)    The breach by the Company of any term, condition, representation, warranty or covenant of this Agreement.

9.2.    If any action is brought against Dealer Parties in respect of which indemnity may be sought hereunder, Dealer shall promptly notify the party or parties against whom indemnification is to be sought in writing of the institution of such action, and the Company shall assume the defense of such action. Dealer Parties shall have the right to employ counsel in any such case. The fees and expenses of such counsel shall be at the Company's expense and authorized in writing by the Company.

9.3.     The Company agrees to promptly notify Dealer of the commencement of any litigation or proceedings against the Company or any of its officers or agents in connection with the issuance and sale of the Interests, or in connection with the Memorandum.

9.4.     The indemnity provided to Dealer Parties pursuant to this Section 9 shall not apply to the extent that any loss arises out of or is based upon any untrue statement or alleged untrue statement of material fact made by Dealer Parties, or any omission or alleged omission of a material fact required to be stated by Dealer Parties. The foregoing shall not apply to any untrue statement or alleged untrue statement or omission that is based on statements or representations in the Memorandum, as amended or supplemented.

10.     <u>Indemnification of the Company</u>.

10.1.     Subject to the conditions set forth below, Dealer agrees to indemnify and hold harmless the Company and its partners, directors, officers, managers, employees, members and agents, and its attorneys and accountants ("Parties"), against any and all loss, liability, claim, damage and expense whatsoever ("loss") arising out of or based upon:

(a)     Any unauthorized verbal or written representations in connection with the offering made by Dealer or the Soliciting Dealers or each of their agents (other than by the Company or its employees or affiliates), employees, or affiliates in violation of the Securities Act, or any other applicable federal or state securities laws and regulations;

(b)     Dealer's failure to comply with any of the applicable provisions of the Securities Act, the Exchange Act, Regulation D (including Rule 506), or the rules and regulations under such acts, applicable requirements and rules of the NASD, or any applicable state laws or regulations, other than any failure to comply which results from acts of the Company;

(c)     The breach by Dealer of any term, condition, representation, warranty, or covenant of this Agreement; or

(d)     The failure by any purchaser of Interests to comply with the investor suitability requirements set forth in the sections captioned "Purchaser Suitability Requirements" in the Memorandum.

10.2.     If any action is brought against any Parties in respect of which indemnity may be sought hereunder, the Parties shall promptly notify Dealer in writing of the institution of such action, and Dealer shall assume the defense of such action. The Parties shall have the right to employ counsel in any such case. The fees and expenses of such counsel shall be at Dealer's expense and authorized in writing by Dealer.

10.3.     Dealer agrees to promptly notify the Company of the commencement of any litigation or proceedings against Dealer or any of Dealer's officers, directors, partners, affiliates, or agents in connection with the issuance and sale of the Interests or in connection with the Memorandum.

11.     <u>Contribution</u>. To provide for just and equitable contribution in circumstances in which the indemnification provided pursuant to Sections 9 and 10 is for any reason held to be unavailable from the Company or Dealer, as the case may be, the Company, on the one hand, and Dealer, on the other, shall contribute to the aggregate losses, liabilities, claims, damages and expenses (including any amount paid in settlement of any action, suit, or proceeding or any claims asserted) in such amounts as a court of competent jurisdiction may determine (or in the case of settlement, in such amounts as may be agreed upon by the parties) in such proportion to reflect the relative fault of the Company, on the one hand, and the Dealer, on the other hand, in connection with the events described in Sections 9 and 10, as the case may be, which resulted in such losses, liabilities, claims, damages or expenses, as well as any other equitable considerations. The relative fault of the parties shall be determined by reference to, among other things, whether any untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Company, on the one hand, or the other, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such omission or statement. The other Parties and Dealer Parties shall also have rights to contribution under this Section 11.

12.     <u>Compliance</u>. All actions, direct or indirect, by Dealer, its respective agents, employees and affiliates, shall conform to (i) requirements applicable to broker-dealers under federal and applicable state securities laws, rules and regulations, and (ii) applicable requirements and rules of the NASD.

13.     Representations and Agreements to Survive Sale and Payment. Except as the context otherwise requires, all representations, warranties and agreements contained in this Agreement shall be deemed to be representations, warranties and agreements at and as of any time during the offering period up to and including the Offering Termination Date, and such representations, warranties and agreements by Dealer, the Company, including the indemnity agreements contained in Sections 9 and 10, shall remain operative and in full force and effect regardless of any investigation made by Dealer, the Company and/or any controlling person, and shall survive the sale of, and payment for, the Interests.

14.     Costs of Offering.

        14.1.     Except for the Compensation payable to Dealer described in Section 6, which is the sole obligation of the Company, Dealer will pay all of its own costs and expenses, including, but not limited to, all expenses necessary for Dealer to remain in compliance with any applicable federal, state or NASD laws, rules or regulations in order to participate in the offering as a broker-dealer, and the fees and costs of Dealer's counsel, except to the extent reimbursed pursuant to the Engagement Letter, the Company agrees to pay all other expenses incident to the performance of its obligations hereunder, including all expenses incident to filings with federal and state regulatory authorities and to the exemption of the Interests under federal, Nevada and other state securities laws, including fees and disbursements of the Company's and the Company's counsel, and all costs of reproduction and distribution of the Memorandum, and any amendment or supplement thereto.

15.     Termination. This Agreement is terminable by any party at any time upon written notice to the other parties, subject to the Engagement Letter. Such termination shall not affect the indemnification agreements set forth in Sections 9 and 10.

16.     Construction. This Agreement shall be governed by, subject to and construed in accordance with, the laws of the State of California without regard to conflict of law provisions.

17.     Severability. If any portion of this Agreement shall be held invalid or inoperative, then so far as is reasonable and possible (a) the remainder of this Agreement shall be considered valid and operative and (b) effect shall be given to the intent manifested by the portion held invalid or inoperative.

18.     Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, and together which shall constitute one and the same instrument.

19.     Modification or Amendment. This Agreement may not be modified or amended except by written agreement executed by the parties hereto.

20.     Notices. All communications hereunder, except as herein otherwise specifically provided, shall be in writing and, if sent to Dealer, shall be mailed or delivered Direct Capital Securities, and if sent to the Company, shall be mailed or delivered to the Company (5500 East Flamingo Road, Las Vegas, Nevada 89122). The notice shall be deemed to be received on the date of its actual receipt by the party entitled thereto.

21.     Parties. This Agreement shall be binding upon and inure solely to the benefit of the parties hereto, the controlling persons referred to in Section 9, the Parties described in Section 10 hereof and their respective successors, legal representatives, heirs and assigns, and no other person shall have or be construed to have any legal or equitable right, remedy or claim under, in respect of, or by virtue of, this Agreement or any provision herein contained.

22.     Delay. Neither the failure nor any delay on the part of any party to this Agreement to exercise any right, remedy, power, or privilege under this Agreement shall operate as a waiver thereof, nor shall a waiver of any right, remedy, power, or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power, or privilege with respect to any subsequent occurrence.

23.     Recovery of Costs. If any legal action or other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding (and any additional proceeding for the enforcement of a judgment) in addition to any other relief to which it or they may be entitled.

24.     Entire Agreement. This Agreement contains the entire understanding between the parties hereto and supersedes any prior understandings or written or oral agreements between them respecting the subject matter hereof

with the exception of the Engagement Letter. To the extent there is a conflict between the terms of the Engagement Letter and this Agreement, this Agreement shall control.

If the foregoing correctly sets forth the understanding among Dealer and the Company, please so indicate in the space provided below for that purpose, and return one of the signed copies of this letter agreement to the Company in the envelope provided for this purpose, whereupon this letter agreement shall constitute a binding agreement among us.

Very truly yours,

Signature Fairway Properties, LLC
a Delaware Limited Liability Company ("COMPANY")

By: _____

Name: _____

Title: _____

Dealer:

DIRECT CAPITAL SECURITIES, INC.

By. _____

Name: _____

Title: _____

## CERTIFICATE OF SERVICE

I hereby certify that a copy of **MOTION OF COUNTERDEFENDANTS TIC CAPITAL MARKETS, INC. AND DIRECT CAPITAL SECURITIES, INC. TO DISMISS THE COUNTERCLAIMS OF FAIRWAY SIGNATURE PROPERTIES, LLC AND RELATED PARTIES; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** was filed electronically with the Clerk of the Court on July 24, 2009, and will be served electronically to designated CM/ECF participant counsel through the court's electronic filing system and mail served to the other interested parties in this action.

Ryan Fife - rfife@ertwllp.com

Edward Gartenberg - egartenberg@ggwslaw.com

Craig A Henderson - chenderson@baileykennedy.com, klebel@baileykennedy.com

Dennis L. Kennedy - dkennedy@baileykennedy.com, srusso@baileykennedy.com

Kimberly R. McGhee - kmcghee@baileykennedy.com, bolaughlin@baileykennedy.com

Kristin Sciarra - ksciarra@ggwslaw.com

Kyle O Stephens - ecf@lslawnv.com, shac@lslawnv.com

Adam J Thurston - athurston@ertwllp.com

Christopher F Wong - cwong@ertwllp.com

Thomas N. FitzGibbon – tnf@ptflaw.com

Doris Nehme-Tomalka – doris@nehme-tomalka.com

John P. Aldrich – jaldrich@johnaldrichlawfirm.com

I declare under penalty of perjury that the foregoing is true and correct.  Executed on July 24, 2009, at Santa Monica, California.

_Thomas N. FitzGibbon_

_____
Thomas N. FitzGibbon

Pfeiffer Thigpen FitzGibbon & Ziontz LLP
233 Wilshire Blvd., Suite 220
Santa Monica, California 90401