1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

7   FSP STALLION 1, LLC, *et al.*,                    )
8                                    Plaintiffs,      )        Case No. 2:08-cv-01155-PMP-PAL
                                                      )
9   vs.                                               )        **ORDER**
                                                      )
10  MICHAEL LUCE, *et al.*,                           )        (Mot Compel - Dkt. #351)
                                                      )        (CM/Exclude - Dkt. #354)
11                                   Defendants.      )        (CM/Exclude - Dkt. #355)
    _____        )        (Mot Leave File Supplement - Dkt. #364)
12

13          Before the court is Plaintiffs' Emergency Motion to Compel (Dkt. #351) filed under seal,

14   Countermotion and Motion for Leave to Supplement (Dkt. #364).  The court has considered the motion;

15   the Walters Defendants' Response (Dkt. #352); Countermotion to Exclude (Dkt. #354); Plaintiffs'

16   Reply (Dkt. #356); Plaintiffs' Opposition to Countermotions in Limine and to Exclude (Dkt. #358);

17   Waters Defendants' Reply in Support of their Countermotion to Exclude the DCS Documents (Dkt.

18   #361); Defendant Direct Capital Securities Joinder in Opposition of the Walters Defendants and Luce

19   Parties to Plaintiffs' Motion to Compel and Countermotion to Exclude (Dkt. #362); Walters

20   Defendants' Request for Leave to File a Supplement (Dkt. #364); and Plaintiffs' Reply to DCS

21   Opposition to Motion to Compel (Dkt. #366); and the arguments of counsel at a hearing conducted

22   March 2, 2010.

23                              **BACKGROUND**

24   **I.      The Complaint**

25          Plaintiffs FSP Stallion 1, LLC through FSP Stallion 26, LLC are twenty-six (26) separate and

26   independent special purpose limited liability companies organized under the laws of Delaware.  First

27   Amended Complaint, Dkt. #320, ¶ 1.  Defendants William Walters ("Walters") and Michael Luce

28   ("Luce") are Nevada residents.  *Id.* ¶¶ 2, 3.  Defendant Joe R. Munsch ("Munsch") is a resident of

Texas. *Id*. ¶ 4.  Defendant Fairway Signature Properties, LLC ("Fairway") is a Delaware limited liability Company with its principal place of business in Nevada.  *Id*. ¶ 5.  Defendant Golf Club of Nevada, Inc. ("Golf Club") is a Nevada corporation.  *Id*. ¶ 6.  Defendant Stallion Mountain LeaseCo, LLC ("LeaseCo") is a Delaware limited liability company with its principal place of business in Nevada.  *Id*. ¶ 7.  Defendant Evergreen Alliance Golf Limited, LP ("EAGL") is a Delaware limited partnership with its principal place of business in Texas.  *Id*. ¶ 8.  Defendant Direct Capital Securities ("DCS") is a Delaware corporation with its principal place of business in California.  *Id.* ¶ 11.  Defendant TIC Capital Markets, Inc. ("TICCM") is a Delaware corporation with its principal place of business in California.  *Id.* ¶ 12.  Defendant Clay H. Womack ("Womack") is a Texas resident.  *Id*. ¶ 13.

Plaintiffs' First Amended Complaint alleges claims for: (1) violation of federal and state securities law; (2) fraudulent misrepresentation; (3) fraudulent concealment; (4) aider and abettor liability for fraud; (5) conspiracy to commit fraud; (6) breach of fiduciary duty; (7) breach of contract; (8) breach of the implied covenant of good faith and fair dealing; (9) negligence; and (10) interference with prospective economic advantage.  Plaintiffs allege the Defendants are sophisticated golf course owners and operators who conspired to sell them a struggling golf course at an inflated price and who targeted potential investors with little or no knowledge of the golf course business generally, or the Las Vegas golf market in particular.  *Id*. ¶ 20.  The First Amended Complaint alleges that in 2005, Defendants Walters, Luce, Munsch and Womack conspired to develop a scheme to fraudulently induce investors to purchase Stallion Mountain at a grossly inflated price through private placement of undivided tenant-in-common ("TIC")  interests in the property.  *Id*. ¶ 32.

The transaction was structured as a private placement of TIC interests in the Stallion Mountain Country Club ("Stallion Mountain") in Las Vegas.  *Id*. ¶ 21.  Stallion Mountain was sold by Golf Club to Fairway, an entity formed and controlled by Luce and Munsch to sponsor the PPM and sell TIC interests to investors.  *Id*. ¶ 35.  The TIC investors leased the property to LeaseCo, which served as the Master Tenant under a Master Lease Agreement with the investors.  *Id*. ¶ 35.  LeaseCo was an entity controlled by two of the Defendants, who continued to operate the property.  *Id.* ¶ 21.

///

2

1
2
3
4
5
6
7
8
9
10

Walters, Luce, Munsch, Womack and their respective entities, Fairway, LeaseCo, EAGL, Golf Club and DCS each played a significant role and substantially participated in drafting and preparation of the PPM. *Id.* ¶ 34.  The offering price was $24.4 million dollars, $15.2 million of which was financed through a secured loan. *Id.* ¶ 22.  Plaintiffs allege that the loan appeared to reduce the amount of cash each that individual investor would need to participate in the offering, but actually saddled the project with a heavy debt obligation that left investors with negative cash flow. *Id.*  The Defendants made misleading representations and material omissions to create the appearance that Stallion Mountain was capable of generating sufficient revenue to service a $15.2 million dollar loan secured by the property and provide a return on an approximate $9.2 million equity investment in the range of 8.25% to 8.75% over seven (7) years. *Id.* ¶ 32.

11
12
13
14
15
16
17
18
19
20
21

The Defendants also made a number of other false and misleading statements and omissions in the PPM provided to the Plaintiffs. *Id.* ¶¶ 40-51.  Plaintiffs relied upon the Confidential Private Placement Memorandum ("PPM") prepared by Defendants in deciding to invest in the TIC interests. *Id.* ¶ 23.  After Plaintiffs purchased the TIC interests, Defendant Luce and Munsch operated Stallion Mountain for approximately a year at a substantial deficit, depleting operating reserves. *Id.* ¶ 24.  In June 2007, Luce and Munsch announced that LeaseCo would stop making rent payments. *Id.*  Within months, LeaseCo also stopped making debt service payments to the lender, forcing Plaintiffs to start pouring new money into Stallion Mountain to keep the project afloat and avoid foreclosure. *Id.*  Plaintiffs retained their own management company to perform Defendants' obligations to manage and operate Stallion Mountain. *Id.*  Plaintiffs eventually lost their entire investment and seek to recover their out-of-pocket losses. *Id*. ¶ 26.

22

## II.   The Counterclaims.

23
24
25
26
27
28

Walters and Defendants Golf Club, Walter Golf, Las Vegas Preferred Tee Times, LLC ("Walters parties") filed an answer and counterclaims (Dkt. #324) against Plaintiffs for waste and conversion.  Defendants Michael Luce, Joe Munsch, Fairway Signature Properties, Evergreen, Stallion Mountain LeaseCo ("Luce parties") also filed an answer (Dkt. #325) to Plaintiffs' First Amended Complaint and alleged counterclaims for: (1) a breach of contract; (2) breach of a guarantee agreement; (3) intentional misrepresentation; (4) negligent misrepresentation; (5) breach of the covenant of good

faith and fair dealing; (6) unjust enrichment; (7) quantum meruit; and (8) intentional interference with contractual relations, contribution, accounting.

## A.   **Plaintiffs' Motion to Compel (Dkt. #351)**

Plaintiffs seek an order: (1) compelling the Walters and Luce Defendants to produce documents relating to the drafting and preparation of the Private Placement Memorandum ("PPM") at issue in this case; (2) compelling all Defendants to answer questions regarding these documents at depositions; and (3) finding that the documents produced by Direct Capital Securities, Inc., ("DCS") to Plaintiffs are not privileged.  The Walters and Luce Defendants have withheld documents requested in discovery in this matter, asserting a "common interest" privilege and have instructed witnesses not to answer deposition questions relating to documents the Defendants have withheld, as well as documents produced by DCS voluntarily to Plaintiffs in informal discovery.  Plaintiffs describe the documents at issue as e-mails, drafts of the PPM, spreadsheets containing financial information and draft projections for the PPM, and related documents exchanged between the seller, Golf Club of Nevada, Inc., ("Golf Club") the sponsor of the offering, Fairway Signature Properties, LLC, ("Fairway") the managing broker-dealer, DCS, and Evergreen Alliance Golf Limited, L.P. ("EAGL"), the company that was to serve as the prospective manager of Stallion Mountain Lease Co., LLC, after the sale.

Fairway retained Stephen Burr of the firm of Foley & Lardner ("F&L") to prepare the PPM and other documents associated with the offering.  Golf Club was represented by the Bailey Kennedy firm. DCS was represented by its own in-house counsel, Jeff Kohn.  EAGL was represented through its in-house counsel, Lynn Marie Mallery.

Plaintiffs assert that none of these communications are between an attorney and a client and that the "common interest doctrine" is an exception to the general rule that the attorney-client privilege is waived when a protected communication is disclosed to a third party.  In this case, the documents involve commercial communications about the sale of the Stallion Mountain golf course in a private placement offering of tenant in common interests.  The common interest doctrine does not apply where the common interests shared by the parties is commercial rather than legal in nature, even if counsel was involved for the purpose of structuring the transaction or insuring that the documents related to it were legally appropriate.

4

Plaintiffs argue that extending the common interest privilege to these documents would be particularly unwarranted in this case because at least one of the parties, DCS, did not view the communications as privileged.  During informal pre-suit discovery, Plaintiffs met with Clay Womack ("Womack"), the CEO of DCS and their counsel.  DCS voluntarily provided Plaintiffs' counsel with: (1) drafts of the PPM; (2) proformas showing various financial models and cash flow projections; and (3) communications between DCS and the various Luce Defendants regarding the drafting of the PPM, including discussions about what information should be disclosed and withheld from the investors.  In formal document discovery, the Walters and Luce Defendants produced an eighty-seven page privileged document log which withheld (1) communications between DCS and the Walters and Luce Defendants, (2) certain communications with EAGL, and (3) certain communications involving F&L, the law firm representing Fairway, and parties not represented by F&L.

In this motion, Plaintiffs seek documents in these withheld categories created on or before May 5, 2006, the date the last Plaintiff purchased an interest in Stallion Mountain.  Attached as Exhibit "B" to the declaration of Ryan Fife are highlighted pages from the Walters and Luce Defendants' privileged document logs identifying the documents Plaintiffs seek to compel Defendants to produce.

During the deposition of Mr. Munsch, a principal of Fairway and Stallion Mountain LeaseCo., Plaintiffs' counsel marked a number of DCS documents as exhibits.  Counsel for the Walters and Luce Defendants believed the documents were privileged but permitted the witness to answer questions about the exhibits without seeking a protective order or instructing the witness not to answer.  Six days later at Mr. Luce's deposition, counsel for Walters instructed Luce not to answer questions regarding these documents.  As a result, the parties agreed to "sequester the documents" marked as Exhibits 379–383, 410, and 411, pending a decision on the merits of this dispute.  Plaintiffs argue that there is no dispute that the documents are highly relevant and that the only issue is whether they fall within the scope of the attorney-client privilege under the "common interest doctrine."

Plaintiffs argue the common interest exception to the attorney-client privilege does not apply because communications between DCS and the Luce or Walters Defendants do not independently satisfy the elements of the attorney-client privilege as there has never been an attorney-client

relationship between DCS and any of the Luce or Walters Defendants.  Plaintiffs also contend that the "common interest doctrine" does not apply because the Luce Defendants, Walters Defendants, and DCS did not share a common legal interest.  Rather, the documents were generated in connection with a commercial or business endeavor.  Finally, Plaintiffs argue that any privilege has been waived by the voluntary production of the documents by DCS and its counsel.  Any potential attorney-client privilege was also waived during Mr. Munsch's deposition when counsel for all of the Defendants permitted him to answer questions regarding certain of the documents now claimed to be privileged.  Although counsel for Defendants objected, no counsel stopped the deposition to seek a protective order or instructed or even advised the witness not to answer questions.  Thus, the witness's voluntary disclosure of the information constitutes a waiver.  Plaintiffs also argue that defense counsel's failure to instruct the witness not to answer "reveals a lack of sincerity as to the assertion of the common interest privilege generally" as counsel obviously would have instructed the witness not to answer if they genuinely believed the documents in question sought attorney-client privileged information.

Defendant Walters also claims that he entered into a joint defense agreement with the Luce Defendants February 4, 2009 which makes the documents at issue in this motion privileged.  However, Plaintiffs argue that the joint defense agreement is not relevant to this motion because Plaintiffs have limited the scope of the motion to compel documents created on or before May 5, 2006, nearly three years before the joint defense agreement was entered into.  Any disclosures made to Walters before May 5, 2006 are not subject to the joint defense agreement because it does not apply retroactively to render documents created on or before May 5, 2006 privileged.

Plaintiffs contend that communications between Luce and EAGL's general counsel, Lynn Marie Mallery prior to May 5, 2006, are not privileged and must be produced.  Luce was the president of the Walters Group as well as the Vice President of Fairway and had no attorney-client relationship with Mallery.  Luce did not have a common interest with EAGL before May 5, 2006, and any communications before then were in connection with a purely commercial purpose of trying to finalize the PPM and sell the property.  Similarly, certain communications involving F&L, counsel for Fairway, and the Defendants created before May 5, 2006 are not privileged as there was no attorney-client

///

6

1 relationship between the firm and the other Defendants.  All of these communications were commercial

2 in nature as they also involved attempts to finalize the PPM and complete the transaction.

3 **B.     The Walters Defendants' Response (Dkt. #352) and Counter Motion (Dkt. #354)**

4          The Walters Defendants characterize this dispute as involving two separate sets of documents.

5 The first set of documents are the DCS documents consisting of 4,782 pages of information.  The

6 Walters Defendants claim that neither DCS nor the Plaintiffs disclosed that DCS had produced these

7 documents to Plaintiffs' counsel or provided defense counsel with copies of them until November 30,

8 2009, a month after the close of discovery in this case.  The second set of documents consists of: (1)

9 documents produced by the Walters Defendants May 18, 2009 as part of their Rule 26(a)(1) initial

10 disclosures; (2) documents produced by the Walters Defendants on October 28, 2009 in supplemental

11 disclosures; and (3) documents produced by the Luce Defendants May 18, 2009 as part of their Rule

12 26(a)(1) initial disclosures.  Although these documents were produced, privileged portions of the

13 documents were redacted and redactions were logged on privileged document logs.  Defendants were

14 not aware until the second day of Defendant Joseph Munsch's deposition, the day  after the close of

15 discovery, that Plaintiffs had obtained unredacted versions of a number of these documents.  (Mr.

16 Munsch's deposition was taken one day after the close of discovery pursuant to a stipulation and order.)

17 During the deposition, Plaintiffs' counsel used certain of the DCS documents as exhibits and examined

18 Mr. Munsch about them.

19          The Walters Defendants oppose Plaintiff's motion to compel on two grounds.  First, that it is

20 untimely, and second, because the documents Plaintiffs seek are, in fact, privileged.  The Walters

21 Defendants assert the motion is untimely because these Defendants made their Fed. R. Civ. P. 26(a)(1)

22 initial disclosures May 18, 2009.  The initial disclosures withheld certain documents on the basis of

23 privilege and redacted others.  A privileged document log was served identifying documents either

24 withheld or redacted on the basis of the attorney/client privilege.  Plaintiffs had these documents and

25 the accompanying privilege log for almost two months without challenging the Walters Defendants'

26 assertion of privilege.  At a hearing to resolve the parties' electronically stored information ("ESI")

27 dispute, the Walters Defendants advised the court that they had redacted certain documents on privilege

28 grounds.  The court ordered the Walters Defendants to reproduce their initial disclosures in electronic

7

1   format, but permitted them to scan and redact the privileged portions of the documents.  The Walters

2   Defendants claim Plaintiffs' motion to compel is untimely because it was filed seventy-six (76) days

3   after the close of discovery, and 136 days after Plaintiffs receipt of Defendants' written discovery.

4         Plaintiffs did not disclose that they had obtained unredacted versions of documents the Walters

5   Defendants claim are privileged from the DCS parties until Mr. Munsch's deposition on October 29,

6   2009.  During Mr. Munsch's deposition, Plaintiff marked a number of exhibits obtained from the DCS

7   parties without the redacted portions.  Plaintiffs' counsel took the position that he was not required to

8   disclose or produce documents DCS and its counsel produced informally to the Plaintiffs.  The Walters

9   Defendants did not receive a copy of the DCS documents voluntarily provided to the Plaintiffs by DCS

10  until November 30, 2009, and learned for the first time that the DCS parties had not withheld any

11  portion of the documents as privileged or redacted any of them.  Plaintiffs made their Rule 26

12  disclosures on May 19, 2009, and have not supplemented their initial disclosures with the documents

13  the DCS parties produced to Plaintiffs informally.  As counsel for Plaintiffs acknowledges that the DCS

14  documents go "straight to the heart of the most important issue in this case–whether Defendants

15  withheld from investors material negative information about Stallion Mountain in violation of state and

16  federal securities laws", they were obligated to produce them.  The documents were in Plaintiffs'

17  possession, custody and control, and their failure to produce them to the other Defendants should result

18  in an order that Plaintiffs may not use the information for any purpose pursuant to the provisions of

19  Rule 26(a) and (e) and Rule 37(c).

20        On the merits, the Walters Defendants argue that communications between DCS and the Luce

21  Defendants are protected by the attorney-client privilege because the Managing Broker-Dealer

22  Agreement ("MBDA") between Fairway and DCS obligated DCS to take all steps necessary to permit

23  Fairway to offer the TIC interests pursuant to exemptions available under federal and state securities

24  laws, rules and regulations.  The MBDA also obligated DCS to bring to Fairway's attention any

25  circumstance causing DCS to believe the PPM or any literature distributed in connection with the

26  offering was inaccurate or misleading; to thoroughly review pertinent organizational documents of

27  Fairway; and warrant to Fairway that the offering would not result in a breach or violation of any order,

28  rule or regulation directed to Fairway by any court or federal or state regulatory body.  Under the

8

1   provisions of the MBDA, DCS took on the role to facilitate the offering and to ensure that the offering

2   itself, including information distributed to potential investors, was in compliance with federal and state

3   securities laws and regulations.  Thus, it does not matter who hired the attorney DCS used to

4   accomplish these objectives in determining whether an attorney-client privilege attaches.

5           The attorney-client privilege applies to these communications because DCS's attorney was

6   acting in a professional relationship to the Walters Defendants in marketing the TIC interests and

7   providing legal advice to Fairway.  The Walters Defendants assert that they shared a common legal

8   interest with the Luce Defendants and DCS Defendants in ensuring that the offering of TIC interests in

9   Stallion Mountain was in compliance with federal and state securities laws.  Each of these Defendants

10  shared the common legal interest of ensuring that the offering was in compliance with all applicable

11  securities laws, and the fact that there may be an overlap of a commercial and legal interest does not

12  destroy their common legal interest, and privilege.

13          The Walters Defendants argue that Fairway is the holder of the attorney-client privilege with

14  respect to the DCS documents.  Under Nevada law, and federal common law, only the client-holder of

15  the privilege may waive it.  Thus, DCS and Womack's voluntary disclosure of these documents does

16  not waive Fairway's privilege.  Additionally, the fact that the parties agreed during the deposition of

17  Mr. Munsch to bring the privilege dispute to the court for a judicial determination did not waive the

18  privilege.  Plaintiffs' counsel repeatedly stipulated on the record that the parties were reserving their

19  rights with respect to whether the documents Plaintiffs marked as exhibits and referred to during the

20  deposition were actually privileged.  Here, the Defendants had no idea until Mr. Munsch's deposition

21  that Plaintiffs were in possession of privileged documents.  Relying on *Perrignon v. Bergen Brunswig*

22  *Corp.*, 770 F.R.D. 445, 459 (N.D. Cal 1978), the Walters Defendants argue that the Luce Defendants'

23  failure to stop Mr. Munsch's deposition and seek a protective order or instruct Mr. Munsch not to

24  answer questions about the DCS documents does not constitute a per se waiver of the attorney-client

25  privilege.

26          Finally, the Walters Defendants argue that communications with Lynn Marie Mallery, General

27  Counsel for EAGL and Mr. Luce, are privileged because Ms. Mallery "was communicating in her

28  capacity as an attorney."  EAGL was the entity selected to manage Stallion Mountain once the TIC

9

1   interests were sold, and as such, shared a common legal interest with the other Defendants that the

2   offering complied with all applicable securities laws and regulations.  For the same reason,

3   communications between Foley & Lardner and Fairway that were disclosed to EAGL and/or the

4   Walters Defendants are protected from waiver of the attorney-client privilege by the common interest

5   doctrine.

6        The Walters Defendants' counter motion seeks an order prohibiting the Plaintiffs from using

7   DCS documents in this case because they were not disclosed during discovery as required by Fed. R.

8   Civ. P. 26.

9        **C.**      **The Luce Defendants' Opposition (Dkt. #353) and Counter Motion (Dkt. #355)**

10        The Luce Defendants also characterize this discovery dispute as involving two sets of

11  documents.  The first set consists of the 4,782 pages of documents produced by the DCS parties to

12  Plaintiffs.  The second set of disputed documents consist primarily of e-mails produced by the Walters

13  parties and the Luce parties on May 18, 2009 as part of their Rule 26(a)(1) disclosures and documents

14  produced by the Walters parties' October 28, 2009 in supplemental disclosures, which are claimed to be

15  privileged.  Counsel for the Luce Defendants also claims that it was not until the October 29, 2009

16  deposition of Joseph Munsch that he discovered Plaintiffs had obtained unredacted versions of these

17  documents from DCS.  Mr. Munsch was deposed individually and as the corporate representative of

18  EAGL and Fairway pursuant to Rule 30(b)(6).  Plaintiffs marked Exhibits 379 through 383, 410, and

19  411 at his deposition.  The Luce Defendants claim these e-mail communications are protected by the

20  attorney-client privilege.  Defense counsel asserted the documents were privileged at the deposition and

21  objected to their use but did not instruct Mr. Munsch to refuse to answer, reserving their rights to assert

22  privilege or challenge the admissibility of the documents later.

23        The Luce Defendants characterize the DCS documents as a large volume of e-mail

24  communications between and among several of the Defendants in this case and their respective in-

25  house counsel, discussing various aspects of the Stallion Mountain offering, including issues relating to

26  compliance with securities laws.  The documents contain unredacted e-mails between and among Lynn

27  Marie Mallery, EAGL's in-house counsel, Jeff Kohn, counsel for DCS, and several attorneys with the

28  ///

10

1    law firm of Foley & Lardner, Fairway's outside counsel.  The Luce Defendants' opposition closely

2    tracks arguments raised by the Walters Defendants.

3         These Defendants also argue that the DCS documents should be barred from use for any

4    purpose in this case because Plaintiffs failed to disclose them in their Rule 26(a)(1) disclosures.  Fed. R.

5    Civ. P. 37(c) is a self-executing, automatic sanction for a party's failure to make disclosures required by

6    Rule 26(a) unless the court finds the failure to disclose information was substantially justified or

7    harmless.  The Luce Defendants argue that, because the documents were clearly in Plaintiffs'

8    possession before initial disclosures were made, Plaintiffs were obligated to produce the documents,

9    and that their failure to produce them was not substantially justified.  The Luce Defendants also claim

10   that, Plaintiffs' failure to produce the documents was not harmless, because the Defendants were

11   "sandbagged" and have been prejudiced by being "required to respond after the close of discovery to

12   documents that were never produced during discovery."

13        The Luce Defendants point out that Plaintiff did not challenge the Luce parties' assertion of

14   attorney-client privilege in the documents identified in their privilege log, and that this discovery

15   dispute has disrupted the court's scheduling order.

16        The Luce Defendants also argue that the Defendants properly withheld and redacted documents

17   protected by the attorney-client privilege and that communications between DCS and the Luce parties

18   are protected by the attorney-client privilege.  The Luce parties contend that they, the Walters parties,

19   and DSC shared the common legal interest of ensuring that the private placement offering involved in

20   this case was in compliance with federal securities laws.  The Luce Defendants argue that DCS and

21   Fairway had an attorney-client relationship because Fairway sought advice from an attorney associated

22   with DCS.  DCS attorney Jeff Kohn was hired to assist in the successful completion and compliance

23   with a sophisticated securities transaction and "his legal knowledge and expertise was a key element in

24   the services DCS offered."  The Managing Broker-Dealer Agreement ("MBDA") entered into between

25   DCS and Fairway obligated DCS to: (1) complete the necessary steps to offer the investment interests

26   pursuant to exemptions available under federal and Nevada securities law; (2) alert Fairway to any

27   circumstance or fact which DCS believed supplied prospective investors with inaccurate or misleading

28   information; (3) review all organizational documents of Fairway; (4) warrant to Fairway that

1   consummation of the transactions would not result in a breach or violation of any order, rule or

2   regulation directed to Fairway by any court or any federal, state or regulatory body or administrative

3   agency having jurisdiction over Fairway or its affiliates.

4        The Luce Defendants argue that these provisions of the MBDA clearly demonstrate that DCS

5   facilitated the offering and ensured that the offering itself and information distributed to potential

6   investors was in compliance with federal and state securities laws and regulations.  As such, the

7   documents are privileged.  Fairway is the holder of the attorney-client privilege, and DCS's voluntary

8   production of these documents cannot waive Fairway's privilege.  The fact that Mr. Luce testified at his

9   deposition that he did not communicate with DCS "for the purpose of developing any kind of legal

10  strategy to defend against a lawsuit" and that Fairway was not seeking legal advice from DCS does not

11  suggest otherwise.  This is because it is well-established that a lawsuit or litigation is not necessary to

12  create an attorney-client relationship.  Mr. Luce testified at his deposition that he has been in business

13  long enough to understand that any transaction may result in some type of litigation. He also testified

14  that DCS was the expert in preparing PPMs and was hired for the purpose of getting the transaction

15  done.  Thus, the Luce parties, the Walters parties, and DCS shared the common legal interest of

16  ensuring that the offering was in compliance with federal securities laws.

17       Additionally, the Walters parties and Luce parties entered into a joint defense agreement

18  ("JDA") in this case.  The Luce Defendants do not take the position the joint defense agreement

19  retroactively renders any non-privileged communications privileged, only that the exchanges during the

20  course of this litigation have not waived attorney-client privilege with respect to documents which have

21  been exchanged.  The Luce Defendants assert that communications with Ms. Mallery which included

22  Mr. Luce are privileged because Ms. Mallery was communicating in her capacity as an attorney.

23  Finally, the Luce Defendants claim that communications between the law firm of Foley & Lardner and

24  Fairway that were disclosed to EAGL and/or the Walters parties are privileged and that the privilege has

25  not been waived because they are covered under the "common interest doctrine."

26       **D.    Plaintiffs' Reply (Dkt. #356)**

27       Plaintiffs' reply that the Luce Defendants and Walters Defendants improperly withheld critical

28  and damaging documents based on an improper assertion of privilege and are attempting to divert

12

attention from their improper conduct by disingenuously claiming they were "blind sided" and prejudiced because Plaintiffs did not reproduce their own documents to them.  Plaintiffs claim that the only issue presented in the motion to compel is whether the documents at issue are actually privileged.  As the parties asserting privilege, the Defendants bear the burden of establishing that the documents are actually privileged.  Plaintiffs claim the Defendants have not met their burden and cannot because each of the Defendants was represented by their own counsel in connection with the offering involved in this case.  Additionally, the MBDA with DCS provides that Fairway was responsible for ensuring its own compliance with securities laws and ensuring the accuracy of its representations.  DCS did not act in a legal capacity and, in fact, received indemnity from the Walters and Luce Defendants in the event that their actions violate securities laws.  Plaintiffs also reiterate their arguments that Defendants were not pursuing a common legal interest but were involved in the preparation and marketing of a public placement offering which was commercial in nature.  As such, the common interest doctrine does not apply, and the documents are not privileged.

Plaintiffs also dispute that the motion to compel is untimely.  The reply relates the procedural history which ultimately resulted in the electronic filing of the motion to compel.  The motion to compel was filed before the dispositive motion deadline and is, therefore, timely.  Additionally, Plaintiffs' counsel reviewed the Defendants' privilege logs and advised defense counsel of their intention to challenge the assertion of privilege before the discovery cutoff.  The issue "came to a head" during the depositions of Messrs. Luce and Munsch, and the parties agreed to suspend further depositions until the issue was presented and resolved by the court.  Plaintiffs assert that other litigation tasks had priority over counsel's review of Defendants' privilege logs which were reviewed as the discovery cutoff neared, and depositions were scheduled in mid to late October 2009.  The parties stipulated, and the court approved the parties' stipulation to take certain depositions outside the discovery cutoff.  Thus, Defendants will not be prejudiced by resolution of the privilege issues at this point before depositions are concluded and before the deadline for filing dispositive motions has run.

Plaintiffs also argue that the Defendants' counter motions to exclude the DCS documents have no bearing on the merits or outcome of the instant motion to compel because the issue is whether the documents at issue are privileged.  If they are not privileged, the Defendants have already produced the

1   documents in redacted form and will be required to produce them in unredacted form.  Thus, even if

2   Plaintiffs should have disclosed and produced the documents counsel received from DCS, Plaintiffs

3   would still have the same documents from the Walters Defendants and Luce Defendants document

4   productions.

5       **E.    DCS Joinder (Dkt. #362)**

6       DCS filed a joiner to the Walters and Luce Defendants' opposition to Plaintiffs' motion to

7   compel, and in the counter motions to exclude the DCS documents nearly a month after Plaintiffs' reply

8   brief was filed.  In the joinder, which is supported by the declaration of Attorney Thomas FitzGibbon,

9   DCS claims that the documents it voluntarily produced in informal pre-litigation discovery to the

10  Plaintiffs were "inadvertently produced".  Counsel for DCS points out that DCS was not initially named

11  as a Defendant in this case until mid May 2009, when DCS and TIC Capital Markets Inc. ("TICCM")

12  and Clay Womack were named as third-party Defendants by the Luce and Walters parties.  The Luce

13  and Walters parties have asserted third-party claims against DCS and TICCM for indemnity.  Plaintiffs

14  did not sue DCS, TICCM and Womack ("Broker Defendants") until August 19, 2009.  The third-party

15  claims have been dismissed by the court without prejudice based on language in an engagement

16  agreement which requires all claims to be litigated in Los Angeles.  Additionally, the Broker

17  Defendants have arbitration agreements with eighteen of the twenty-six Plaintiffs in this case, and

18  believe these claims must be arbitrated.

19      Despite all of these procedural issues, the Broker Defendants have participated in all of the

20  depositions in this case, provided initial disclosures, and responded to all discovery served upon them.

21  The Broker Defendants claim that the court's Discovery Plan and Scheduling Order is not workable,

22  and request that discovery be reopened for a short but reasonable period of time so that they can defend

23  themselves no matter which way the motion to compel is resolved.

24      The joinder indicates that DCS and Fairway entered into the MBDA pursuant to which DCS

25  marketed and sold the tenant-in-common interests involved in this case to investors.  DCS claims that it

26  was consulted about certain aspects of the preparation of the PPM and that its employees communicated

27  with Fairway and with attorneys at F&L.  Counsel for DCS sometimes participated in discussions with

28  Fairway and the other Defendants for the purpose of preparing the PPM.

14

In August 2008, counsel for Plaintiffs approached Clay Womack, a principal of DCS and TICCM.  Womack believed that DCS had done nothing wrong in connection with the PPM, signed a tolling agreement, and agreed to produce documents to the Plaintiffs.  Counsel for DCS reviewed thousands of pages of documents and produced over 4,500 pages of documents to counsel for Plaintiff on November 20, 2008.  Counsel for DCS thoroughly reviewed the documents to determine if they were privileged and determined they were not.  However, at the time counsel reviewed the documents for privilege, counsel was focusing on "documents that would be directly privileged as to DCS."  Counsel for DCS did not consider whether the common interest privilege would apply, and did not intend to waive any attorney-client privilege that belonged to Fairway.  Counsel for DCS claims that it was not until October 29, 2009 during the deposition of Mr. Munsch that litigation counsel for the Broker Defendants (the same lawyer who reviewed the documents for privilege and produced them) recognized that the documents it produced may be privileged and may have been "inadvertently produced."  Counsel for the Broker Defendants argues that the privilege was not waived by the "inadvertent disclosure" of the documents, and that new Federal Rule of Evidence 502, which took effect September 19, 2008, applies to this dispute.

## DISCUSSION

As an initial matter, the court rejects, out of hand, arguments advanced by the Broker Defendants that the provisions of newly enacted Federal Rule of Evidence 502 governing inadvertent production of documents applies to a resolution of this dispute.  Rule 502 became effective September 19, 2008.

Pursuant to Rule 502(b), disclosure of attorney-client privileged materials does not operate as a waiver if: (1) the disclosure was inadvertent; (2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and (3) the holder promptly took legal steps to rectify the error.  In the Ninth Circuit, a totality of circumstances approach is taken to determine whether "inadvertent" disclosure of privileged information results in a waiver of applicable privileges.  *United States ex rel. Bagley v. TRW, Inc.,* 204 F.R.D. 170, 177 (C.D. Cal. 2001).  Factors to be considered in determining whether the disclosure was inadvertent include: (a) the reasonableness of precautions used to prevent inadvertent disclosure; (b) the time taken to rectify the error; (c) the scope of discovery; (d) the extent

1    of the disclosures; and (e) the overriding issue of fairness.  *United States v. SDI Future Health, Inc.,*

2    464 F.Supp.2d 1027, 1045 (D. Nev**.** 2006), *affirmed in part, reversed in part on unrelated grounds*, 568

3    F.3d 684 (9th Cir. 2009); *see also* Fed.R.Evid. 502, Advisory Committee Note (b).  The burden of

4    proving inadvertent disclosure is on the party asserting the privilege.  *In re: Sulfuric Acid Antitrust*

5    *Litigation*, 235 F.R.D. 407, 417-19, (N.D. Ill. 2006), *supplemented by*, 432 F.Supp.2d 794 (N.D. Ill.

6    2006).

7            DCS filed a belated joinder claiming the documents it voluntarily produced to the Plaintiffs

8    before it was sued were "inadvertently produced" and that DCS agrees that Fairway is a holder of the

9    privilege, and as such, DCS's voluntary disclosure cannot waive Fairway's privilege.  However, the

10   court finds there was clearly nothing inadvertent about DCS's voluntary production of these documents

11   to the Plaintiffs.

12           The record is clear that Clay Womack, DCS's CEO, was approached by counsel for Plaintiffs

13   and asked if he would be willing to provide certain documents to the Plaintiffs, with the suggestion that

14   the DCS Defendants would not be sued if they provided documents.  *See* Declaration of Thomas

15   FitzGibbon (Dkt. #362 ¶ 9).  Mr. Womack agreed to produce the documents hoping that he would avoid

16   litigation with the Plaintiffs.  *Id.* ¶ 10.  At the request of DCS, Mr. FitzGibbon reviewed thousands of

17   pages of documents given to him by DCS and produced over 4,500 pages of documents to Plaintiffs on

18   November 20, 2008.  *Id.* ¶ 11.  The DCS documents were primarily e-mails and attachments to e-mail

19   that were exchanged among persons working with F&L and Fairway on the PPM.  *Id.*  Mr. FitzGibbon

20   reviewed the DCS documents and conducted legal research to determine whether these documents

21   might be privileged, although his primary focus was whether DCS was the holder of the privilege.  Mr.

22   FitzGibbon's research "did not indicate one way or the other whether these documents would be

23   privileged, and suggested that they were not privileged with DCS as the holder."  As a result, DCS

24   produced the documents to counsel for Plaintiff on November 20, 2008 without redaction.  *Id.*  Mr.

25   FitzGibbon has now reviewed the documents produced by DCS and believes that approximately 234

26   pages of e-mails out of the more than 4,500 pages of documents produced to Plaintiffs November 20,

27   2008 were "inadvertently produced" and privileged.  *Id.* ¶ 20.

28   / / /

16

1    The court finds that this was not an accidental or careless production of a volume of documents

2  in which some privileged documents slipped through the cracks.  Rather, DCS and its counsel

3  intentionally produced the documents after determining they were not privileged.  Counsel for DCS

4  indicates the documents were "thoroughly reviewed" for privilege, that he decided they were not

5  privileged and that Womack, DCS's CEO decided to produce them to the Plaintiffs.

6    DCS and the other Broker Defendants have been parties in this case since mid-May 2009 when

7  they were named as third-party Defendants by the Luce and Walters parties who are seeking indemnity

8  from them.  DCS's joinder claims that when Mr. FitzGibbon reviewed the documents for production, he

9  simply did not recognize that the documents might be covered by a common interest privilege.  Mr.

10  FitzGibbon is also litigation counsel for the Broker defendants in this case.  Incredibly, he now claims

11  that he did not learn that Fairway and the other Defendants regarded these documents, or portions of the

12  documents, as privileged until these documents were discussed during Mr. Munsch's October 29, 2009

13  deposition.

14    DCS's position completely undermines the Defendants' arguments that the documents DCS

15  voluntarily produced to Plaintiff are privileged.  DCS, as the recipient of documents now claimed to be

16  privileged, clearly did not believe it was receiving confidential communications for the purpose of

17  receiving or providing legal advice throughout the process of structuring and implementing the PPM.

18    Mr. FitzGibbon's declaration relates his understanding of how these documents were

19  exchanged.  Fairway issued the PPM, including the financial projections, with the help of attorneys at

20  F&L, including Stephen Burr.  FitzGibbon's Declaration ¶ 6.  The PPM was also based on information

21  provided by EAGL.  *Id*.  DCS was consulted about certain aspects of the preparation of the PPM.  *Id*.

22  DCS employees communicated with Fairway and with attorneys at F&L.  *Id*.  Mr. FitzGibbon avers that

23  Fairway retained Burr to advise it in connection with drafting and creation of the PPM, and that the

24  other parties were consulted by F&L to provide advice to Fairway.  *Id.* ¶ 7.  F&L used the information

25  provided by Walters, Luce, Munsch, EAGL and DCS to provide legal advice to Fairway.  *Id*.  Mr.

26  Kohn, an in-house lawyer for DCS "also provided input in connection with the preparation of the PPM,

27  including to representatives of Fairway and to lawyers at Foley & Lardner."  *Id*.  He understands that

28  / / /

17

1   Ms. Mallery served in a similar role at EAGL.  *Id.*  These communications took place from the spring of
2   2005 through early 2006 when the offering was sold to investors.  *Id.*

3          Although DCS and its counsel now claim to "realize" that Fairway is the holder of privileged
4   documents DCS voluntarily disclosed, the record does not support a finding that all of the parties
5   exchanging the communications in dispute regarded them as privileged or confidential at the time of the
6   exchanges.

7          Mr. FitzGibbon's conclusory and unsupported assertion that F&L used the information provided
8   by Walters, Luce, Munsch, EAGL and DCS to provide legal advice to Fairway is not supported by any
9   affidavit or declaration of Fairway–the entity all of the Defendants agree is the holder of the privilege.
10  Additionally, as indicated, Mr. FitzGibbon concedes that it never occurred to him that Fairway and the
11  other Defendants in this case regarded the shared communications involved in this dispute as
12  privileged.  Mr. FitzGibbon did not realize that the documents were privileged (1) at the time DCS
13  decided to voluntarily produce them, or (2) when DCS was named as a third-party Defendant by the
14  Walters and Luce Defendants, or (3) when DCS was named as a direct Defendant by the Plaintiffs.  The
15  fact that DCS and its counsel did not recognize that the documents might be covered by a common
16  interest privilege until counsel for the co-Defendant suggested so at Mr. Munsch's deposition, is a clear
17  indication that the entities involved in drafting and implementing the PPM and related agreements did
18  not regard or treat the documents they exchanged as confidential or privileged.

19  **I.     Fed. R. Evid. 501**

20         Rule 501 of the Federal Rules of Evidence governs the determination of whether the material
21  sought in discovery is privileged.  It provides:

22         Except as otherwise required by the Constitution of the United States or provided by Act
           of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority,
23         the privilege of a witness, person, government, State, or political subdivision thereof
           shall be governed by the principles of the common law as they may be interpreted by the
24         courts of the United States in the light of reason and experience. However, in civil
           actions and proceedings, with respect to an element of a claim or defense as to which
25         State law supplies the rule of decision, the privilege of a witness, person, government,
           State, or political subdivision thereof shall be determined in accordance with State law.

26

27  *Id.*

28  / / /

18

Plaintiffs' Complaint and Amended Complaint assert both federal and state claims against the Defendants.  The Plaintiffs have asserted claims for violation of federal and state securities law, fraudulent misrepresentation, fraudulent concealment, aider and abettor liability for fraud, conspiracy to commit fraud, breach of fiduciary duty, breach of contract, breach of implied covenant of good faith and fair dealing, negligence, and interference with prospective economic advantage against all of the Defendants.  In the Ninth Circuit, it is well settled that "in federal question cases with pendant state law claims, the law of privilege is governed by the principles of the common law as they may be interpreted by the courts of the United States in light of reason and experience." *Religious Technology Center v. Wollersheim*, 971 F.2d 364, 367 at n.10 (9th Cir. 1992) (refusing to apply California litigation privilege in copyright action with pendant state law claims); *Roberts v. Heim*, 123 F.R.D. 614, 620-21 (reviewing cases holding federal common law of privileges governs all privilege issues in federal question case with pendant state law claims); *see also* Advisory Committee Notes to Rule 501 (stating that state law applies only in diversity cases).  "Where there are federal question claims and pendant state law claims present, the federal law of privilege applies." *Agster v. Maricopa County*, 422 F.3d 836, 839 (9th Cir. 2005).  Federal privilege law clearly applies to resolution of the parties' dispute.

## II. The Attorney-Client Privilege

"The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." *Upjohn Co., v. United States*, 449 U.S. 383, 389 (1981).  It serves to protect confidential communications between a party and its attorney in order to encourage "full and frank communication between attorneys and their clients and thereby promote broader public interest in the observance of law and administration of justice." *Id.*  The privilege applies where legal advice of any kind is sought from a professional legal advisor in her capacity as such, and the communication relates to that purpose, and is made in confidence by or for the client.  *Id.*  The Ninth Circuit has adopted Dean Wigmore's articulation of the elements of the attorney-client privilege: (1) where legal advice of any kind is sought, (2) from a professional legal advisor in his or her capacity as such, (3) the communications relating to that purpose, (4) made in confidence, (5) by the client, (6) are, at that instance, permanently protected, (7) from disclosure by the client or by the legal advisor, and (8) unless

///

19

1   the protection is waived.  *In re: Fischel*, 557 F.2d 209, 211 (9th Cir. 1977); *Admiral Insurance Co. v.*

2   *U.S. Dist. Ct.*, 881 F.2d 1486, 1492 (9th Cir. 1989).

3        "The burden is on the party asserting the privilege to establish all the elements of the privilege."

4   *United States v. Martin*, 378 F.3d 988, 999-1000 (9th Cir. 2002).  The party asserting the attorney-client

5   privilege must establish the attorney-client relationship and the privileged nature of the communication.

6   *United States v. Bauer*, 132 F.3d 504, 507 (9th Cir. 1997).  A party claiming the attorney-client

7   privilege "must identify specific communications and the grounds supporting the privilege as to each

8   piece of evidence over which privilege is asserted."  *Martin*, 278 F.3d at 1000.  Blanket assertions of

9   attorney-client privilege are "extremely disfavored".  *Id*.  Additionally, "the communication must be

10   between the client and lawyer for the purpose of obtaining legal advice."  *Id.*  "The fact that a person is

11   a lawyer does not make all communications with that person privileged."  *Id.* at 999.  The party

12   asserting the privilege must, at a minimum, make a *prima facie* showing that the privilege protects the

13   information the party intends to withhold.  *In re Grand Jury Investigation,* 974 F.2d 1068, 1071 (9th

14   Cir. 1992).

15        Courts narrowly construe the privilege and recognize it "only to the limited extent that . . .

16   excluding relevant evidence has a public good transcending the normal predominate principal of

17   utilizing all rational means for ascertaining the truth."  *Trammel v. United States*, 445 U.S. 40, 50

18   (1980); *Weil v. Inv./Indicators Research & Mgmt., Inc.,* 647 F.2d 18, 24 (9th Cir. 1981) ("Because it

19   impedes full and free discovery of the truth, the attorney-client privilege is strictly construed.")

20   Similarly, because the attorney-client privilege is in derogation of the truth-finding process and must be

21   strictly construed, "the privilege should attach only where extending its protection would foster more

22   forthright and complete communication between the attorney and her client *about the client's legal*

23   *dilemma*."  *United States v. ChevronTexaco Corp.,* 241 F.Supp.2d 1065, 1070 (N.D. Cal. 2002)

24   (emphasis in original).

25        Generally, the voluntary disclosure of privileged attorney-client communications constitutes a

26   waiver of the privilege as to all other such communications dealing with the same subject matter.

27   *United States v. Zolin*, 809 F.2d 1411, 1415 (9th Cir. 1987).  "In order to establish the applicability of

28   the attorney-client privilege to a given communication, the party asserting the privilege must

affirmatively demonstrate non-waiver." *Id.*  Any disclosure inconsistent with maintaining the confidential nature of the attorney-client relationship waives the privilege. *Id.*

III.   **Community of Interest/Common Interest Doctrine**

The joint defense privilege is recognized as an exception to the general rule that disclosure of privileged information to a third party waives the privilege. *In re: Grand Jury Subpoenas*, 902 F.2d 244, 248 (4th Cir. 1990) (*citing Chahoon v. Commonwealth*, 62 Va. (21 Gratt.) 822 (1871)).  The joint defense or common interest doctrine "presupposes the existence of an otherwise valid privilege, and the rule applies not only to communications subject to the attorney-client privilege, but also to communications protected by the work product doctrine." *Id. at* 249 (*citing Transmirra Products Corp. v. Monsanto Chemical Co.*, 26 F.R.D. at 572, 578 (S.D.N.Y. 1960).  "The joint defense and common interest doctrines are not privileges in an of themselves.  Rather, they constitute exceptions to the rule on waiver where communications are disclosed to third parties." *Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 578 (N.D. Cal. 2007).  The joint client doctrine overcomes what would otherwise constitute a waiver of confidentiality when communications are shared between two clients. *In re: Regents of the Univ. of Cal.*, 101 F.3d 1386, 1389 (Fed. Cir. 1996) (*citing Griffith v. Davis*, 161 F.R.D. 687, 693 (C.D. Cal. 1995)).

Several different, but related terms are used in the cases recognizing a common interest privilege.  The cases refer to a "joint defense privilege" to refer to both the joint client privilege and the "common interest" privilege.  Edna Selan Epstein*, Attorney-Client Privilege and Work Product Doctrine,* 274 (5th ed. 2007).  "The common interest doctrine has its origins in situations where one attorney acts for two clients." *Id.*  A joint defense privilege was first recognized in the context of criminal co-defendants whose attorneys shared information in the course of preparing a joint strategy for their clients' defense. *In re: Grand Jury Subpoenas*, 902 F.2d at 248 (*citing Chahoon v. Commonwealth*, 62 Va. (21 Gratt.) 822 (1871)).  When two or more clients are represented by the same attorney, they are viewed as joint clients for purposes of the attorney-client privilege. *In re: Regents of the Univ. of Cal.* 101 F.3d at 1389.

The joint defense privilege has been extended to civil co-defendants because "[t]he need to protect the free flow of information from client to attorney logically exists whenever multiple clients

21

share a common interest about a legal matter." *United States v. Schwimmer*, 892 F.2d 237, 243-44, (2d Cir. 1989). Thus, courts have recognized a joint defense privilege applies to companies individually summoned before a grand jury who shared information before an indictment was returned. *Continental Oil Co. v. United States,* 330 F.2d 347 (9th Cir. 1964). Courts have also recognized a joint defense privilege for potential co-parties to prospective litigation, *In re: LTD Securities Litigation*, 89 F.R.D. 595 (N.D. Tex. (1981); for plaintiffs pursuing separate actions in different states, *Schachar v. American Academy of Opthalmology*, 106 F.R.D. 187 (N.D. Ill. 1985); and for civil defendants sued in separate actions, *Transmirra Products Corp. v. Monsanto Chemical Co.,* 26 F.R.D. 572 (S.D.N.Y. 1960). In *Schwimmer*, the Second Circuit concluded that modern application of the joint defense privilege had evolved into what is more commonly referred to as the "common interest rule". *Schwimmer*, 892 F.2d at 243. "It serves to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel." *Id.*

The rationale for the rule is that "persons who share a common interest in litigation should be able to communicate with their respective attorneys and with each other to more effectively prosecute or defend their claims." *In re: Grand Jury Subpoenas*, 902 F.3d at 249 (*citing Transmirra,* 26 F.R.D. at 578. The rationale for the joint defense or common interest privilege "focuses not on when documents were generated, but on the circumstances surrounding the disclosure of privileged documents to a jointly interested third party." *Id.*

The common interest privilege applies where: (1) the communication is made by separate parties in the course of a matter of common legal interest; (2) that communication is designed to further that effort; and (3) the privilege has not been waived. *Nidec,* 249 F.R.D. at 578. (internal quotations and citations omitted). "Of course, since it is an anti-waiver exception, it comes into play only if the communication at issue is privileged in the first instance." *Id.*

In determining whether parties have a community of legal interests sufficient for the attorney-client privilege to attach "the issue is not who employed the attorney, but whether the attorney was acting in a professional relationship to the person asserting the privilege." *In re: Regents of the Univ. of Cal.,* 101 F.3d at 1389. In turn, whether or not a professional relationship exists for purposes of

asserting the attorney-client privilege to communications "hinges upon the client's belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice." *Id.* (*citing Westinghouse Electric Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311, 1319 (7th Cir.)), *cert. denied*, 439 U.S. 955 (1978) (*quoting* McCormick, *Evidence* § 88 at 179 (2d ed. 1972)).  "As in all claims of privilege arising out of the attorney-client relationship, a claim resting on the common interest rule requires a showing that the communication in question was given in confidence, and that the client reasonably understood it to be so given."  *Schwimmer*, 892 F.2d at 244.

The joint client or community of interest doctrine has been frequently applied to patent cases.  A number of courts have concluded that the joint client doctrine and community of interest doctrine apply to and protect legal advice and communications between the patent applicant or pantentee, and attorneys of its optionee/licensee.  *See, e.g., Baxter Travenol Labs, Inc. v. Abbott Labs*, 1987 WL 12919 at *1 (N.D. Ill. June 19, 1987); *SCM Corp. v. Xerox Corp.,* 70 F.R.D. 508, 514 (D. Conn.), *appeal dismissed*, 534 F.2d 1031 (2nd Cir. 1976); *In re: Regents of the Univ. of Cal.,* 101 F.3d at 1389.

Some courts require a showing of actual or threatened litigation for the common interest doctrine to apply to shared communications.  The Fifth Circuit held that the common interest doctrine applies to: (1) communications between co-defendants in actual litigation and their counsel; and (2) communications between potential co-defendants and their counsel.  *In re: Santa Fe Intern. Corp.*, 272 F.3d 705, 710 (5th Cir. 2001).  For communications between potential co-defendants and their counsel to be covered by the common interest doctrine, the Fifth Circuit requires the party claiming privilege to show "a palpable threat of litigation at the time of the communication." *Id*. at 711.  Sharing communications to avoid conduct that might lead to litigation is insufficient.  *Id; see also Polycast Tech. Corp. v. Uniroyal, Inc.,* 125 F.R.D. 47, 50 (S.D.N.Y. 1989) (holding actual or potential litigation is a necessary prerequisite for application of the joint defense privilege).  Some courts have held that the common interest doctrine applies only where multiple persons are represented by the same attorney.  *See International Insurance Co. v. Newmont Mining Corp.,* 800 F.Supp. 1195, 1196-97 (S.D.N.Y. 1992) (finding common interest doctrine inapplicable because no joint representation); *North River Insurance Company v. Philadelphia Reinsurance Corp.,* 797 F.Supp. 363, 367 (Dist. N.J. 1992) ("the

/ / /

23

1    common interest doctrine is completely unleashed from its moorings in traditional privilege law when it

2    is held broadly to apply in contexts other than when there is dual representation").

3            However, the majority of courts apply the common interest doctrine where parties are

4    represented by separate counsel but engaged in a common legal enterprise.  *Bank Brussels Lambert v.*

5    *Credit Lyonnaise (Suisse) SA*, 160 F.R.D. 437, 447 (S.D.N.Y. 1995); *United States v. Bay State*

6    *Ambulance and Hosp. Rental Serv.,* 874 F.2d 20, 28 (1st Cir. 1989) (common interest doctrine serves to

7    protect confidentiality of communications passing from one party to the attorney for another party

8    where a joint defense effort or strategy has been decided upon and undertaken by the parties and their

9    respective counsel); *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989) (common interest

10   doctrine extends to situations "where a joint defense effort or strategy has been decided upon and

11   undertaken by the parties and their respective counsel."); *Bank of America v. Terra Nova Ins. Co., LLT*,

12   211 F.Supp.2d 493 (S.D.N.Y. 2002) (finding the common interest doctrine applies where parties are

13   represented by separate counsel, but engaged in a common legal enterprise).  Similarly, the weight of

14   authority does not require that there be actual litigation in progress for the common interest doctrine to

15   apply.  *Schwimmer,* 892 F.2d at 244; *United States v. Aramony*, 88 F.3d 1369, 1392 (4th Cir. 1996);

16   *United States v. Zolin*, 809 F.2d 1411, 1417 (9th Cir. 1987).

17           Additionally, for the common interest doctrine to apply, the parties must share a common legal

18   interest, rather than a commercial or a financial interest.  *Bank Brussels Lambert*, 160 F.R.D. at 447;

19   *Walsh v. Northrop Grumman Corp.,* 165 F.R.D. 16, 18 (E.D.N.Y. 1996); *Bank of America, N.A. v.*

20   *Terra Nova Ins. Co. Ltd.,* 211 F.Supp.2d 493, 496 (S.D.N.Y. 2002); *Blanchard v. Edgemark Financial*

21   *Corp.,* 192 F.R.D. 233, 237 (N.D. Ill. 2000) ("The common interest must be a legal one, not

22   commercial or financial.").  "The doctrine does not extend the communications about a joint business

23   strategy that happens to include a concern about litigation.  *Walsh*, 165 F.R.D. at 18; *Bank Brussels*

24   *Lambert,* 160 F.R.D. at 447;  *Nidec*, 249 F.R.D. at 579.  Similarly, "sharing a desire to succeed in an

25   action does not create a 'common interest'".  *Shamis v. Embassador Factors Corp.,* 34 F.Supp.2d 879,

26   893 (S.D.N.Y. 1999).  Finally, even if parties share a common legal interest, the common legal interest

27   exception requires that the communication at issue be designed to further that legal effort.  *Nidec*, 249

28   F.R.D. at 579 (*citing United States v. Bergonzi,* 216 F.R.D. 487, 495 (N.D. Cal. 2003)).

In *Bank Brussels Lambert*, the court stated,

> The common interest doctrine then, has both a theoretical and a practical component. In theory, the parties among whom privileged matter is shared must have a common legal, as opposed to commercial, interest. In practice, they must have demonstrated cooperation in formulating a common legal strategy.

160 F.R.D. at 447. There, the court found that parties sharing certain communications had established that each member of a bank group shared a common concern about the threat of shareholder litigation. However, there was no evidence that they had formulated a joint legal strategy to deal with that possibility or that counsel for Bank Brussels Lambert coordinated its legal efforts with attorneys from any other bank group member. Bank Brussels Lambert ("BBL") obtained an opinion letter from counsel concerning the viability of a potential transaction, and one of the issues addressed in the opinion letter was possible litigation. BBL disclosed that letter to Chase Bank to facilitate a joint business decision, and Chase disclosed it to other members of the bank group. The court held that BBL's disclosure of the opinion letter waived any attorney-client privilege that would otherwise attach to the letter when legal advice was shared with third parties who were not pursuing a common legal strategy with BBL and that the fact that BBL and the third parties to whom the disclosures were made shared a concern about litigation did not bring the disclosure within the common interest doctrine.

In *Blanchard*, the court compelled the Defendants to produce documents listed on a privilege log that were sent to Defendant Edgemark's investment banker in connection with its merger with another company. The court assumed, without deciding that the documents contained privileged communications. The Defendants contended that after counsel for Plaintiff threatened to sue Edgemark, Edgemark and its investment banker's interests became "inextricably linked" because the threatened litigation might have jeopardized the proposed merger. Therefore, Defendants argued that disclosure of the documents to the investment banker was covered by the common interest rule, and the disclosure did not waive the attorney-client privilege. The court rejected this argument finding that the communications to the investment banker were not made for the purpose of assisting Edgemark's counsel to render legal advice "because the threatened litigation did not implicate any *legal* interest of [the investment banker], only its financial interests." 192 F.R.D at 237 (emphasis in original). Thus,

///

25

1   the court found that Defendants waived the attorney-client privilege by sharing the disputed documents

2   with the investment banker.

3       Similarly, in *Terra Nova*, the Plaintiffs sought an order compelling disclosure of certain

4   documents that Bank of America withheld from discovery as privileged.  The bank asserted the

5   documents it withheld were communications with Palladium Insurance and/or its counsel with respect

6   to structuring and effectuating a letter of credit agreement and supporting reinsurance policies.  The

7   bank claimed that it shared a common interest with Palladium in structuring and effectuating the credit

8   agreement that was supported by the insurance policies.  The court accepted the bank's characterization

9   of the interest that it shared with Palladium, but rejected its argument that the common interest doctrine

10  applied.

11      First, the court found the common interest doctrine did not apply because, in structuring the

12  credit agreement, the parties' interests were not identical.  The bank was issuing letters of credit on

13  behalf of Palladium, it's debtor, and the fact that the parties were working together to structure a

14  transaction as favorable as possible did not create a common interest.  Second, the bank did not satisfy

15  the court that the letter of credit agreement constituted anything more than a business transaction which

16  had a desire that the transaction be legally appropriate.  "The existence of a 'legal'- rather than a

17  commercial-venture, however, is a critical component of the common interest doctrine."  211 F.Supp. at

18  497.  The fact that the parties may have been developing a business deal that included a desire to avoid

19  litigation "does not transform their interest and enterprise into a legal, as opposed to a commercial

20  matter."  *Id*. (internal quotations and citations omitted).  The court also found that there was no

21  evidence that the parties had any concern at the time the documents were exchanged about litigation.

22  Citing *Bank Brussels Lambert*, the court found that, even if there had been a concern about potential

23  litigation at the time the documents were exchanged, the common interest doctrine did not apply to a

24  joint business strategy which included a concern about litigation.  *Id.*

25      Finally, in *TIFD III E Inc. v. United States*, 233 F.R.D. 47 (D. Conn. 2004), the court found the

26  common interest doctrine did not apply to communications from counsel for a foreign bank to General

27  Electric Capital Corporation ("GECC") regarding creation of a partnership.  The lawsuit involved a tax

28  refund suit brought against the United States.  The United States believed that the transaction to create a

26

1   commercial aircraft leasing partnership was a sham to avoid payment of taxes.  Plaintiff TIFD produced

2   documents responsive to the government's requests for production, but withheld or redacted documents

3   that reflected legal advice from its counsel, or documents seeking legal advice.  Two of the documents

4   were communications from counsel for one of the foreign banks involved in the transaction to GECC's

5   counsel.  TIFD asserted the documents were privileged under the common interest rule.  The court

6   found the common interest rule did not apply, and that any privilege with respect to the contents of the

7   documents was waived when they were disclosed to counsel for GECC because "the parties worked

8   together towards a business, and not a legal goal."  *Id.* at 50.  The court agreed with the court in *Bank*

9   *Brussels Lambert* that "the rule does not encompass a joint business strategy that merely happens to

10  include as one of its elements a concern about litigation."  *Id.*

11        Applying these principals to the parties' dispute in this case, the court finds that the Defendants

12  have not met their burden of establishing the documents in dispute are privileged.  The moving

13  Defendants all claim that Fairway is the holder of the privilege.  Therefore, Fairway bears the burden of

14  establishing all of the elements of privilege, including non-waiver.  During oral argument, the court

15  asked counsel for the moving parties to point where, in the record, there was any indication that the

16  parties sharing the documents claimed to be privileged, agreed to treat them as privileged and

17  confidential at the time the documents were exchanged.  Tellingly, counsel were unable to do so.

18        After oral argument, the Walters Defendants submitted a request for leave to file a supplement

19  which attached an unexecuted copy of an engagement agreement between the Walters group on the one

20  hand, and TICCM and DCS on the other.  The letter agreement purports to create a relationship

21  pursuant to which TICCM and DCS would provide the Walters group with advice regarding the

22  structure of a "TIC transaction".  The agreement contains a confidentiality clause pursuant to which

23  TICCM and/or DCS agreed to maintain in confidence "all confidential and proprietary information and

24  data furnished" to them by the Walters group.

25        Excerpts of the deposition of Michael Luce were also attached to the supplement.  In the

26  attached excerpts, Mr. Luce was asked about the copy of the engagement agreement submitted to the

27  court.  The letter is addressed to Mr. Jim Walters on behalf of the Walters group.  Mr. Luce did not

28  know anyone by that name, as Bill Walters is the principal of the Walters group.  Additionally, Mr.

1    Luce testified that he did not believe "this is a final document."  He believed that an engagement letter

2    with TIC Capital Markets was ultimately signed, but the Walters group did not have a copy of it.  He

3    could not recall with certainty whether Mr. Womack, on behalf of DCS and TICCM, ultimately signed

4    a copy of an engagement agreement.  This is the only evidence any of the Defendants have identified to

5    support their claim that, at the time these documents were exchanged, the parties treated them as

6    privileged or confidential.

7          DCS's CEO, Clay Womack, clearly did not regard the documents as privileged or confidential

8    when he decided to produce them to the Plaintiffs.  Before producing them, he had his counsel, who

9    now serves as litigation counsel, review the documents for privilege.  It did not even occur to counsel

10   for the Broker Defendants that these documents might be privileged until the October 29, 2009

11   deposition of Mr. Munsch.  There is simply nothing in the record to support a finding that these

12   documents were exchanged in confidence.  Fairway waived any attorney-client privilege that might

13   attach to communications with its outside counsel, F&L, when it shared F&L's legal advice with third

14   parties.

15         The common interest does not operate as an exception to the general rule that disclosure of

16   privileged information to third parties waives the privilege in this case.  The parties sharing these

17   communications were engaged in a common business enterprise to sell TIC interests in Stallion

18   Mountain.  While the parties certainly intended to structure and implement this commercial transaction

19   in compliance with applicable securities laws and regulations, this is insufficient to show they shared a

20   common legal interest.  The common interest doctrine does not extend to communications about a joint

21   business or financial transaction, merely because the parties share an interest in seeing the transaction is

22   legally appropriate.  Additionally, the common interest doctrine does not apply simply because the

23   parties are interested in developing a business deal that complies with the law, and a common goal to

24   avoid litigation.  A desire to comply with applicable laws and to avoid litigation does not transform

25   their common interest and enterprise into a legal, as opposed to a commercial, matter.

26         Having reviewed and considered the matter, and for the foregoing reasons,

27         **IT IS ORDERED** that:

28         1.     Plaintiffs' Motion to Compel (Dkt. #351) is **GRANTED.**

28

2.   Defendants' Countermotion to Exclude (Dkt. #354, #355) are **DENIED**.

3.   The Walters Defendants' Motion for Leave to File a Supplement (Dkt. #364) is

   **GRANTED.**

4.   Counsel for the parties shall have until **October 15, 2010** to meet and confer to schedule

   the deposition suspended while this dispute was under submission, and to submit any

   proposal for completing discovery in this case.

Dated this 30th day of September, 2010.


_____
Peggy A. Leen
United States Magistrate Judge

29